UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| In re TARGET CORPORATION SECURITIES LITIGATION | Master Civil File No. 16-1315 (JNE/BRT) |
| | CLASS ACTION |
| THIS DOCUMENT RELATES TO: | |
| All Actions. | DEMAND FOR JURY TRIAL |

**CONSOLIDATED AMENDED COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**


NATURE OF THE ACTION ... 1

JURISDICTION AND VENUE ... 4

PARTIES ... 5

CLASS ACTION ALLEGATIONS ... 6

BASIS OF ALLEGATIONS ... 8

SUBSTANTIVE ALLEGATIONS ... 11

The Company and Its Business ... 11

Target Seeks to Expand Internationally ... 11

Target Canada Was an Important Part of Target's Growth Story ... 14

Target Canada Experienced Systemic Problems with Supply Chain IT Systems from the Very Beginning Which Lasted Throughout the Class Period ... 16

Incorrect Data Loaded into SAP Caused Severe Inventory Problems Throughout Target Canada's Supply Chain ... 18

Target Canada's Automatic Replenishment System Did Not Work ... 25

Target Canada's Forecasting Software Was Largely Futile ... 26

Target Canada Faced Significant Problems with Its Checkout System ... 26

Defendants Knew that Target Canada Was Plagued with Significant Problems ... 28

Defendants Hid Target Canada's True Problems from Investors and Misrepresented that Things Were Progressing as Planned ... 30

Target Fired Key Executives Due to Target Canada's Problems ... 37

The Market Begins to Learn More About Target Canada's Systemic Problems with Supply Chain IT Systems ... 40

Target Issues Revised Guidance and Finally Acknowledges that a Reset of Its Canadian Supply Chain Is Necessary ... 42

**Page**


Target Canada's Supply Chain Reset: Too Little, Too Late ..... 47

MATERIALLY FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS ..... 49

Pre-Class Period Statements ..... 49

Class Period Statements ..... 53

Second Quarter 2013 Statements ..... 61

Third Quarter 2013 Statements ..... 67

Fourth Quarter 2013 Statements ..... 76

First Quarter 2014 Statements ..... 83

Second Quarter 2014 Statements ..... 92

Summary of SEC Filings Signed by the Individual Defendants During the Class Period ..... 96

Target's Class Period SEC Filings Omitted Known Trends, Events and Uncertainties that Were Impacting, and Would Impact, the Company's Financial Results ..... 96

Target's Class Period SEC Filings Omitted to Include Significant Risk Factors Required to Be Disclosed Therein ..... 99

ADDITIONAL SCIENTER ALLEGATIONS ..... 100

LOSS CAUSATION/ECONOMIC LOSS ..... 106

August 21, 2013 Corrective Disclosure and/or Materialization of Risk ..... 107

November 21, 2013 Corrective Disclosure and/or Materialization of Risk ..... 108

January 10, 2014 Corrective Disclosure and/or Materialization of Risk ..... 109

May 5, 2014 Corrective Disclosure and/or Materialization of Risk ..... 110

May 20, 2014 Corrective Disclosure and/or Materialization of risk ..... 112

May 22, 2014 Corrective Disclosure and/or Materialization of Risk ..... 115

**Page**

June 2, 2014 Analyst Reports ........ 116

August 5, 2014 Corrective Disclosure and/or Materialization of Risk ........ 117

Post Class Period Events ........ 118

Cumulative Effect of the Partial Disclosures and Materializations of Risk ........ 120

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ........ 120

APPLICABILITY OF PRESUMPTION OF RELIANCE: *AFFILIATED UTE* DOCTRINE ........ 121

NO SAFE HARBOR ........ 122

COUNT I ........ 123

Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ........ 123

COUNT II ........ 126

Violations of Section 20(a) of the Exchange Act Against the Individual Defendants ........ 126

PRAYER FOR RELIEF ........ 127

JURY DEMAND ........ 128

Lead Plaintiff Carpenters Pension Fund of Illinois ("Lead Plaintiff" or "Plaintiff") by its undersigned attorneys, on behalf of itself and the class it seeks to represent, for its Consolidated Amended Complaint for Violations of the Federal Securities Laws (the "Complaint"), alleges the following upon knowledge as to its own acts, and upon the investigation conducted by Lead Plaintiff's counsel, as detailed below.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of purchasers of the common stock of Target Corporation ("Target" or the "Company") between March 20, 2013 and August 4, 2014, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5]. Plaintiff alleges claims against defendant Target and three individuals who were senior executives of Target during the Class Period.

2. Defendant Target is the second-largest discount retailer in the United States, with nearly 1,800 locations throughout the country. This case focuses on Target's expansion into Canada and its ultimate failure. To facilitate its Canadian expansion, as announced on January 13, 2011, Target purchased the leasehold interests for 220 locations operated by Zellers Inc. ("Zellers"), a declining and now defunct Canadian discount retailer, for $1.84 billion. Target portrayed Canada as fertile ground for the Company to achieve strong earnings growth through the rapid opening of between 100-150 Canadian-based stores during 2013 and 2014.

3. A key part of Target's business model is inventory management. As Target states in its financial statements, "[e]ffective inventory management is *key* to our ongoing success" and "[a] ***substantial part***[1] of our business is dependent on our ability to . . . effectively manage our inventory in a broad range of merchandise categories." To successfully manage inventory, Target relies on supply chain information technology ("IT") systems to keep track of the thousands of individual products sold in its stores. Indeed, Target's financial statements state, "We ***rely extensively*** on our computer systems to manage inventory," and, in the United States, Target has well-developed computer systems to sustain optimal levels of inventory throughout its stores.

4. As alleged below, from the start, Target's foray into Canada was riddled with systemic problems with its supply chain IT systems which Defendants hid from investors. The failure of that key part of the Company's business model led to inventory backlogs, overburdened warehouses, empty store shelves, markdowns of excess inventory, materially negative financial results and ultimately bankruptcy.

5. Despite being aware of these systemic problems, Defendants maintained an aggressive store-opening schedule for Target Canada Co. ("Target Canada," or the "Canadian Segment"). In fact, a few short weeks before the first Target Canada stores were scheduled to open, Target's CEO, Defendant Steinhafel, conveyed internally that Target Canada would open its stores on time, even if its employees needed to do their work using "***paper and pencil***" instead of its deficient supply chain IT systems.

---

[1] Unless otherwise noted, all emphases herein are added.

6. On March 5, 2013, Target Canada opened its first stores and customers were immediately greeted with empty shelves and poor product selection, negatively impacting sales. By the end of 2013, Target Canada had 124 stores operating in all ten Canadian provinces. Since the issues with Target Canada's supply chain IT systems were never corrected, the problems compounded with the opening of each new store and negatively impacted Target's financial results.

7. Defendants, however, hid the true nature and extent of Target Canada's problems from investors. At the same time Defendants were misrepresenting the Canadian Segment, the Individual Defendants and other senior Company executives sold more than $63 million worth of Target Common Stock at artificially inflated prices.

8. At the beginning of the Class Period, Defendants represented that the Canadian Segment was progressing well and that any problems were "no different" than those experienced "every time" Target had opened a new store in the United States.

9. As the Class Period proceeded, Target reported disappointing financial results for its Canadian Segment, which negatively impacted the Company's stock price. Defendants led the market to believe, however, that the problems were limited and that mere refinements were needed, failing to reveal that Target Canada's supply chain IT systems were suffering from systemic problems, as detailed herein.

10. Target Canada reported a massive EBIT loss of $941 million for Fiscal Year 2013 as well as EBIT losses in each quarter throughout the Class Period. By May 2014, both Defendant Steinhafel and Defendant Fisher, the President of Target Canada, were removed from their positions.

11. Finally, in August 2014, after announcing yet another round of unexpected negative financial results for Target Canada, Target issued a press release revealing the nature and extent of the systemic problems with the Company's supply chain IT systems that were the root causes of Target Canada's poor financial performance. Target admitted that the problems permeating the Canadian Segment's supply chain IT systems were systemic and that it was necessary to "reset" and develop a plan aimed at fixing them.

12. Target's acknowledgment of the problems and potential solutions, however, were too little, too late. On January 15, 2015, less than two years after Target Canada opened its first store, Target issued a press release announcing that it planned to discontinue all operations in Canada and that Target Canada had filed for bankruptcy. In the press release, the Company acknowledged it was "unable to find a realistic scenario that would get Target Canada to profitability ***until at least 2021***." That same day, Target's new CEO stated publicly that even profitability in 2021 could not be achieved without "invest[ing] additional capital in our supply chain and technology."

13. As alleged herein, Defendants knowingly, and at a minimum recklessly, made material misstatements and omissions that concealed the systemic problems with Target's supply chain IT systems, resulting in an artificial inflation of Target's stock price that caused damage to investors.

## JURISDICTION AND VENUE

14. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)], and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

15. This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa], and 28 U.S.C. §§1331 and 1337.

16. Venue is properly laid in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b) and (c). Target is headquartered in this District, and a substantial amount of the acts and conduct complained of herein occurred in this District.

17. In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, telephonic communications, and the facilities of the national securities markets.

**PARTIES**

18. Lead Plaintiff Carpenters Pension Fund of Illinois purchased the common stock of Target during the Class Period as set forth in the attached certification, which is incorporated by reference herein, and was damaged thereby.

19. Defendant Target is incorporated in Minnesota and maintains its principal executive offices in Minneapolis, Minnesota. The Company's stock is listed on the New York Stock Exchange (the "NYSE") where it trades under the ticker symbol "TGT."

20. Defendant Gregg W. Steinhafel ("Steinhafel") became CEO of Target on May 1, 2008 and Chairman of Target beginning in February 2009. Steinhafel served in these positions until his resignation on May 5, 2014.

21. Defendant John J. Mulligan ("Mulligan") served as the Company's CFO beginning on April 1, 2008 and throughout the Class Period. Mulligan served as the Company's Interim President and CEO from May 5, 2014 to August 31, 2014.

22. Defendant Anthony S. Fisher ("Tony Fisher" or "Fisher") served as president of Target Canada until his termination from Target Canada on May 20, 2014. Fisher gave numerous presentations to investors and analysts regarding Target Canada's business and operations during the Class Period.

23. The defendants identified in ¶¶20-22 are sometimes collectively referred to herein as the "Individual Defendants."

24. Defendant Target and the Individual Defendants are sometimes collectively referred to herein as the "Defendants."

## CLASS ACTION ALLEGATIONS

25. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of Target during the Class Period (the "Class"), who were damaged thereby.

26. Excluded from the Class are Defendants, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest, or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

27. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Target shares were actively traded on the NYSE. As of March 15, 2013, there were over 641 million shares of Target common stock outstanding. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are

hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Target or its transfer agent. Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

28. Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff and all the Class members' damages arise from, and were caused by, the same false and misleading representations and omissions made by or chargeable to Defendants. Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

29. Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection, and intends to prosecute this action vigorously.

30. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the Company's business and operations in Canada;

(c) whether the price of Target common stock was artificially inflated during the Class Period; and

(d) the extent of injuries sustained by members of the Class and the appropriate measure of damages.

31. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**BASIS OF ALLEGATIONS**

32. The allegations herein are based upon the investigation conducted by and under the supervision of Plaintiff's counsel in order to obtain the information necessary to plead Plaintiff's claims with particularity where necessary. Plaintiff's counsel's investigation included examining and analyzing information relating to the relevant time period obtained from numerous public and proprietary sources (such as LexisNexis®, Dow Jones and Bloomberg, Inc.) – including, *inter alia*, United States Securities and Exchange Commission ("SEC") filings, court filings related to the Company, other regulatory filings and reports, publicly available annual reports, press releases, investor presentations, published interviews, news articles and other media reports (whether disseminated in print or by electronic media), and reports of securities analysts and investor advisory services. In particular, the allegations herein are based, in part, on a January 15, 2016 report in *Canadian Business* by Joe Castaldo,

titled "*The Last Days of Target – The untold tale of Target Canada's difficult birth, tough life and brutal death*" (hereinafter, the "*Canadian Business* Report").

33. Additionally, in the course of Plaintiff's counsel's ongoing investigation, a number of former Company employees and other individuals who possessed direct knowledge of the wrongdoing alleged herein were interviewed. Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

34. The allegations made herein are based, in part, upon information and belief and are supported by the first-hand knowledge of eight confidential witnesses ("CWs") who have direct, first-hand knowledge about the facts attributed to them as alleged herein, as follows:

35. Confidential Witness 1 ("CW1") was employed by Target beginning in 2007. CW1 worked for Target Canada from October 2012 through May 2015, as a Property Management Business Partner and then Senior Property Management Business Partner. CW1 was responsible for, *inter alia*, directing store managers, and training and managing a group of Target Canada store technicians.

36. Confidential Witness 2 ("CW2") worked for Eleven Points Logistics ("Eleven Points"), a third party logistics company whose employees worked at Target Canada's distribution centers. CW2 worked for Eleven Points from August 2011 through November 2013. CW2 worked as a consultant on the Target Canada project to help implement the Company's warehouse IT system that tracked inventory.

37. Confidential Witness 3 ("CW3") worked for Target from September 2006 through February 2015. CW3 worked for Target Canada as a Senior Presentation Expert

from July 2014 through February 2015. CW3 was responsible for store planograms, which are visual representations of a store's products or services.

38. Confidential Witness 4 ("CW4") was employed by Target from August 2012 through January 2015. CW4 worked for Target Canada as a senior business analyst and merchandise planner. CW4 was tasked with the forecasting and replenishment of inventory in Target Canada's stores.

39. Confidential Witness 5 ("CW5") was employed by Target from July 1987-January 2014. CW5 worked as a Sales Auditor and was responsible for, *inter alia*, conducting research for financial audits. CW5 worked across a number of different Target functional areas and was familiar with Target Canada's enterprise systems, in particular its Point of Sale ("POS") Systems.

40. Confidential Witness 6 ("CW6") worked for Target from the Summer of 2013 through the end of the Class Period, serving as, *inter alia*, a member of the IT department who was tasked with identifying and attempting to remedy issues with Target Canada's supply chain IT systems.

41. Confidential Witness 7 ("CW7") worked for Target Canada from September 2013 through February 2015. CW7 served as a Senior Business Analyst – Supply Chain and Merchandise Planning in Mississauga. CW7 was responsible for keeping certain lists and categories of goods – numbering 800 to 1,200 – in stock, based on long-range demand forecasts and inventory levels at the stores.

42. Confidential Witness 8 ("CW8") worked for Target Canada from 2013 through 2015. CW8 worked as a senior team leader at a Target store in Ottawa, Ontario. CW8 was responsible for a variety of tasks including inventory replenishment.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

43. Defendant Target, originally the Dayton Dry Goods Company and later the Dayton Hudson Corporation, was founded in 1902. The Company, headquartered in Minneapolis, Minnesota, is the second-largest discount retailer in the United States, trailing only Wal-Mart Stores, Inc. ("Wal-Mart"), with nearly 1,800 locations throughout the country. The Company offers a wide array of merchandise from household essentials and certain food items to clothing and recreational goods, and other items. Target sells these products through its brick-and-mortar stores, through its website, and via direct shipment from vendors or third-parties.

44. Target currently has 38 distribution centers all across the United States from which the Company ships its products to stores. According to the Company's website, more than 16,000 Target employees work at Target's distribution centers "to act as the bridge between suppliers and stores – distributing products to over 1,700 stores."

### Target Seeks to Expand Internationally

45. Since the Company's inception, Target's stores were located exclusively within the United States. By contrast, Wal-Mart, one of Target's chief competitors, operates over 6,000 stores internationally.

46. During a Target investor meeting held on January 21, 2010, Defendant Steinhafel noted that the Company "continue[d] to monitor the retail landscape to understand potential opportunities for Target to open stores outside of the United States. As we have said in the past, we continue to believe that it is more of a question of when, not if we choose to expand internationally." Steinhafel added, "[w]hen we do expand, we believe it will make sense to initially move just across our borders, either North into Canada, or South into Mexico or Latin America."

47. Ultimately, the Company decided on Canada for its first international endeavor. According to the *Canadian Business* Report, which was based on interviews with dozens of former Target Canada employees and provided new and unique insight into the story of Target Canada, in late 2010, Target was approached by Richard Baker, the executive chairman of Hudson's Bay Co., to gauge the Company's interest in the potential acquisition of over 200 leasehold interests for sites operated throughout Canada by Zellers, a declining Canadian discount retail chain and one of Hudson's Bay Co.'s subsidiaries.

48. Defendant Steinhafel, armed with the knowledge that Wal-Mart was also interested in Zellers' real estate, jumped at the opportunity and negotiated a deal to pay $1.84 billion for the leasehold interests for up to 220 Zellers locations. Under this deal, Target had the right to select up to 110 sites in conjunction with the first payment due to Zellers in May 2011 and to continue to select additional leases in advance of the second payment due to Zellers in September 2011. The substantial amount Steinhafel was willing to pay was more than Zellers expected for the properties. In fact, according to the *Canadian*

*Business* Report, Mark Foote, the CEO of Zellers at the time stated, "when the numbers got up as high as they did, we found that pretty surprising."

49. On January 13, 2011, Target issued a press release announcing the deal and proclaimed that it expected to open "100 to 150 Target stores throughout Canada in 2013 and 2014." With this announcement, the Company had publicly set a two year deadline to, *inter alia*, hire and train staff, customize and remodel the former Zellers stores, construct and stock distribution centers, develop relationships with Canadian vendors, develop or customize an enormous network of supply chain information technology systems, and populate computer databases with records and physical stores with products.

50. To lead this endeavor, the Company chose 38 year old Defendant Tony Fisher, who previously held a variety of positions within Target, most recently serving as vice-president of merchandise operations. Fisher's appointment as President of Target Canada was announced on January 18, 2011.

51. On May 26, 2011, Target issued a press release announcing the initial 105 former Zellers sites selected to become Target stores across all 10 Canadian provinces. The press release also announced the selection of 180,000 square-feet of space in Mississauga, Ontario, for its Canadian headquarters. From the day Target announced its expansion into Canada, it tasked employees at its U.S. Headquarters in Minneapolis to work on the Canadian launch.

52. On July 12, 2012, the Company issued a press release listing the 126 former Zellers locations selected to become Target Canada stores and announced certain stores were "set to begin opening in March/early April 2013."

**Target Canada Was an Important Part of Target's Growth Story**

53. Target's leadership made clear from the start that expansion into Canada was a key component of the Company's growth story and that Target Canada would contribute significantly to the Company's earnings in the coming years. For example, shortly after the Zellers deal was announced, and almost two years before the first Target Canada store opened its doors, Target's then-CFO Douglas Scovanner, on a February 24, 2011 earnings call, explained that Target Canada was expected to improve Target's growth potential, stating:

> [W]hy are we so excited about our transaction in Canada? The explanation is quite straightforward. ***We strongly believe that several years out, Target sales and EPS will be higher and our long-term growth prospects stronger, with this transaction than they would be without it***. . . .

54. Additionally, on April 12, 2011, Scovanner, speaking at ISI Group Inc.'s Retail Summit, stated "within [] six or seven year[s] . . . Canada will be contributing $6 billion plus in revenue at a 10% plus EBITDA margin rate . . . [o]bviously that means that ***we expect to be generating $600 million or more, perhaps quite a bit more in EBITDA out of Canada at retail in the next six or seven years***." Scovanner added that Target was poised to earn significant revenue from its new Canadian Segment, stating that "almost without question when we turn the corner from having expenses and no revenue to having ***lots and lots of revenue, billions and billions and billions of dollars of Canadian revenue***, we will turn the corner pretty sharply from a generation of EPS standpoint."

55. Target reiterated its lofty expectations for the Canadian Segment at its August 18, 2011 Financial Community Meeting, during which Scovanner stated: "[w]e continue to

believe that ***our margin structure in Canada will produce EBITDA margins in the range of 12% of sales by the fifth year of store operations. To us, these overall performance metrics feel real and feel achievable***."

56. That same day, a Barclays analyst who attended Target's Financial Community Meeting wrote in a report that Target Canada "could turn to profitability by the end of 2013 and ***continue to believe Canada represents a long-term growth opportunity for Target***."

57. A year later, on August 15, 2012, a Barclays report stated "We continue to believe Canada represents a long-term growth opportunity for Target." Similarly, a Morgan Stanley report, dated August 2, 2012, stated "The Canada startup in 2013 should serve as a valuation catalyst as it will kick TGT into double-digit EPS growth and rising free cash flows."

58. In stark contrast with Target's optimistic statements about Target Canada, the expansion itself experienced systemic problems from the start. These problems were exacerbated by the fact that the high price Target paid for the Zellers locations pressured the Company to open stores as quickly as possible in order to recoup startup costs and generate sales.

59. Specifically, Target was determined to maintain its tight schedule for opening Canadian stores even as systemic problems negatively impacted Target Canada's supply chain IT systems. Instead of slowing down to fix the problems, Target opened stores prematurely and with deficient supply chain IT systems. As alleged below, many of these problems were not adequately addressed from the beginning, and became worse over time as

Target continued opening stores without addressing the problems. Ultimately, the problems proved disastrous for Target Canada.

60. Target later admitted, in papers filed in connection with Target Canada's application for insolvency protection under Canadian law, that Target Canada failed because of its inability to adequately solve the systemic problems with its supply chain IT systems. These problems only snowballed as the Company's Canadian operations increased in scope.

**Target Canada Experienced Systemic Problems with Supply Chain IT Systems from the Very Beginning Which Lasted Throughout the Class Period**

61. A retailer of Target's size relies heavily on software systems to keep track of inventory, shipping details, cost, product information, and more for the thousands of individual products sold in its stores. In addition, each of these systems needs to be able to properly communicate with each other and integrate data as necessary.

62. In the United States, Target utilizes a well-developed supply chain and IT infrastructure to sustain optimal levels of inventory throughout its stores and ensure that millions of transactions are processed properly. According to the *Canadian Business* Report, Target's supply chain IT systems in the United States has been customized and adjusted over the years to meet the Company's specific needs. Target developed extensive knowledge about the operation of these U.S.-based systems.

63. Target concealed from investors, however, how its venture into Canada was unlike its experience in the U.S. because Target encountered ongoing, systemic problems with the supply chain IT systems chosen for its Canadian operations. These systems

consisted of several interdependent parts, each of which experienced systemic problems, as described below.

**SAP Data Entry Errors**

64. Target Canada chose not to use the same Enterprise Resource Planning ("ERP") software, which incorporates a company's crucial business functions including sales and distribution, production planning, logistics execution, and supply chain management, that it utilized in the United States. Instead, the Company purchased new software made by SAP. As a result, employees were forced to manually enter the details for over 75,000 products into the system prior to opening its Canadian stores. Each product contained numerous fields and many contained more than fifty. The data entered into SAP was largely inaccurate. Unresolved product data issues resulted in significant problems for Target Canada's supply chain, including empty store shelves and overburdened warehouses.

**Communication Errors Between SAP and Manhattan Warehouse Management System**

65. Manhattan, the warehouse management system selected for Target's Canadian operations, often had severe communication issues with SAP. Product orders from SAP often would not come through to Manhattan, and as a result, inventory would not be shipped out to stores.

**Target Canada's Automated System for Replenishing Inventory on Store Shelves Did Not Work**

66. Target Canada's automated system for replenishing inventory on store shelves was so dysfunctional that it was turned off immediately after the first stores had opened, and could not be operated without constant manual overrides.

**Futility of Target Canada's Forecasting Software**

67. The software purchased for Target Canada's forecasting of long-term demand for inventory, made by JDA Software, did not provide accurate sales forecasts, and Target employees did not know how to use it.

**Defective Cash Register Systems**

68. Target Canada's point-of-sale (cash register) systems often malfunctioned. Self-checkout systems often returned incorrect change, cash terminals took a long time to load, would often freeze, and commonly gave incorrect prices.

69. Before Target opened a single Canadian store, it was clear to Defendants that Target Canada's supply chain IT systems suffered from most of the above-referenced critical issues. Throughout the Class Period, the Canadian Segment's supply chain IT systems did not function properly.

70. As the Company ultimately admitted on August 12, 2014, even just to make a genuine attempt at correcting the problems, it was necessary for Target Canada to conduct, *inter alia*, a "physical count of inventory at all stores, ***resulting in a reset of systems***, and more accurate ordering and shipping data."

**Incorrect Data Loaded into SAP Caused Severe Inventory Problems Throughout Target Canada's Supply Chain**

71. When deciding on the supply chain IT systems for Canada, Target faced the choice of using its existing technology or purchasing a new system to build out. According to the *Canadian Business* Report, a full integration of the technology existing in the U.S. at the time into Target's Canadian operations would have been too complex and taken too

much time given the time constraints imposed by the Company's overly ambitious plans for its Canada expansion.

72. Among other things, Target would have had to customize its existing network to take into account both the Canadian dollar and French-language characters. According to the *Canadian Business* Report, implementing these types of changes would be time consuming.

73. As alleged above, SAP is an ERP software that incorporates crucial business functions of a company, such as sales and distribution, production planning, logistics execution, and supply chain management. SAP stores important data on each and every product in a company's stores. For Target Canada, this data would be fed by SAP into its other essential systems such as software to forecast the demand for products and replenish inventory.

74. In addition, SAP would send data to a separate program for management of the Company's newly constructed distribution centers for Target Canada's inventory, which, according to Company filings collectively totaled nearly four million square feet of space.

75. In order to correctly stock products, Target Canada employees had to first enter a substantial amount of information about each product into SAP. According to the *Canadian Business* Report, for each individual item, there could be dozens of fields to input, including, *inter alia*, the manufacturer, model, UPC (or barcode), its dimensions, weight, and how many of a certain product could fit into a case for shipment. It is essential that accurate data is inputted into SAP to ensure products move through the supply and distribution chain correctly.

76. As the *Canadian Business* Report stated, the tight deadlines to implement the data for over 75,000 products resulted in numerous errors.

77. Target had set an onerous plan to assemble SAP, load it with all the necessary data to feed into the Company's other systems, test these processes, and work out the kinks before the first stores opened their doors to customers.

78. By 2012, the speed with which Target ordered its employees to execute an enormous number of tasks was already having a crippling impact on the remainder of Target Canada's supply chain IT systems, because each system was supposed to be integrated into the others. According to the *Canadian Business* Report, a team investigating the errors estimated that the information in SAP was accurate only 30% of the time.

79. By the fall of 2012, it was well known to Defendants that SAP was plagued by data issues. Defendants learned of these problems through the findings of a team that investigated the SAP system. The *Canadian Business* Report stated that sometime in the fall of 2012, a mere few months before Target was to begin opening stores in Canada, the quality of the data in the SAP system was so deficient that members of the investigative team approached Tony Fisher and John Morioka, Target's senior vice president of merchandising, and proposed to shut down the entire merchandising division so employees could attempt to remedy the problem. Fisher gave his approval.

80. According to the *Canadian Business* Report, in the fall of 2012, Target Canada's merchandisers took part in what became known as "data week," in which scores of employees worked around the clock attempting to manually verify all data points for every

single product with each of their vendors. There were between 50 to 80 fields to verify for each product and a particular buyer could be responsible for up to 1,500 different products.

81. A separate process was necessary to make sure that accurate data for each product made it into SAP. Employees at Target Canada's Mississauga headquarters could not do this directly. According to the *Canadian Business* Report, this information was instead sent to a Target office in India, where the data would be loaded into SAP. Target Canada's "data week" stretched into two weeks as the uploading of the huge amount of data into SAP took longer than expected. Data week, however, failed to fix the enormous amount of problems with the data in the SAP System, which persisted throughout the Class Period.

82. When Target Canada opened the first of its stores, the unresolved issues with incorrect product data being entered into SAP resulted in customers being confronted with empty store shelves. As revealed after the Class Period in the *Canadian Business* Report, "[t]he reality was that Target was still struggling with data quality problems that were hampering the supply chain, and it didn't have time to address the root causes before opening another wave of stores."

83. At the same time Target Canada's customers were met with empty shelves all across the country, its three massive distribution centers were overwhelmed with excess products, in large part due to unresolved data problems with SAP.

84. Target Canada's newly constructed distribution centers consisted of:

(a) A 1.30 million sq. ft. regional distribution center in Balzac, Alberta (the "Balzac Center"). The Balzac Center was designed to support over 46 stores from Vancouver to Winnipeg. The furthest store the Balzac Center supported was 844 miles away;

(b) A 1.32 million sq. ft. regional distribution center in Milton, Ontario (the "Milton Center"). The Milton Center was intended to support 45 stores in Ontario west of the Kingston area. The furthest store the Milton Center supported was 871 miles away; and

(c) A 1.35 million sq. ft. regional distribution center in Cornwall, Ontario (the "Cornwall Center"). The Cornwall Center was designed to support 41 stores in Eastern Ontario, Quebec, New Brunswick, Nova Scotia, Prince Edward Island and Newfoundland. The furthest store from the Cornwall store was an astounding 1,644 miles away.

85. Target Canada's distribution centers were plagued with problems associated with the integration of its warehouse management system and SAP. According to CW2, a warehouse management system is employed to execute product orders received by a distribution center and support product shipping. Both the *Canadian Business* Report and CW2 stated that Manhattan, the warehouse management system chosen by Target for its Canadian operations, and SAP, had severe communication issues. CW2 explained that product orders from SAP often did not come through to Manhattan and, as a result, inventory was not shipped out to stores, which contributed to Target Canada's problem with empty store shelves. CW2 added that the entire system was out of sync.

86. Because of these types of communication problems between SAP and Manhattan, a shipment would not actually exist within Manhattan and could not be processed. According to the *Canadian Business* Report, a shipment that wouldn't exist within Manhattan would then get set aside to a "problem area" to be addressed at a later time. This happened with regularity and, as a result, the distribution centers quickly became overwhelmed with inventory.

87. The issues Target Canada faced in its distribution centers were systemically linked to SAP. According to CW1, SAP would order the incorrect amount of a certain product. For example, when the Company would intend to order one case pack of a product consisting of twelve individual products, SAP would instead order twelve case packs of that product, which amounted to 144 products. CW3 recalled 300 of one product being allocated to a particular store where not one of that same product was allocated to other stores.

88. By the fall of 2013, each of Target Canada's three distribution centers, four million square feet in total, were bursting at their respective seams with goods because of the above-described systemic problems with SAP. Packed tractor-trailers sat in yards outside distribution centers. There was no place at any of the distribution centers for workers to even place the goods. Warehouse operatives were forced to improvise just get shipments out the door. For example, according to the *Canadian Business* Report, if a crate was supposed to hold 12 packs of a certain product but was discovered to only have 10, workers would open the crate, stuff two packs in it, seal it, and send it out to a store.

89. According to CW2, the distribution centers became so overwhelmed with inventory the situation became unmanageable. The conditions became so bad that Target was forced to rent separate storage space even though it already owned huge distribution centers. For example, CW2 explained that Target Canada utilized a very large warehouse near the Milton distribution center that was at least 600,000 square feet in size. CW2 noted that this was necessary because so much inventory was being delivered to the Milton distribution center.

90. According to the *Canadian Business* Report, once products were sent off to a rented storage facility, they were as good as gone from Target Canada's supply chain IT systems. It was extremely difficult for workers to locate these products at a later time. A May 21, 2014 *Reuters* article (discussed *infra* ¶¶136-38) reported that, "[w]hile Eleven Points ran the warehouses, teams of workers and managers, sometimes 30 or more at a time, would arrive from Target's U.S. distribution centers to help resolve the choke points." It quickly became apparent, however, that U.S.-based Target officials were unfamiliar with the Canadian systems and stocking procedures, so there was not much, if anything, they could do. CW2, who spent time in all three distribution centers, confirmed that Target brought many of its own people in to look into these issues. The *Reuters* article also noted that "[g]oods were coming into the warehouses faster than they were going out, in part because the barcodes on many items did not match was in the computer system." This inventory overload was but one example of the undisclosed systemic problems with Target Canada's supply chain IT systems.

91. Inventory overload at Target Canada's distribution centers was not an issue merely confined to its early days but persisted throughout the Class Period. According to the *Canadian Business* Report, the distribution centers were inundated with inventory in early 2014, forcing the Company to rent additional storage space.

92. The issues created by SAP at Target Canada's distribution centers exacerbated other systemic problems with the Company's supply chain IT systems downstream. Some stores had a copious amount of certain products and a total lack of others. CW8, a team leader at an Ontario Target, stated that when store employees offloading trucks would

discover certain products were missing, a call would be placed to the distribution center to inquire as to why that item was not included in a shipment. CW8 noted that distribution center workers would sometimes report that the store would not be able to receive any of a particular product for two or three months. According to CW8, various problems persisted through 2015.

93. In addition, the excess inventory at Target Canada's distribution centers forced Target Canada to heavily discount products at its stores to clear excess inventory.

**Target Canada's Automatic Replenishment System Did Not Work**

94. As explained by the *Canadian Business* Report, Target Canada's replenishment system was supposed to automatically provide that specific store shelves would be restocked with the items previously on those specific shelves that had been purchased by customers, by calculating when employees needed "to pull more products to fill an empty rack." However, as the *Canadian Business* Report further explains, "the company didn't fully understand how to use it," and it was riddled with bad data. As reported by *Canadian Business*, "immediately" after Target opened "its first three test stores," "Fisher made the call to shut off the system and replenish manually. That meant store employees had to literally walk the floor and check each shelf – a laborious, error-laden process." According to *Canadian Business*, the system "wasn't switched back on until later that year." As explained by CW7, even when it was turned on, the system did not work properly, and employees had to override it manually, in order to get items from the warehouse to the store.

**Target Canada's Forecasting Software Was Largely Futile**

95. Target Canada's software for forecasting each store's demand for inventory several months out, which was developed by a company named JDA Software, also did not work properly, and Target did not have "the fundamental knowledge to disseminate" regarding how to run the system, according to CW7. Forecasting inventory demand was important because, as explained by CW7, internationally sourced items carried lead times for delivery of up to four months. Thus, inaccurate demand forecasts contributed to both the massive bottlenecks at Target Canada's three distribution centers, and the shortage of items on shelves that customers actually wanted to purchase. As stated by CW7, empty shelves and excess inventory were "two sides of the same problem."

96. CW4 confirmed that Target ordered many products based on misplaced optimism that they would sell in Canada. When those products did not sell as anticipated, they remained at the distribution centers, restricting the available space for other products, including those Canadian customers desired to purchase. As such, products for which there was Canadian demand became backlogged.

**Target Canada Faced Significant Problems with Its Checkout System**

97. The POS or checkout system Target chose for its Canadian operations also suffered from systemic problems. For example, according to the *Canadian Business* Report, cash registers would take a long time to load and sometimes froze, items would not scan or the POS system returned the incorrect price. Target Canada's POS software was purchased from an Israeli company named Retalix. According to CW6, Target decided to purchase

Retalix Version 10 which, according to CW6, was untested and considered vaporware[2] at the time it was purchased. CW6 reported numerous problems were experienced once the Retalix system was launched, including coupons that went out to customers not being properly downloaded into the system. This resulted in Retalix having the incorrect prices for products in its system.

98. Target Canada was not equipped to address the many issues it faced with this supply chain IT system. CW6 confirmed that Retalix had never previously been used by Target in the United States. According to the *Canadian Business* Report, in 2014, Retalix flew in a team to Toronto to view the problems experienced by the Company. Retalix executives were stunned at how many issues there were. Even though Target Canada experienced a multitude of problems with Retalix, the Company did not have time to search for a new vendor or install any new systems because of the accelerated schedule for opening stores mandated from Target's senior executives, including Defendant Steinhafel. In fact, the start schedule prevented Target from correcting numerous other significant problems before opening stores. CW5 added that problems with Retalix were so extensive that they hindered his/her duties conducting research as a sales auditor. CW5 saw little or no improvement with the Retalix system during his/her time working with Target Canada.

99. The systemic problems with the POS system comprising part of Target Canada's supply chain had an immediately negative impact on its stores. The lack of products and technological problems alienated its customer base as soon as the first stores

[2] Vaporware is software that has been advertised but is not yet available for purchase, because it is either only a concept, or it is still being written or designed.

opened. For example, CW8 noted that even though Target Canada advertised certain products, the store would not actually have them in-stock when customers would come in to buy them. According to CW8, Target Canada would label store shelves for a sale of a particular product, such as luggage prior to a busy travel season, but customers would discover that product was not actually in-stock. To avoid dealing with these issues, Canadian shoppers flocked to Target's well-established competitors such as Wal-Mart, Loblaws, and Canadian Tire.

**Defendants Knew that Target Canada Was Plagued with Significant Problems**

100. Throughout the Class Period, Defendants knew about the many systemic problems plaguing Target Canada's supply chain IT systems.

101. According to CW5, in the weeks leading up to the first store openings, in light of the many unresolved problems with Target Canada's information technology systems, there was a widely held fear among employees that the stores would not be ready to open by the dates the Company had publicly announced. CW5 noted that a mere two to three weeks before the first stores were scheduled to open, department heads reported, in meetings attended by CW5, that Defendant Steinhafel declared Target would open its Canadian stores even if the supply chain IT systems continued experiencing systemic problems and Canadian Segment employees needed to do their work using "***paper and pencil***." CW5 understands that this message was conveyed from Defendant Steinhafel to Target's Operating Committee, which, in turn, communicated it to the department heads for dissemination to employees, including CW5.

102. CW5 stated that department meetings were originally held once per month, but were more frequently held as time went on – *i.e.*, as the systemic problems with Target Canada's supply chain IT systems began to materialize and then persist. According to CW5, department meetings went from being held once per month, to once every two weeks, to once per week and eventually even once per day, in light of the many problems impacting operations at Target Canada.

103. According to CW6, Defendant Fisher held a weekly telephone conference call known as the "Rapid Response" call during which lower-level managers educated him about the problems they were encountering. Additionally, according to the *Canadian Business* Report, Defendant Fisher held frequent status update meetings at headquarters in Mississauga, in which the plethora of operational problems were discussed, including the undisclosed systemic problems with supply chain IT systems alleged herein. After the first few waves of store openings, as the Company's technological and logistical problems multiplied, the meetings became more tense.

104. According to CW6, open lines of communication also existed between senior Target Canada staff and the Company's headquarters in Minneapolis.

105. CW6 reported that Fisher frequently traveled back and forth between Canada and the Company's headquarters in Minneapolis to meet with both Defendant Steinhafel and Target's Board of Directors. CW6 noted that when Defendant Fisher returned from these visits to Minnesota, he would hold meetings with senior Target Canada staff, to report on what had happened in his meetings with Defendant Steinhafel and the Board. CW6 added

that these meetings consisted of very detailed discussions about the problems being experienced at Target Canada.

106. Staff from Target's Minneapolis headquarters regularly visited Canada before and during the Class Period. CW6 recalled an instance in December 2013 when teams from Minneapolis came to Canada, noting that at that time, Target Canada was suffering from severe supply chain issues and had an extensive amount of inventory that was still loaded on trucks and not on store shelves.

107. CW6 noted that Defendant Fisher was well aware of the many serious problems that Target Canada was facing.

**Defendants Hid Target Canada's True Problems from Investors and Misrepresented that Things Were Progressing as Planned**

108. Throughout the Class Period, as customers, reporters, and securities analysts questioned the Company about the empty shelves that were seen all across Canada, Defendants continuously and deliberately failed to disclose the true extent of the Company's systemic problems with its supply chain IT systems and the impact they were having, and would continue to have, on the Canadian Segment's operations. Defendants misrepresented that Target Canada was on a path to profitability and that any issues encountered by the Company were not materially impacting its performance.

109. On February 27, 2013, the Company held a conference call with analysts and investors during which several topics were discussed, including the imminent launch of Target Canada. Defendant Steinhafel reported that the Company was ready to begin opening stores in several cycles throughout 2013, stating that Target Canada was "going to open

somewhere between 20 and 28 stores a cycle." Additionally, Steinhafel remarked that the Company had a "***good plan that is centered around our supply chain investments and the readiness of our distribution centers***."

110. On March 4, 2013, Tony Fisher held a press conference in one of Target Canada's three "pilot" stores to discuss the upcoming opening of the first stores in Canada and, in particular, the reasons behind using pilot stores. Fisher told reporters that these stores were "really our stores that we're using to continue to ***test and refine some of our processes, some of our training, some of our systems***." By March 18, 2013, however, a *Toronto Star* article reported that Target Canada customers were already complaining on social media about empty shelves and spoiled food. Target's Senior Vice President of merchandising, John Morioka, falsely attributed the problems to higher than expected crowds, stating "[w]e thought that there would be an initial bump and what I would say is that the bump has not leveled off to the degree that we thought."

111. In reality, however, Target Canada's systemic problems with its supply chain IT systems were severely impacting operations. Morioka told reporters that Target Canada was working on improving truck-to-shelf delivery, they were merely "tuning the dials, so to speak," and that any changes were merely fine tuning. Unbeknownst to investors, Target Canada had substantial, widespread problems with its supply chain IT systems, including the data associated with its products.

112. These issues materialized shortly following the opening of the first three pilot stores. According to the *Canadian Business* Report, it was then that Tony Fisher himself made the call to shut off the entire auto-replenishment system and have employees refill

shelves manually. A primary purpose of opening pilot stores is to learn about problems and fix them before the rollout of regular store openings. Even though Target learned about systemic problems with its supply chain IT systems (such as its distribution and POS systems, described *supra*), Target failed to slow down to fix the problems before proceeding with the opening of its first cycle of stores. According to CW3, if Target had properly implemented test stores in Canada, a practice commonly exercised by the Company in the United States before a store rollout, the numerous problems the Company faced may have been avoided. CW3 reported that Target Canada was in a "downward spiral" from the very beginning.

113. On March 19, 2013, a mere two weeks after opening the "pilot" stores, Target Canada opened 17 more stores across Ontario, and by the end of the month had 24 stores operating in the Province.

114. Target set an expeditious pace for its Canadian employees to prepare the stores for their openings. According to CW1, employees would be tasked with getting a Target Canada Store open and a few weeks later would move onto the next one, "lather, rinse, repeat," regardless of whether or not the Company got it right on the last one. As a result, many of the same problems found in Target's first stores were encountered in stores opened in later waves, because the issues had not been fixed. CW4 added that Target did not have time to fix the issues infiltrating its supply chain because of the ambitious goal of opening so many stores at the same time, which only magnified the problems and made them much more disruptive and difficult to correct as more and more stores were opened.

115. CW4 noted that typically when infrastructure of this nature is being developed, a Company proceeds at a much slower pace. Target, however, was opening wave after wave of stores with brand new systems, rendering the Company unable to rectify the mistakes that were made in the previous wave. To CW6, Target Canada simply could not keep up with the slated schedule of store openings. CW6 added that during his/her time at Target Canada there were significant issues with Target's major systems. According to a former employee quoted in the *Canadian Business* Report, "[e]veryone was trying to execute Gregg Steinhafel's deal [] and once one thing went wrong, it was an impossible achievement."

116. Despite the systemic problems the Company faced with its supply chain IT systems when launching its Canadian operations, Defendants continued to reaffirm their previously stated earnings guidance for the Canadian Segment. Indeed, less than a week before Target opened its first "pilot" store in Canada, on a February 27, 2013 conference call, Defendants discussed, *inter alia*, the Company's outlook for Target Canada. Defendant Mulligan assured conference call participants that the Company's view on its projected earnings for 2013 had not changed at all over the past two years. Mulligan stated, "If we look back a year ago, or even two years ago when we signed the [Zellers] deal, ***the projected EBITDA for this quarter -- for this year, excuse me, is essentially right on where we thought it would be***." By reaffirming the same guidance for the Canadian Segment that was issued two years earlier, Defendants failed to account for, and minimized the extent of, the systemic problems that the Company faced with its supply chain IT systems.

117. As alleged below (*infra* ¶¶170-261), even as Target Canada's losses mounted, Defendants repeatedly reaffirmed their stated guidance for the Canadian Segment, misled the

market as to what exactly the problems with its supply chain systems were, downplayed their significance and systemic nature, and indicated that they had been resolved.

118. Defendants, for example, failed to disclose to investors that the SAP system had incorrect data on thousands of Target Canada products, and that this was having a profound, negative effect on operations. As noted above, these serious, systemic problems Target Canada was experiencing with SAP was known to Defendants long before the first stores even opened. Yet, Defendants failed to disclose this to investors throughout the entire Class Period.

119. Moreover, even though Defendants may have generally informed investors at points during the Class Period that the Canadian Segment's supply chain was experiencing problems, they never notified investors about the root causes of the issues, or that they were so fundamental and systemic that the entire supply chain needed to be reset.

120. Shortly after the first stores opened and as Target Canada was overwhelmed with these systemic problems with its supply chain IT systems, Defendants falsely assured the market that things had been resolved. On April 18, 2013, Defendant Mulligan and Target's Head of Investor Relations, John Hulbert, hosted a sell-side analyst meeting at the New York Stock Exchange to discuss the Company's opening months in Canada. Following the meeting, several analysts who were attendees issued reports which reflected being told that Target's supply chain and inventory issues in the Canadian Segment were behind them. For example, Morgan Stanley issued a report stating "the Canada startup is on track and ***inventory stocking issues have been ironed out*** . . . . Target Canada store openings are on track and ***the business has worked out some of the inventory replenishment issues that***

***plagued the first openings***." Additionally, Janney Capital Markets analysts wrote in a report "Canada Off To Strong Start; ***Initial Logistical Issues Appear Resolved*** . . . . With the robust opening, there were operational issues with replenishment, and in-stocks, but they ***have improved dramatically*** in the past few weeks. ***TGT expects that the next wave of openings will have in-stock levels that one would expect from TGT***."

121. In addition, despite the many problems Target Canada was facing, during a May 30, 2013 conference hosted by Sanford C. Bernstein & Co., Defendant Mulligan stated that, for the Canadian Segment, "[a] ***lot of the execution risk is behind us. . . . We're still refining. Things like replenishment systems, they take a while to tune, and so we're tuning***." Contrary to these statements, systemic problems with Target Canada's supply chain IT systems remained and became more difficult to fix as the Company opened more stores.

122. Target's rapid Canadian expansion continued throughout 2013. By November 22, 2013, the Company had 124 stores open in all 10 Canadian provinces. The following chart details the number of stores that Target opened in Canada, and the waves in which they were opened, from March 5, 2013 through November 22, 2013:




123. By late August 2013, after Target reported disappointing financial results for the Canadian Segment, Defendants continued to downplay the extent of the problems. For example, on August 21, 2013, Defendant Fisher told the *Financial Post*, "***we don't have to make transformational changes in our business model, it really is tweaks***."

124. Defendants even equated Target's Canadian experience to some of the Company's past store openings in different cities in the United States. For example, during a "Financial Community Meeting " held by Target on October 30, 2013, eight months into its disastrous start, Defendant Mulligan stated that "***our Canada plan now matches the pattern we saw following the launch of some of our strongest US markets, including Philadelphia and Washington, DC***." This was not so. The problems experienced by Target in Canada with its supply chain IT systems were systemic and unlike anything the Company had faced in the United States.

125. Nevertheless, Defendants repeatedly made positive statements or failed to disclose the truth about the problems faced by Target in Canada and/or minimized the extent of those problems, throughout the Class Period (*see infra* ¶¶170-261).

**Target Fired Key Executives Due to Target Canada's Problems**

126. As a direct result of the many systemic problems it faced with its supply chain IT systems, as noted in the following chart (and as discussed in detail below, *infra* ¶¶157, 185, 201, 230, 242, 256) Target Canada incurred significant losses in each quarter throughout the Class Period:

| Quarter | Canadian Segment Earnings (Loss) before Interest and Taxes (USD) |
|---|---|
| Q1 2013 | ($205 million) |
| Q2 2013 | ($169 million) |
| Q3 2013 | ($238 million) |
| Q4 2013 | ($329 million) |
| Q1 2014 | ($211 million) |
| Q2 2014 | ($204 million) |

127. By the Spring of 2014, Target Canada had been a colossal failure and the Company finally publicly recognized that new leadership was necessary to try to save it. On May 5, 2014, Target's Board of Directors issued a statement announcing Defendant Steinhafel resigned from his roles as CEO, President, and Director of the Company effective immediately. Defendant Steinhafel left the Company due in large part to the many problems with Target Canada. Target's Canadian expansion was an extremely important part of the Company's growth story but it had failed under Defendant Steinhafel's leadership.

128. The substantial media coverage of the massive credit card data breach, which compromised the personal information of millions of Target customers in the United States,

caused some in the press to speculate that it may have put pressure on Steinhafel. JP Morgan, however, commenting on Steinhafel's departure from the Company, noted in an analyst report, "[w]hile the press may point to the highly publicized data breach, we believe the so far very disappointing launch in Canada is the bigger issue at hand."

129. About two weeks after the announcement of Steinhafel's resignation, on May 18, 2014, Belus Capital Advisors published an analyst report titled *14 Headshaking Photos that Show Target Canada is still a Major Problem.* The report attached fourteen pictures illustrating supply chain IT systems that were *still* experiencing systemic problems – including low stocked and completely empty shelves.

130. The Belus Capital report stated:

> Strangely, ever since I began to chronicle the Canadian store operations for our coverage on Target, the situation has seemed to worsen. ***That is quite the opposite of what I was being pitched by Target on the phone, predominately that the business' operations were on track to be structurally tightened*** and 1Q14 would represent some sort of mini rebirth. I hung up the phone skeptical, as Target's assertions did not match what my own two eyes were seeing, consistently, on the ground. Now, that skepticism is at an all-time high . . .
>
> * * *
>
> Target Canada does not get in this shape if there weren't ***leadership voids inside the operation***, from stores to higher up the food chain. No retail executive would want their names associated with a business that is unable to keep basic items such a food and detergent on the shelves.
>
> ***Whatever Target Canada's leadership IS doing, in concert with HQ directives, is not solving the fundamental issues*** at the stores and within the supply chain.

131. As set forth below, however, before this time, Defendants had communicated to the market the problems with bare shelves had improved. For example, three months

earlier, Defendant Mulligan, on a February 26, 2014 earnings call, stated that "***the Canadian segment ended 2013 in a much cleaner inventory position***." *See infra*, ¶243.

132. Shortly after Steinhafel's resignation, on May 20, 2014, the Company announced in a press release that Tony Fisher had been terminated as president of Target Canada. Fisher had been with Target Canada since the very beginning, being appointed just days after the announcement of the Zellers deal.

133. Analysts commenting on Fisher's departure noted the connection between his termination and the many problems at Target Canada. For example, on the day of the announcement, a Cowen and Company analyst report stated, "***[w]e view this move as further confirmation that Target Canada has not progressed as the company planned***."

134. In a May 20, 2014 *New York Times* article, a retail consultant referred to Target Canada's performance as "a shocking, shocking level of misstep." A May 22, 2014 Trefis report stated, "***[t]he company was very aggressive in opening stores without a sturdy supply chain to support its needs***." The Trefis report added, "***[w]e believe that the new management should slow down store expansion in the region and focus on developing a strong supply chain instead***."

135. Despite admitting that new leadership was necessary for Target Canada, Defendants still failed to disclose the extent and systemic nature of the problems the Company faced with its supply chain IT systems.

**The Market Begins to Learn More About Target Canada's Systemic Problems with Supply Chain IT Systems**

136. On May 21, 2014, an article published by *Reuters* revealed, for the first time, information about the issues faced at Target Canada's distribution centers and the resulting impact they had on inventory levels downstream.

137. The *Reuters* article, which interviewed two former Eleven Points workers disclosed, *inter alia*, that Target Canada faced "inconsistencies between goods and computer records" which resulted in a "chain reactions of delays" and that "barcodes on many items did not match was in the computer system." The true source of these problems, however, was not revealed by the *Reuters* article, which noted that "[i]t is not clear whether these errors were caused by Target's buyers entering bad data, vendors making mistakes, some glitch in Eleven Points' warehouse computer system or all three."

138. The next day, May 22, 2014, a *Wall Street Journal* article analyzed the importance of the data inconsistencies plaguing Target Canada's supply chain that had been revealed by *Reuters*. An independent supply chain consultant quoted in the *Wall Street Journal* article explained, "[t]he real big thing is the data . . . . You have to make sure it's perfect and that it matches from the beginning all the way through the process, and you have to check it along the way." An analyst interviewed by the *Wall Street Journal* stated, "[y]ou have to have data owners, stewards of the data, using measures of data quality and showing we have a match across all these systems of records. If the numbers don't match then it becomes a garbage-in, garbage-out situation."

139. Defendant Mulligan, who had been elevated to the role of Interim President and CEO following Steinhafel's departure, and Executive Vice President of Merchandising and Supply Chain Officer Kathee Tesija, hosted an analyst meeting on May 30, 2014 at the New York Stock Exchange, at which the Company's Canadian Segment was discussed. The meeting itself was not public, but there were reports on what Target had disclosed during the meeting, by individual analysts. According to a Barclays analyst report later that day, Target disclosed that "[t]he key challenge with Canada is the supply chain, where ***substantial work remains to be executed*** . . . ." Barclays also noted that Target admitted "the configuration of the [IT] system was overly simplistic (given the aggressive store opening schedule last year)."

140. According to Barclays, the Company acknowledged that "its decision to open stores every few weeks was what led to the challenges at Canada." Barclays added that "[t]his put stress on the management team as well as the IT Team" that was "was forced to beat the clock given the aggressive store opening schedule and therefore oversimplified things."

141. A Cowen and Company analyst report issued the same day noted that Defendant Mulligan stated that Target is "focused on fixing" the Canadian Segment. According to Cowen and Company, Target was supposedly working on "improving the supply chain, achieving the right assortment and promotional cadence, and significant systems enhancements" in Canada.

142. A report published on June 2, 2014, by a Jeffries analyst stated "***[m]ajor system issues*** have resulted in high out of stocks and poor forecasting . . . . Target did not

extend its US systems to Canada, but used a new one that it claims has the capabilities of a BMW, but are configured like a VW." The Jeffries analyst report further stated, "***[t]he goal is to get them to a performance level on par with the US, but it is unclear how long this will take***."

143. Another analyst report published on June 2, 2014, by UBS, stated:

> Management openly discussed the flaws from the beginning. ***The choice was made to avoid dead rent costs by rapidly opening stores instead of just a few. This required a rapid build out of IT to support the stores, leaving out the full complexity needed to forecast the business, assort the stores and manage labor***. Using the US system was deemed to be too expensive vs. building new. ***Currently, consultants have been brought in to figure out how to reboot their IT systems***. The answer seems to be a month away.

144. Defendants, however, withheld from the market the financial impact that these problems would have on Target's second quarter of 2014, failing to articulate that their previously issued guidance for that quarter should no longer be relied upon.

**Target Issues Revised Guidance and Finally Acknowledges that a Reset of Its Canadian Supply Chain Is Necessary**

145. On August 5, 2014, Target issued downbeat guidance for the second quarter of 2014, announcing that it expected adjusted EPS would be within a range of $0.78 a share compared with prior guidance of $0.85 to $1. The Company also reported that sales in the Canadian Segment continued to suffer from the "impact of continued investments to clear excess inventory." On this news, Target's stock price plummeted 4.5% over the course of August 5 and 6, 2014. Among other things, the Company had revealed the financial impact of its problems in Canada on the second quarter of 2014. On August 5, 2014, following the Company's disappointing news, the *Financial Post* reported that "[i]t looks as though the

uphill climb for Target Corp. will be even steeper than expected after the coming second quarter."

146. Just over a week later, on August 12, 2014, Defendants revealed further details regarding the problems Target Canada faced and the steps they would they would be taking to fix them. Specifically, Target issued a press release (the "8/12/14 Press Release") announcing "several initiatives to improve business performance" in its failing Canadian Segment. Certain of these "initiatives" were aimed at addressing the many problems that *still* plagued Target Canada's supply chain. The 8/12/14 Press Release, stated, in pertinent part, as follows:

> *Supply chain*
>
> Target Canada has undertaken a variety of initiatives to address in-stock issues, including:
>
> - ***A physical count of inventory at all stores, resulting in a reset of systems, and more accurate ordering and shipping data***.
> - Better forecasting and allocation of product based on sales history and promotional plans to ensure the right amount of product is in the right place at the right time.
> - Adjusting delivery schedules so stores receive merchandise more frequently.
> - Providing new training and processes to headquarters and in-store teams to create good routines and engaging store team members.

147. Through the announcement of these "initiatives," the Company went more clearly on record with a more comprehensive admission of what it had known internally since the very beginning – the IT problems that permeated Target Canada's supply chain

were systemic and that it was necessary to hit the reset button and work to finally develop a comprehensive plan aimed at fixing them.

148. Analysts were pleased by the fact that Target was at long last taking a significant proactive step towards addressing the issues that had plagued the Canadian Segment's supply chain IT systems since inception. For example, a Barclays analyst report issued the next day stated that they were "encouraged by the new steps Target Canada is pursuing, which we believe address the core issues" that the Company was facing. Additionally, in an August 13, 2014 report, Janney Capital Markets stated they "continue to believe that Canada is fixable, and ***full acknowledgment of the key issues is a great starting point***."

149. After the new initiatives were announced, Target Canada's new President, Mark Schindele, offered his views on why the Canadian Segment had been such a failure. Schindele was quoted in an August 12, 2014 *Reuters* article stating that "[w]ith the benefit of hindsight, if we could do it all over again, ***we wouldn't have opened up that many stores, that many DCs (distribution centers), in that short a time frame. I know that much***." Schindele also told *Reuters*, "[w]e're now unwinding some of the ***decisions we made that were based on speed***." According to *Reuters*, Schindele confirmed that "the rapid pace of Target's entry resulted in problems with the set-up of its all-new Canadian technology systems due to hastily made decisions." Schindele also acknowledged that Target Canada's distribution centers were hampered by data problems with products and shipments, telling *Reuters* "[i]f your data integrity isn't good, it's really hard to keep stores in stock."

150. Additionally, according to an August 12, 2014 *Globe and Mail* article, Schindele acknowledged that products were stuck in the distribution centers because of an overly complex process with supplier identification that the Company employed. Schindele stated that this made it "hard to track purchase orders." The *Globe and Mail* also reported that Schindele confirmed that Target Canada was switching to the vendor identification system it employed in the U.S. According to the *Globe and Mail* article, Schindele disclosed that "[a]nother issue that Target Canada struggled with was bar codes on some of its products failing to match those in its computer system, which clogged up merchandise in the warehouses as workers tried to sort out the inventory."

151. Additionally, in an August 14, 2014 *CBC News* article, Schindele commented on Target's hurried entrance into Canada, stating that "***[i]f I could build a time machine and go back, we would've liked to have a slower approach***." Schindele acknowledged the fact that with respect to Target's rapid pace in opening its stores across Canada, "***[i]t was too much in too short a window***. ***Our biggest issue (was) that we needed more time***."

152. Target's public mea culpa continued after the Canadian Segment's supply chain reset was announced. According to an August 20, 2014 *Canadian Business* article, Defendant Mulligan offered his take on what the Company should actually have done instead of proceeding with the rampant store opening pace it carried out in Canada, stating "***[i]n retrospect (we would) probably open five to 10 stores last year [] refine the operations, refine the supply chain, the technology, get our store teams trained***."

153. The same day, Target held a conference call with analysts and investors during which Target officials, including Defendant Mulligan, elaborated on the systemic problems

with supply chain IT systems in the Canadian Segment and the purported initiatives to address them that were announced in the 8/12/14 Press Release.

154. Kathee Tesija, Target's Chief Merchandising and Supply Chain Officer, stated that Target Canada was "engaged in a comprehensive review of strategy and operations" and "taking decisive steps to address our guests' concerns head on, including changes to address in-stocks, pricing and assortment." Tesija added, "[t]o address in-stocks, the team is taking action on four dimensions: better reporting to identify in stock issues sooner; retraining our teams on best methods; developing new best methods tailored to Canadian segment systems; and reconfiguring systems to work more effectively over the long run."

155. Defendant Mulligan also spoke about the process changes the Company finally admitted were necessary in Canada. Mulligan stated, "[i]n Canada, the team has been working hard to assess root causes for underperformance, and implement changes to improve operations and the product assortment, with a focus on improving results in time for the holiday season." Mulligan also noted that the Canadian Segment was still dealing with inventory issues, stating "[w]e continue to see inconsistent in-stock levels by item and location, and we have excess inventory overall, leading to elevated levels of clearance markdowns." Mulligan confirmed that "[t]his is why the Canadian leadership team has put its ***highest priority on implementing system and process changes designed to improve operations***, with the goal of improving performance in time for the holiday season."

156. The need for the implementation of these comprehensive "system and process changes" that Company leadership was now finally going to implement was nothing new to Defendants. Well before the first Target Canada stores opened, Defendants knew, or

recklessly disregarded, that the Canadian Segment's supply chain was in need of much more than the "fine tuning" they said was necessary throughout the Class Period, given the systemic problems with its supply chain IT systems.

**Target Canada's Supply Chain Reset: Too Little, Too Late**

157. Target's efforts to finally implement changes to address systemic problems with its supply chain IT systems came in too little too late. By the Fall of 2014, the Company was unable to lure Canadian shoppers back into its stores, who had experienced too many barren shelves and other negative experiences. In the second and third quarters of 2014, the Company reported EBIT losses of $204 million and $211 million and gross margin rates of 18.4 percent and 19.5 percent for the Canadian Segment, respectively. Over time, it became evident that it would take too long and be too expensive to repair Target Canada's supply chain. The Company finally came to terms with the fact that its foray into Canada was an unalterable failure.

158. On January 15, 2015, Target issued a press release announcing that it planned to discontinue operating stores in Canada and that as part of that process Target Canada Co. had filed for insolvency protection under the laws of Canada. That same day, Target's new CEO Brian Cornell was interviewed by Target's company blog, *A Bullseye View* regarding the decision to exit Canada. Cornell acknowledged the fact that Target "***missed the mark from the very beginning by taking on too much too fast***."

159. Also on January 15, Target held a call with analysts and investors to discuss the Company's decision to discontinue its operations in Canada. On the call, CEO Cornell commented on this topic, in pertinent part, as follows:

> ***Our assessment of Canadian operations, which began before I arrived last August***, has included the exploration of multiple alternative operating scenarios including closing our worst performing stores and shrinking our footprint to allow us to operate with fewer distribution centers. In assessing these scenarios, ***we acknowledge that if we are going to continue operating in Canada we would need to invest additional capital in our supply chain and technology*** to make further operational improvements and enable Target to sell online in Canada. . . . ***we are unable to map out a scenario which would allow Target Canada to generate profits or cash flow until at least 2021***.

160. Analysts reacted to Target's decision to leave Canada. In a note issued the day of the announcement, a Credit Suisse analyst report stated that they "see the exit as the right thing to do; the venture into Canada was poorly thought out and executed." Additionally, Deutsche Bank issued a report noting "[w]hile exiting Canada is not a surprise, given that management was unable to find a route to profitability until at least 2021, the swiftness of CEO Brian Cornell's decision was still unexpected . . . ."

161. Additionally, as alleged above, Target admitted that the breakneck pace of its store opening process had a profound effect on the Company's ability to keep up with all of the systemic problems the Canadian Segment had with its supply chain IT systems. On January 15, 2015, Mark J. Wong, Target Canada's General Counsel and Secretary, filed an affidavit with the Ontario Superior Court of Justice in connection with Target Canada's application for insolvency protection under Canadian law (the "1/15/15 Wong Affidavit"), which provided, *inter alia*, the reasons behind Target Canada's failure, stating, in pertinent part, as follows:

> TCC [Target Canada Co.] believes that it did not succeed due to the following principal issues, among others:
>
> (a) *Issues of scale*: TCC opened 133 stores across Canada in less than two years. This was, in part, an attempt to allow its operations to quickly reach an

> efficient scale. The breadth of the expansion stretched TCC's resources and limited TCC's ability to respond quickly and effectively to certain issues . . . .
>
> (b) *Supply chain issues*: Although TCC invested heavily in information technology to create synchronized retail, inventory, and distribution systems for the Canadian operations, TCC has encountered significant supply chain issues. ***TCC's stores were often: (i) out-of-stock for important merchandise, resulting in consumer dissatisfaction; and (ii) over-stocked on other merchandise, necessitating discounts to manage the inventory and impairing operating margins*. *These supply chain issues created a poor first impression in Canada and prevented TCC from offering the wide assortment of merchandise consistent with Canadian consumers' expectations*** . . . .

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS

### Pre-Class Period Statements

162. On February 27, 2013, the Company announced its financial and operational results for the fourth quarter 2012 and fiscal year ending February 2, 2013 in a press release (the "2/27/13 Press Release"), which it filed with the SEC on Form 8-K. The Company also held a conference call that day with analysts and investors (the "2/27/13 Conf Call") to discuss the financial results and other information set forth in the 2/27/13 Press Release. During the 2/27/13 Conf Call, Defendants Steinhafel and Mulligan reiterated Target's financial results as detailed in the 2/27/13 Press Release.

163. On the 2/27/13 Conf Call, Defendant Steinhafel responded to a question from an analyst about the Company's plans for opening stores in Canada over the coming year, stating, in pertinent part, as follows:

> **Sean Naughton - Piper Jaffray – Analyst**:
>
> And also on the guidance for this year and thinking about the modeling, sounds like you're opening up a few more waves in Canada than your normal

> store opening cadence. Just from a modeling perspective, how should we think about some of those store openings this year? . . . .
>
> **Gregg Steinhafel - Target Corp – President & CEO**:
>
> Well, typically in the US, we open stores in three cycles. Due to the number of stores we have in Canada, we're taking an approach that we're going to open five cycles this year. So think April, May, and every couple of months beyond that, we're going to open somewhere between 20 and 28 stores a cycle. We haven't defined all of that yet. But we're going to start in the greater Toronto area. Then we're going to move to Western Canada. Then we'll densify. Then we'll go East, and then we'll densify again. ***So we've got a good plan that is centered around our supply chain investments and the readiness of our distribution centers***, and we just think it makes sense to spread out those kinds of openings over more cycles than we typically would do in the US.

164. Also on the 2/27/13 Conf Call, Defendant Mulligan discussed Target's financial projections with respect to the Canadian Segment, stating, in pertinent part, as follows:

> ***[I]n the Canadian segment, we expect to transition from recording meaningful quarterly dilution in the year to recognizing accretion by the fourth quarter***.
>
> * * *
>
> In 2013, we expect Canadian segment to generate approximately $0.45 of dilution to our GAAP EPS, as the cost to open and operate Canadian stores, along with the depreciation related to our capital investments, offsets the profitability we generate from the locations after they open. Dilution is expected to exceed $0.45 through the first three quarters, ***after which we expect the segment to contribute several cents of positive GAAP EPS in the fourth quarter***.
>
> * * *
>
> ***Looking to Canada, we expect that the first quarter will mark the peak of dilution attributable to this segment, at about $0.23***. However, this is expected to be more than offset by accounting gains from the receivables sale, leading to an expectation of first quarter GAAP EPS in the range of $1.22 to $1.32.

* * *

> ***Following this year, our current view of 2014 has us fully on or above the path outlined in our long range financial plan, benefiting from Canadian segment accretion*** and a meaningful increase in the amount of capital available to return to our shareholders through dividends and share repurchase.

165. An analyst inquired as to the Company's expected free cash flow and the dilution of EPS as it related to Canada on the 2/27/13 Conf Call. Defendant Mulligan's exchange with the analyst set forth , in pertinent part, as follows:

> **Mark Wiltamuth - Morgan Stanley – Analyst**:
>
> Okay. Can you give us a little more color on the Canada dilution of $0.45? I think that's bigger than a lot of people were expecting, and it sounds like a lot of it's related to the capital spending decisions. If you could walk us through that a little bit?
>
> **John Mulligan - Target Corp – EVP, CFO**:
>
> Yes. I think that's right, Mark. ***When we look back on where we're at right now with Canada, we feel really good about where we're at and our projections for returns in Canada. If we look back a year ago, or even two years ago when we signed the deal, the projected EBITDA for this quarter-- for this year, excuse me, is essentially right on where we thought it would be***.

166. Also on the 2/27/13 Conf Call, analysts were very interested to learn when Target Canada would recapture Canadian losses that were accrued before turning profitable. Defendant Mulligan's exchange with the analyst set forth, in pertinent part, as follows:

> **Peter Benedict - Robert W. Baird & Company, Inc. – Analyst**:
>
> I think in the past you guys have said that you'd expect to recapture the Canadian losses that you accrue within two years of turning profitable. So if you sum up the last three years -- well, the last two years plus this year – it's a little over $1, maybe $1.10. Do you still expect to get that back in earnings from Canada in '14 and '15, or is the D&A going to make that a longer process?

**John Mulligan - Target Corp – EVP, CFO**:

> ***I think you hit on it. It'll be a little bit longer. We're not talking about five years or anything like that. But 2.5, three years, something like that, our current modeling would say, we'll get it back in, something like that. So a bit more than two years***.

167. On March 4, 2013, Target opened three pilot stores in Ontario, Canada. That day, the Company issued a Press Release (the "3/4/13 Press Release"), which referenced, *inter alia*, the testing process the Company purportedly instituted prior to opening stores across Canada, stating, in pertinent part, as follows:

> Target today announced that it is opening three pilot stores in Ontario on March 5 at Stone Road in Guelph, Milton Mall Shopping Centre in Milton and Gates of Fergus in Fergus. The three pilot stores are the first Target locations to open in Canada, and the first of 124 Target stores that will open across the country throughout 2013. ***This marks the final phase in a testing process, which was designed to prepare systems, train team members and determine operational readiness as the first wave of 24 stores soft open across Ontario later in March***.

168. Also on March 4, 2013, Tony Fisher held a press conference at the pilot store in Guelph, Ontario to discuss the upcoming opening of the first stores in Canada and, in particular, the purpose of utilizing pilot stores. Fisher stated, in pertinent part, as follows:

> These are what we're calling our pilot stores. ***Our pilot stores are really our stores that we're using to continue to test and refine some of our processes, some of our training, some of our systems***. We built our technology infrastructure from the ground up over the last two years. So there's a lot of things we want to test both from technology, continuing to train our team members. You'll see as we go throughout the store that we're still putting the finishing touches on our store. You'll notice the stanchion on the way in that says we're mostly open. You'll notice some of the signs on some of our merchandise that says, we're stocking up so you can too.

169. As Target began opening the first of its pilot stores in Canada, analysts were encouraged by Defendants' announcements that the Canadian Segment was advancing just

as they had predicted. On March 5, 2013, BMO Capital Markets issued an analyst report stating that, "Management's current projected EBITDA for Canada in 1Q13 is effectively where it thought it would be two years ago when it first signed the deal to go into Canada." The analysts added, "***make no mistake – Canadian progress is right where management thought it would be***." Unbeknownst to the market, however, Target's supply chain IT systems suffered from systemic problems and the Company was not ready for the upcoming opening of its first wave of stores in Canada.

**Class Period Statements**

170. Throughout the Class Period, Defendants issued materially false and misleading statements and failed to disclose material information about Target Canada. As alleged herein, Defendants continuously failed to disclose the systemic problems the Canadian Segment experienced with its supply chain IT systems – problems which were so extensive that wholesale process changes were necessary. Target continued to open up stores at a breakneck pace all throughout Canada despite the fact that the Company had not adequately resolved these problems. These issues only magnified as Target pushed forward in Canada.

171. The Class Period commences on March 20, 2013. On that date, Target filed its annual report on Form 10-K with the SEC for fiscal year ended February 2, 2013 (the "2012 Form 10-K"), which reiterated the Company's FY 2012 financial results reported in the 2/27/13 Press Release.

172. The 2012 Form 10-K also included representations about Target's inventory management, stating, in pertinent part, as follows:

> Our ability to deliver a shopping experience that is preferred by our customers, referred to as "guests," is ***supported by our strong supply chain and technology infrastructure***, a devotion to innovation that is ingrained in our organization and culture, and our disciplined approach to managing our current business and investing in future growth.
>
> * * *
>
> ***Effective inventory management is key to our ongoing success***. We utilize various techniques including demand forecasting and planning and various forms of replenishment management. ***We achieve effective inventory management by being in-stock in core product offerings, maintaining positive vendor relationships, and carefully planning inventory levels*** for seasonal and apparel items to minimize markdowns.
>
> * * *
>
> ***A substantial part of our business is dependent on our ability to*** make trend-right decisions and ***effectively manage our inventory*** in a broad range of merchandise categories, including apparel, home décor, seasonal offerings, food and other merchandise. ***Failure to accurately predict constantly changing consumer tastes, preferences, spending patterns and other lifestyle decisions may result in lost sales, spoilage and increased inventory markdowns, which would lead to a deterioration in our results of operations by hurting our sales, gross margins and profitability***.
>
> * * *
>
> ***We rely extensively on our computer systems to manage inventory***, process guest transactions, service REDcard accounts and summarize and analyze results. Our systems are subject to damage or interruption from power outages, telecommunications failures, computer viruses and malicious attacks, security breaches and catastrophic events. ***If our systems are damaged or fail to function properly, we may incur substantial costs to repair or replace them, experience loss of critical data and interruptions or delays in our ability to manage inventories or process guest transactions, and encounter a loss of guest confidence which could adversely affect our results of operations***.

173. The statement referenced in ¶172 above that Target had a "strong supply chain and technology infrastructure" was materially false and misleading when made because it failed to disclose the adverse facts that its Canadian Segment had neither a "strong" supply

chain nor "strong" technology infrastructure. Rather, Defendants knew or recklessly disregarded that systemic problems existed within Target Canada's supply chain IT systems. The statements referenced in ¶172 above that "[e]ffective inventory management is key to our ongoing success" and that "we achieve effective inventory management" were materially false and misleading when made because Defendants failed to disclose that Target did not have effective inventory management with respect to its Canadian Segment's supply chain IT systems. The statement referenced in ¶172 above that failure to "effectively manage our inventory . . . may result in lost sales, spoilage and increased inventory markdowns, which would lead to a deterioration in our results of operations" was materially false and misleading when made because Defendants failed to disclose that, at the time, Target was not effectively managing inventory due to systemic problems with its Canadian Segment's supply chain IT systems. Similarly, the statement referenced in ¶172 above that "[i]f our systems are damaged or fail to function properly," it "could adversely affect our results of operations" was materially false and misleading when made because Defendants failed to disclose that, at the time, systemic problems with its Canadian Segment's supply chain IT systems did prevent them from functioning properly, and did adversely affect its results.

174. The 2012 Form 10-K also included false and misleading disclosures of risk factors regarding Target Canada. Under Item 1A of its 2012 Form 10-K, Target stated:

> ***If we do not effectively execute our plan to expand retail store operations into Canada, our financial results could be adversely affected***.
>
> Our 2013 entry into the Canadian retail market is our first retail store expansion outside of the United States. ***Our ability to successfully open the expected number of Canadian Target stores on schedule depends, in large measure, upon our ability to remodel existing assets, build our supply chain***

> ***capabilities and technology systems*** and recruit, hire and retain qualified team members. In addition, our ability to offer the expected assortment of merchandise in certain markets may be impacted by the availability of local vendors of certain types of goods. The effective execution of our Canadian retail store expansion is also contingent on our ability to design new marketing programs that positively differentiate us from other retailers in Canada, and achieve market acceptance by Canadian guests. If we do not effectively execute our expansion plan in Canada, our financial performance could be adversely affected.

175. The statement referenced in ¶174 above that Target's "financial results could be adversely affected" was materially false and misleading when made because it failed to disclose the full extent to which its expansion into Canada ***already*** adversely affected Target's financial results. The statement referenced in ¶174 above that Target's success "open[ing] the expected number of Canadian Target stores on schedule" depended on its "ability to . . . build our supply chain capabilities and technology systems" was materially false and misleading when made because it failed to disclose that materially adverse developments in the factors listed had ***already*** come to pass. Specifically, Defendants knew or recklessly disregarded that systemic problems already existed within Target Canada's supply chain IT systems, which ***already*** materially limited its ability to build supply chain capabilities and technology systems, and accordingly open Canadian stores successfully. Defendants therefore failed to disclose the extent to which its operations and "ability to successfully open the expected number of Canadian Target stores on schedule" were ***already*** impaired at the time the statement was made.

176. The statements referenced in ¶¶172, 174 above, which were known, or should have been known, to the Defendants to be false and misleading, were then falsely certified by defendants Steinhafel and Mulligan and included in the 2012-Form 10-K:

CERTIFICATION

I, Gregg W. Steinhafel, certify that:

1. I have reviewed this Annual Report on Form 10-K of Target Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15(d)-15(f)) for the registrant and have:

    a. designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

a. all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

177. The 2012 Form 10-K further included a substantially similar certification signed by Defendant Mulligan as Exhibit 31(B).

178. The statements referenced above in ¶176 were repeated in all material respects in the Forms 10-K and 10-Q Target later filed with the SEC during the Class Period.

179. On March 28, 2013, Defendant Mulligan attended CIBC's Annual Retail and Consumer Conference in Toronto, Canada. During the conference, Defendant Mulligan gave a presentation in which he commented on the Company's progress in Canada, stating, in pertinent part, as follows:

> How about Canada? Going into the year last year, we talked about four key items we needed to achieve. We needed to build out of the supply chain; build the technology; build the team; and then begin to remodel stores, primarily the ones that we're opening right now. ***We achieved all four of those objectives, and did so with a great deal of financial discipline. And the team did a***

> ***fantastic job. We're right where we want to be right now***, and did so with $0.48 of dilution versus our goal of $0.50.
>
> * * *
>
> ***That leaves us with Canada. This year in the fourth quarter, we expect dilution to move to accretion, and next year to be profitable for the full year***. And that will continue to grow out through 2017; so that, through time, Canada will have a very similar return on invested capital characteristic to what we see in the US. That leads us to a total Company return on invested capital which we expect to meaningfully improve over the next several years, as Canada improves; and with, of course, the benefit of credit.

180. The statement referenced above in ¶179 that Target had "achieved" its purported objectives for the Canadian Segment to date was materially false and misleading when made, because it failed to disclose the systemic problems experienced in Target Canada's supply chain IT systems, which was known to Defendants or recklessly disregarded by them. The statement referenced above in ¶179 that Defendants were "right where we want to be right now" was materially false and misleading when made, because Defendants knew, or recklessly disregarded, that Target Canada's supply chain IT systems were already suffering from severe systemic problems, as detailed herein. Additionally, the statement referenced above in ¶179 that "[t]his year in the fourth quarter, we expect dilution to move to accretion, and next year to be profitable for the full year" was false and misleading when made because Defendants knew about, or recklessly disregarded, these systemic problems and the impact they were having in Target Canada's stores and distribution centers. Until Defendants corrected these problems, they lacked a reasonable basis in providing this guidance.

181. During the CIBC Conference, Defendant Mulligan was asked by an analyst about Target's experience in Canada to date. Defendant Mulligan's exchange with the analyst set forth, in pertinent part, as follows:

> **Perry Caicco - CIBC World Markets – Analyst**:
>
> And if so you've had a few stores open now for a few weeks. And you took a few shots to the chin in various media outlets, and social media outlets, for out-of-stocks, and pricing differentials with the US. And I guess it was pretty difficult to soft open the most anticipated retailer in Canada in a decade. Tell us about your first few weeks' experience here.
>
> **John Mulligan - Target Corporation – EVP, CFO**:
>
> We needed to get the first three stores open. You can do all the testing you want of systems and supply chain in the labs. Ultimately, you need to get the real world working. And so getting those three stores opening; let our teams, which is 99% Canadian team members who haven't worked in Target stores, letting them get used to things. ***And that's gone really well. We're very pleased. I think that supply-chain efforts, we work through I think -- if we had had a normal amount of opening, we would have worked through those very rapidly. But combined with the overwhelming response, it's taken us a bit longer than we might like. But we feel very good about where we're at***.

182. The statements referenced in ¶181 above regarding Target Canada's supply chain were materially false and misleading when made because it misrepresented or failed to disclose the following facts, which were known or recklessly disregarded by them:

(a) the Company was experiencing systemic problems with Target Canada's supply chain IT systems, as well as inadequately trained employees, problems that persisted throughout the Class Period;

(b) these supply chain and personnel problems were not typical of newly launched locations in Target's traditional U.S.-based market; and

(c) these supply chain problems were both severe and systemic such that a full system reset was necessary throughout the Class Period.

183. Additionally, the statements referenced in ¶181 above that the out-of-stocks which occurred at Target Canada's first stores were the result of an "overwhelming response" of customers was materially false and misleading when made, because it failed to disclose the adverse fact that the Canadian Segment's operations were actually hindered as a result of severe systemic problems with its supply chain IT systems, which Defendants knew, or recklessly disregarded. Additionally, the statement that referenced above in ¶181 that Defendants "feel very good about where we're at" was materially false and misleading when made, because Defendants knew, or recklessly disregarded, the fact that Target Canada was suffering from these systemic problems, as detailed herein.

**Second Quarter 2013 Statements**

184. On May 22, 2013, prior to the trading session, Target announced its financial and operational results for the period ended May 4, 2013 ("1Q13") in a press release (the "5/22/13 Press Release"), which it filed with the SEC on Form 8-K. In the 5/22/13 Press Release, Target reported 1Q13 net earnings of $498 million or EPS of $0.77. The Company also offered guidance for full-year 2013 EPS of between $4.70 and $4.90.

185. For the Canadian Segment, Target reported a 1Q13 EBIT loss of ($205) million, a gross margin rate of 38.4 percent, and EPS dilution attributed to the Canadian Segment of ($0.24). Also in the 5/22/13 Press Release, Target provided its guidance for full-year EPS dilution relating to the Canadian Segment, which remained at ($0.45) and projected ($0.16) of Canadian Segment dilution for the upcoming quarter.

186. That same day, the Company held a conference call with analysts and investors (the "5/22/13 Conf Call") to discuss the financial results and other information set forth in the 5/22/13 Press Release, including Target's first quarter of operations in Canada. During the 5/22/13 Conf Call, Defendants Steinhafel and Mulligan reiterated Target's financial results as detailed in the 5/22/13 Press Release.

187. Defendant Steinhafel commented on the opening of the Company's first stores in Canada stating, in pertinent part, as follows:

> After two years of preparation, in March we opened our first 24 Canadian stores in the greater Toronto area and we're very pleased with the reception we received from our new Canadian guests. . . . Two weeks ago we opened our second wave of 24 Canadian stores in British Columbia, Alberta and Manitoba and ***we're very pleased with*** the initial guest response in these markets and ***the ability of our teams and systems to accommodate the increasing volume of traffic and sales***.

188. The statement referenced in ¶187 above that the Company was "pleased with . . . the ability of our teams and systems to accommodate the increasing volume of traffic and sales" was materially false and misleading when made because Defendants knew, or recklessly disregarded, that neither its teams nor its supply chain IT systems were in fact equipped to handle the volume of traffic and sales, which created systemic problems that increased as a result of Target continuing with its ill-advised, rampant store opening pace in Canada.

189. On the 5/22/13 Conf Call, Defendant Steinhafel was asked by an analyst if Company's views on the Canadian Segment had changed now that the first wave of stores were open. Defendant Steinhafel's exchange with the analyst set forth, in pertinent part, as follows:

> **Colin McGranahan - Sanford C. Bernstein & Company, Inc. – Analyst**:
>
> As the consumables business ramps up it mixes down. From a productivity perspective, can you tell anything yet on these first stores that are open, in terms of opening expectations relative to what you had thought? Or was it just too much hoopla that you can't discern anything yet?
>
> **Gregg Steinhafel - Target Corp – Chairman, President, CEO**:
>
> I wouldn't call it hoopla. I would just say that the guests were very, very excited and we experienced tremendous surges in sales. And it's just very, very early to draw any conclusions. And we really wanted to deliver a great experience and so to a certain extent we went in with staffing levels to make sure that we were taking care of the guest, both at the front end and we had the right team members there for the supply chain and we had the right teams on the sales floor. So we know that over time and in a run state in addition, we have to work hard at making sure that we get our productivity levels where the business models dictates them to be. And we know our gross margins will settle in and we've got to become more productive and run the business. Over time our consumables share will grow . . . . We didn't want to come out of the blocks by hitting those categories too hard because we wanted to make sure that we led with our strength. ***And we wanted to make sure that all the supply chains and the operational disciplines were in place. We feel very confident now that they are. We're ready to start making those kinds of adjustments in merchandising and supply chain and in store operations to start refining the model***.

190. The statement referenced in ¶189 above that Defendants were "confident" in the "supply chain and operational disciplines" implemented in Canada was materially false and misleading when made, because it failed to disclose the adverse facts about the severe systemic problems being experienced with these supply chain IT systems, which were known to Defendants or recklessly disregarded by them. Additionally, the statement referenced in ¶189 above that Target Canada's model for merchandising, supply chain and in store operations required "refining" was materially false and misleading when made because

Defendants knew, or recklessly disregarded, that, in fact, the systemic nature of these problems would require major, wholesale changes to fix.

191. Defendant Mulligan also discussed Target's financial projections with respect to the Canadian Segment, stating, in pertinent part, as follows:

> ***In Canada, second-quarter sales will ramp up meaningfully from the first-quarter*** pace, yet startup expenses will continue to dominate the P&L. As a result, for the quarter we anticipate expenses from our Canadian operations, including interest expense measured outside the segment, will create $0.16 of dilution to our earnings per share. ***We continue to expect Canadian dilution will come down further in the third quarter and by the fourth quarter we expect our Canadian operations will be slightly accretive to our consolidated earnings***. All together, we expect second quarter adjusted EPS of $1.09 to $1.19. We expect our GAAP EPS will be $0.19 lower than adjusted EPS, in the range of $0.90 to $1, reflecting $0.16 of dilution due to Canada and $0.03 of dilution related to the unwind of the beneficial interest asset related to the receivable sale.

192. The statements referenced in ¶191 above were materially false and misleading when made because Defendants knew about, or recklessly disregarded, the systemic problems Target Canada was already facing with its supply chain IT systems and the impact they were having in both the stores it had opened to date, as well as Target Canada's distribution centers. Until Defendants corrected these problems, they lacked a reasonable basis in providing this guidance.

193. On May 30, 2013, Target filed its quarterly report on Form 10-Q with the SEC for 1Q13 (the "1Q13 Form 10-Q"), which was signed by Defendant Mulligan. The 1Q13 Form 10-Q reiterated the Company's 1Q13 financial results reported in the 5/22/13 Press Release, as set forth in ¶¶184-85 above. The 1Q13 Form 10-Q was falsely certified by Defendants Steinhafel and Mulligan, as noted in ¶¶176-77 above. It contained actionable

omissions pursuant to Item 303 of Regulation S-K [17 C.F.R. §229.303], as alleged in ¶¶268-72, *infra*.

194. Also, on May 30, 2013, Defendant Mulligan represented Target at the Sanford C. Bernstein Strategic Decisions Conference in New York City (the "SCB Conference"). During the SCB Conference, an analyst asked Defendant Steinhafel certain questions regarding the Canadian Segment. Defendant Steinhafel's exchange with the analyst set forth, in pertinent part, as follows:

> **Colin McGranahan - Sanford C. Bernstein & Company – Analyst**:
>
> Okay, great. Let's talk about Canada just generally. Anything really surprising so far?
>
> **John Mulligan - Target Corporation – CFO**:
>
> The intensity of that surge was very surprising. I think we probably out-thought ourselves a little bit, tried to open up these three stores in the western part of the Greater Toronto area, 50 miles from downtown, ***just to test the systems and make sure things were working, and that turned out to be not a good idea because we just were overwhelmed***. Those poor stores were literally overwhelmed, and we probably would've opened many more of them at once had we known that was going to happen. . . .

195. The statements referenced in ¶194 above that operations as Target Canada's first stores were hindered because they were "overwhelmed" with customers, was materially false and misleading when made, because it failed to disclose the adverse fact that the Canadian Segment's operations were hindered by severe systemic problems with its supply chain IT systems, which Defendants knew, or recklessly disregarded.

196. Defendant Steinhafel's exchange with the analyst continued, in pertinent part, as follows:

**Colin McGranahan - Sanford C. Bernstein & Company – Analyst**:

Where are you in terms of execution risk at this point?

**John Mulligan - Target Corporation – CFO**:

***A lot of the execution risk is behind us***. We need the initial execution risk. ***We're still refining. Things like replenishment systems, they take a while to tune, and so we're tuning***, and each one of the stores will be different. So we're working through that. But there is a wave of system enhancements that need to come and operational enhancements that need to come, and ***that's just us honing the business that needed to happen naturally through time just as we've done in the US over 50 years***, but part of us improving and getting to that profitability we need in Canada, we don't have everything we need on day one. There's follow-on investment that we need to do. So that needs to continue to happen. ***But as far as what we planned for the start-up, we feel really good about where we are today***.

197. The statement referenced in ¶196 above that Target Canada's "execution risk is behind us" was materially false and misleading when made, because Defendants knew, or recklessly disregarded, that the execution risk was only intensifying as the Company continued to open stores regardless of the fact that the Canadian Segment was plagued by severe systemic issues with its supply chain IT systems. Additionally, the statements referenced in ¶196 above that Defendants were "refining" and "tuning" systems in Canada were materially false and misleading when made, because they failed to disclose that the systemic nature of these problems would require major, wholesale changes to fix, which Defendants knew, or recklessly disregarded. The statement referenced in ¶196 above that "system enhancements" needed in Canada were a consequence of "honing the business that needed to happen naturally" was materially false and misleading for the same reasons. Finally, the statement referenced in ¶196 above that Defendants "feel really good about where we are today" was materially false and misleading when made because Defendants

knew, or recklessly disregarded, the severe systemic problems that Target Canada was facing with its supply chain IT system, as detailed herein.

198. Additionally, during the SCB Conference, Defendant Mulligan commented on the Company's view with respect to the expected return on invested capital ("ROIC") for the Canadian Segment, stating, in pertinent part, as follows:

> And, finally, Canada -- when you invest billions of dollars and record losses in your P&L, you obviously generate a very large negative ROIC. ***We expect that to turn in the fourth quarter of this year as we turn to accretion and then that will grow***. ***So the ROIC will naturally improve in Canada***.

199. The statements referenced in ¶198 above regarding Target's ROIC in Canada were materially false and misleading when made because they failed to disclose the systemic problems with its supply chain IT systems and the negative impact they were having in Target Canada's stores and distribution centers. Until Defendants corrected these problems, they lacked a reasonable basis in providing this guidance.

**Third Quarter 2013 Statements**

200. On August 21, 2013, prior to the trading session, Target announced its financial and operational results for the period ended August 3, 2013 ("2Q13") in a press release (the "8/21/13 Press Release"), which it filed with the SEC on Form 8-K. In the 8/21/13 Press Release, Target reported 2Q13 net earnings of $611 million or EPS of $0.95. The Company offered guidance for full-year 2013 EPS, expecting it to be "near the low end of its previous guidance" of between $4.70 and $4.90.

201. With respect to the Canadian Segment, Target reported disappointing results, including a significant EBIT loss of $169 million for 2Q13, a gross margin rate of

31.6 percent, and EPS dilution attributed to the Canadian Segment of ($0.21). Target also provided updated guidance for full-year EPS dilution relating to the Canadian Segment, which increased substantially from ($0.45) to ($0.82). The Company also projected ($0.22) of Canadian Segment EPS dilution for the upcoming quarter.

202. Defendant Steinhafel was quoted in the 8/21/13 Press Release, stating, in pertinent part, as follows:

> Target's second quarter financial results benefited from disciplined execution of our strategy and strong expense control, offsetting softer-than-expected sales. For the balance of this year, our U.S. outlook envisions continued cautious spending by consumers in the face of ongoing household budget pressures. In Canada, where we are only five months into our market launch, ***we continue to learn, adjust and refine operations in our existing stores*** as we prepare to open another 56 stores by year-end.

203. The statement referenced in ¶202 above that Defendants "continue to learn, adjust, and refine operations" was materially false and misleading when made because it failed to disclose the adverse fact that the systemic nature of these problems would require major, wholesale changes to fix, which Defendants knew, or recklessly disregarded.

204. That same day, the Company held a conference call with analysts and investors (the "8/21/13 Conf Call") to discuss the financial results and other information set forth in the 8/21/13 Press Release. Defendant Steinhafel provided an update on the Canadian segment, stating, in pertinent part, as follows:

> In our Canadian segment, we've reached the halfway point in our 2013 market launch. We opened another 44 Canadian Target stores in the second quarter, putting our total at 68 today, on the way to our goal of operating 124 Canadian stores by year end. Launching our Canadian segment has required a massive effort from teams throughout the Company, including building a completely new supply chain infrastructure and integrated technology solution, completely reconstructing former Zellers locations transforming them into

> brand new Target stores, hiring and training more than 15,000 Canadian team members, and creating unique merchandise strategies and assortments to fit the preferences of our Canadian guests, including a very strong presence in our home and apparel categories. ***The team***['']s ***execution on these efforts has been excellent***.
>
> * * *
>
> ***Our expectations are informed by*** our experience in launching the PFresh remodel program and City Target format, ***as well as our historical experience entering new markets in the US***. In many of these markets ***we saw [a] similar pattern*** in which sales momentum was slower than expected at the launch, but grew rapidly in the first several years after opening, resulting in achievement of our fifth year sales goals. For the stores we've opened, the team in Canada is working to adjust inventory and store staffing to match the pace of sales in each individual location. And for the segment in total, we have updated the expected timing of earnings accretion. ***Having said that, we remain highly confident in our strategy***.

205. The statement referenced in ¶204 above that Target Canada's "execution" on "efforts" such as "building a completely new supply chain infrastructure and integrated technology solution" had been "excellent" was materially false and misleading when made, because it failed to disclose the adverse facts about the severe systemic problems from which the supply chain IT systems were suffering, which were known to Defendants or recklessly disregarded by them. Additionally, the statements referenced in ¶204 above that Defendants' "expectations are informed by . . . our historical experience entering new markets in the U.S.," and that Defendants "saw a similar pattern" when opening up stores in the United States were materially false and misleading when made, because Defendants knew, or recklessly disregarded, that Target had never before encountered such systemic problems to the extent of which they were dealing with in Canada. Furthermore, the statement referenced in ¶204 above that Defendants "remain highly confident in our strategy" for Target Canada

was materially false and misleading when made because it failed to disclose any information with respect to the severe systemic problems with the Canadian Segment's supply chain IT systems existing at the time, which Defendants knew or recklessly disregarded.

206. Defendant Mulligan also commented on the Canadian Segment, stating, in pertinent part, as follows:

> ***In Canada, the team continues to refine operations in the stores already opened, ensuring that inventory and expenses match the current pace of sales in each individual store****. . . .*

207. The statement referenced in ¶206 above that the Target Canada team "continues to refine operations in the stores already opened, ensuring that inventory and expenses match the current pace of sales in each individual store" was materially false and misleading when made, because Defendants knew, or recklessly disregarded, that any efforts to refine these operations would be futile due to the fact that the systemic nature of these problems with supply chain IT systems would require major, wholesale changes to fix, such that they could not be "ensuring" that in-store inventory matched the pace of store sales.

208. During the 8/21/13 Conf Call Defendants were asked by an analyst about the inventory issues in the Canadian Segment. Defendant Steinhafel's exchange with the analyst set forth, in pertinent part, as follows:

> **Matt Nemer - Wells Fargo Securities, LLC – Analyst**:
>
> A quick follow up on Canada and then a couple on the US business, as well. Could you talk to the inventory overhang in Canada, the clearance that you spoke to, is that primarily also on frequency items, or is that more a discretionary product?

**Gregg Steinhafel - Target Corporation – Chairman, President and CEO**:

> ***The inventory overhang is a function of the shortfall primarily in some of the seasonal categories***. So, think of -- even though Apparel and Home was strong, the variability by store, and the fact that some of our seasonal categories, like Lawn and Patio didn't perform at the level that we were expecting. So, it was not in the basic categories or the non-discretionaries, primarily in a subset of the discretionary categories. But it's one of those things where it's more obvious, because it's such a large number of stores. ***But it's the same kind of fine tuning that we go through every time we open a new store here in the United States, and they have experienced for years and years***. There is always a tremendous amount of fine tuning and getting the right match of sales volatility, variability, assortment, and aligning that with inventory. What we're seeing in Canada is there's such a big critical mass that it stands out, and it's far more obvious. ***But it's no different than what we've experienced [in the U.S.]***.

209. The statement referenced in ¶208 above that the Canadian Segment's "inventory overhang" was a "function of the shortfall primarily in some of the seasonal categories" was materially false and misleading when made because Defendants knew, or recklessly disregarded that not only were Target Canada's inventory issues far more substantial than a mere "inventory overhang," but were a result of the systemic problems with Target Canada's supply chain IT systems, as detailed herein. Additionally, the statement referenced in ¶208 above comparing the handling of the Canadian Segment's inventory problems to the "same kind of fine tuning that we go through every time we open a new store here in the United States, and they have experienced for years and years" was materially false and misleading when made because Defendants knew, or recklessly disregarded that the Company had never encountered such systemic problems to the extent of what was taking place in Canada. For these same reasons, the statement referenced above

in ¶208 that Target Canada's inventory issues were "no different than what we've experienced [in the U.S.]," was materially false and misleading when made.

210. Additionally, Defendant Mulligan was asked about the incremental dilution in Target's stock price attributed to the Canadian Segment. Defendant Mulligan's exchange with the analyst set forth, in pertinent part, as follows:

> **Greg Melich - ISI Group – Analyst**:
>
> I wanted to follow up on Canada and then touch on the US. Just to make sure I've got that right, or maybe ask it a different way, John, if you look at the incremental Canadian dilution this year, how much of it is related to those items of clearance? How much of it would be related to, if you will, start up costs or advertising? How much of it do you think is just a different margin structure in the business to drive that frequency in trips?
>
> **John Mulligan - Target Corporation – EVP and CFO**:
>
> Yes, I think parsing that all out is difficult. I would say that the second one, incremental marketing and advertising is not material to the total move from where we were to where we are today. I think the biggest driver of the change in profitability or dilution this year comes from, we had a set of sales expectations as we entered in the market, and we also, given all of the excitement that we saw building over two years, we protected on the upside from an expense standpoint and from an inventory standpoint, and the sales have been somewhat disappointing. And so we need to work through those inventories. There's some clearance activity, ***there was some excess inventory this quarter, as well, that we work through***. And we need to right size the entire expense structure for what -- for the sales numbers that are currently -- that we're operating at. So, I think that's the vast majority of it.

211. The statement referenced in ¶210 above that Target Canada had "some excess inventory" was materially false and misleading when made, because it grossly understated and failed to disclose the adverse facts about the Canadian Segment's inventory issues including systemic problems with its supply chain IT systems, as detailed herein, which were known to Defendants or recklessly disregarded by them.

212. Also on the 8/21/13 Conf Call, Defendants backed off projections that Target Canada would become accretive to earnings beginning in Q4 2013. *See supra* ¶¶164, 179, 191, 198. Defendants also announced that it was unlikely that Target Canada would be profitable for FY 2014. Defendant Mulligan was asked about this by an analyst. His exchange with that analyst set forth, in pertinent part, as follows:

> **Sean Naughton - Piper Jaffray – Analyst**:
>
> Yes, so the question is is there an ability to say that the Canadian business will be – you believe the Canadian business may be accretive in 2014.
>
> **John Mulligan - Target Corporation – EVP and CFO**:
>
> So on 2014, I think it's very early here, and we've given you our best view. I think when you step back we've been operating 60 some stores for on average about 2.5 months, and so we're giving you our best information here for 2013. And clearly sales are a little bit short of where we need to work through some of the inventory and optimizing the business and optimizing our expense structure. I think as we look forward [to] getting another 56 stores open, getting through a holiday will certainly provide a lot more information about where we expect to be. ***But in 2014, I think we expect to see meaningful improvement in the profitability of Canada***. We'll cycle past all of the start up expenses, we'll have our inventories more in line with sales patterns that we now have some information on. Our expense structure will be optimized to the sales level and we'll start to grow sales. ***So I think we'll see meaningful improvement in 2014***, but I would say probably from this perspective today, ***unlikely that we'll see profitability on the full year*** . . . .

213. Several analysts commented on the Company's unexpected downward revision for the Canadian Segment. J.P. Morgan stated in an analyst report issued the same day, "Canada dilution [was] a ***big surprise***" and Piper Jaffray analysts issued a report stating that, "[w]hile some of the challenges in the market were known, ***the magnitude of the guide-down was a surprise***, as was management's commentary that Canada is not expected to be profitable for the full year 2014." Additionally, Telsey Advisory Group noted in its analyst

report issued the next day that "***the Canadian segment performance and outlook was surprisingly disappointing*** . . . [t]he segment is not anticipated to deliver full year EPS accretion until 2015 – ***a full year after prior indications***."

214. In response to these disappointing results, the price of Target common stock declined from $67.95 per share on August 20, 2013 to close at $65.50 per share on August 21, 2013 – a decline of approximately $2.45 per share, or approximately 3.6%. This decline in Target's common stock was caused in part from a materialization of the risk of the undisclosed systemic problems impacting Target Canada's supply chain IT systems. Target's common stock, however, remained artificially inflated as a result of false and misleading statements and material omissions made by Defendants during the Class Period.

215. The statements referenced in ¶212 above were materially false and misleading when made because Defendants knew about, or recklessly disregarded, the systemic problems Target Canada was facing with its supply chain IT systems and the impact they were having in Target Canada's stores and distribution centers. Until Defendants corrected these problems, they lacked a reasonable basis in providing this guidance.

216. That same day, August 21, 2013, Tony Fisher, in a phone interview with the *Financial Post*, stated, in pertinent part, as follows:

> We continue to learn a lot. There are things we're learning about our guests about what they expect and I'd say where that's most evident is just how that guest shops across our entire store . . . ***we don't have to make transformational changes in our business model, it really is tweaks***.

217. The statements referenced in ¶216 above that, with respect to Target Canada, "we don't have to make transformational changes in our business model, it really is tweaks"

was materially false and misleading when made, because Defendants knew, or recklessly disregarded, that "transformational changes" were exactly what was required to fix the systemic problems with supply chain IT systems and that mere tweaks had not and would not be able to cure such problems.

218. Also on August 21, 2013, Tony Fisher was interviewed about the Company's Canadian expansion by the *Wall Street Journal*. Fisher engaged in the following exchange with the interviewer regarding the necessary changes to Target's Canadian operations:

> WSJ: When Target launched in Canada it faced criticism for inventory shortages at some of its stores and higher pricing here compared to its U.S. stores. What is Target doing to address these criticisms? Is Target making any other changes to the way it operates in Canada?
>
> Fisher: ***We have a lot of tweaks that we need to make*** as far how we replenish the stores, what categories we are replenishing, which ones are selling better, which ones are slower. ***They're not transformational changes, really tweaks*** to make sure that we are consistent with replenishing the stores based on the guests' shopping. . . .

219. The statements referenced in ¶218 above that the Canadian Segment needed "tweaks" and not "transformational changes" were materially false and misleading when made for the reasons stated in ¶217 above.

220. On August 28, 2013, Target filed its quarterly report on Form 10-Q with the SEC for 2Q13 (the "2Q13 Form 10-Q"), which was signed by Defendant Mulligan. The 2Q13 Form 10-Q reiterated the Company's 2Q13 financial results reported in the 8/21/13 Press Release, as set forth in ¶¶200-01 above. The 2Q13 Form 10-Q was falsely certified by Defendants Steinhafel and Mulligan, as noted in ¶¶176-77 above. It contained actionable

omissions pursuant to Item 303 of Regulation S-K [17 C.F.R. §229.303], as alleged in ¶¶268-72, *infra*.

**Fourth Quarter 2013 Statements**

221. On October 30, 2013, Target held a Financial Community Meeting (the "2013 FCM") in Toronto, Canada, in which Defendants Steinhafel and Mulligan, among others, updated the market on the state of the Company's business and, in particular, the Canadian Segment.

222. During the 2013 FCM, Tony Fisher, President of Target Canada, commented on the Company's supply chain and infrastructure technology in Canada, stating, in pertinent part, as follows:

> We are simplifying processes and improving replenishment practices at our stores, things we take for granted after 50 years in the US, to help us operate more efficiently and strengthen our presentation. For instance, in July we rolled out an important receiving process improvement which cut the amount of time it takes to check in a trailer at a store from about 25 minutes to less than two minutes. And it is more accurate. And systematic replenishment in store, which we are now unveiling nationwide, has shown promising results in pilot stores, getting merchandise out of the back room quickly and on to the sales floor. Our stores, merchandising team, vendors, and sourcing offices are working together to improve our ordering practices. ***And we are doing whatever it takes to clear excess merchandise out of our supply chain so we can more efficiently and effectively and correctly flow product from our distribution centers to our stores***.
>
> A key part of this work is getting more familiar with and efficient in the use of our technology and tools. To stick to our timeline, we decided to build and integrate an entirely new technology infrastructure with best-in-class package solutions from Retalix, JDA, SAP, and WMS. We chose these solutions in part because they allowed us to start with a very narrow scope, ensuring speed to market, but they also gave us the flexibility to rapidly add enhancements based on what we are learning now that we are opening and operating stores. ***Now our team is getting better every day at interacting with this new***

> ***technology and we are quickly executing hundreds of fixes to make this suite of systems even easier for our team members to use*.**

223. The statement referenced in ¶222 above that, in Canada, Target was "doing whatever it takes to clear excess merchandise out of our supply chain so we can more efficiently and effectively and correctly flow product from our distribution centers to our stores" was materially false and misleading when made, because Defendants knew, or recklessly disregarded, that a complete reset of the supply chain IT systems was what was actually required to solve its systemic problems. The statement referenced in ¶222 above that Target Canada was "getting better every day at interacting with this new technology and we are quickly executing hundreds of fixes to make this suite of systems even easier for our team members to use" was materially false and misleading when made, because it failed to disclose any of the numerous problems that the Company was experiencing with its supply chain IT systems, let alone their systemic nature, which Defendants knew, or recklessly disregarded.

224. Defendant Fisher was asked during the 2013 FCM about the technology chosen for Target Canada. Defendant Fisher's exchange with the analyst, stated, in pertinent part, as follows:

> **Peter Benedict - Robert W. Baird – Analyst**:
>
> You laid out a number of 2014 operational initiatives to kind of get Canada back on track. Just curious which of those were part of the initial plan, always going to happen; were there any that were kind of new that you kind of put into the plan?. . . .

**Tony Fisher – President Target Canada**:

> So we had plans, and we started these back in 2012, as far as we were going to start lean, start with a very narrow scope. The fact that we went out of the box with these technology solutions allowed us to react and enhance those very, very quickly after opening. So given our performance and the fact that we are sort of our initial sales goal, ***we are staying with all the initial plans because they are the right ones***.

225. The statement referenced in ¶224 above that the plans for the Canadian Segment's technology solutions "are the right ones" was materially false and misleading when made, because Defendants knew about, or recklessly disregarded, the systemic problems that they were experiencing with supply chain IT systems, including SAP, JDA, Retalix and its warehouse management system, Manhattan.

226. Additionally, Defendant Mulligan gave remarks during the 2013 FCM accompanied by presentation slides in which he discussed, *inter alia*, the Canadian Segment. Defendant Mulligan stated, in pertinent part, as follows:

> You can see that while it's steeper than we initially planned, ***our updated expectation is well within the range of our experience in the US. In fact, our Canada plan now matches the pattern we saw following the launch of some of our strongest US markets, including Philadelphia and Washington, DC. Furthermore, as Tony explained earlier, we have a clear understanding of the reasons why we've seen initial softness, and we have a detailed plan to address them***.
>
> * * *
>
> As Gregg mentioned, we have made a long term investment in these stores, and we continue to expect them to be very productive assets. In the meantime, ***we are devoting all necessary resources, and doing whatever it takes, to get our inventory and operations in line***.

227. The statement referenced in ¶226 above that Defendants' plan "now matches the pattern we saw following the launch of some of our strongest US Markets" was

materially false and misleading when made, because Defendants knew, or recklessly disregarded that Target had never before faced the severe systemic issues that it was currently facing with respect to its supply chain IT systems. The statement referenced in ¶226 above that Target had a "clear understanding of the reasons why we've seen initial softness, and we have a detailed plan to address them" was materially false and misleading when made, because Defendants both failed to articulate what these "reasons" were, which Defendants knew, or recklessly disregarded, and provided few, if any, of the specifics making up this so-called "detailed plan." Additionally, the statement referenced in ¶226 above that Target Canada was "doing whatever it takes, to get our inventory and operations in line" was materially false and misleading when made, because, as noted herein, Defendants knew, or recklessly disregarded, that the systemic nature of these problems would require major, wholesale changes to fix.

228. Defendants painted an optimistic long-term picture for the Canadian Segment during the 2013 FCM, but Defendants did not specifically report on its performance for the current quarter or change FY 2014 EPS guidance. According to a Piper Jaffray analyst report, following the conference, "[t]he lack of commentary at the analyst day or pre-release suggests results are within the range of initial outcomes outlined on the Q2 analyst call as ***we do not believe the company would lay out long term expectations only to miss expectations when Q3 results are reported in three weeks***." As the market would soon learn, however, Target had performed below expectations during the quarter in Canada, and reduced its outlook for the Canadian Segment.

229. On November 21, 2013, prior to the trading session, Target announced its financial and operational results for the period ended November 2, 2013 ("3Q13") in a press release (the "11/21/13 Press Release"), which it filed with the SEC on Form 8-K. In the 11/21/13 Press Release, Target reported 3Q13 net earnings of $341 million or EPS of $3.52. The Company also lowered guidance for full-year 2013 EPS of between $4.59 to $4.69, versus prior guidance of $4.70 to $4.90.

230. The 3Q13 results announced in the 11/21/13 Press Release revealed that Target was struggling mightily in Canada. For the Canadian Segment, Target reported an EBIT loss of $238 million, a gross margin rate of 14.8 percent, driven by efforts to "clear excess inventory," and EPS dilution attributed to the Canadian Segment of ($0.29). Target once again raised its expected full-year EPS dilution attributed to the Canadian Segment – up from ($0.82) to a range of ($0.95) to ($1.05). The Company also projected a range of ($0.22) to ($0.32) of Canadian Segment EPS dilution for the upcoming quarter.

231. That same day, the Company held a conference call with analysts and investors (the "11/21/13 Conf Call") to discuss the financial results and other information set forth in the 11/21/13 Press Release. During the 11/21/13 Conf Call, Defendants Steinhafel and Mulligan reiterated Target's financial results as detailed in the 11/21/13 Press Release and discussed the Company's inventory levels and supply chain with respect to the Canadian Segment. Despite revealing both that the Canadian Segment was performing poorly and that there were some inventory issues, Defendants continued to make representations downplaying the true extent of the problems that Target was facing in Canada. In fact,

Defendant Steinhafel told investors that the Company's inventory levels in Canada were actually improving.

232. As part of his prepared remarks, Defendant Steinhafel stated, in pertinent part, as follows:

> The Target Canada team is energized and prepared for the holiday season, and preparing to enter 2014 with ***improved in-stocks and a much better inventory position***.

233. The statements referenced in ¶232 above were materially false and misleading when made because even though Target may have been attempting to fix some of the problems the Company faced in Canada, regardless of whatever steps had been taken Defendants failed to disclose that deeper, systemic problems existed and unless these problems were corrected they would continue to exist.

234. Defendant Mulligan also commented on the Company's inventory position in the Canadian Segment, stating, in pertinent part, as follows:

> In our Canadian segment, we opened another 23 stores in the third quarter, even as ***we continue to work to refine operations and improve performance***. In the quarter, the team made a lot of progress in their efforts to begin to rationalize our inventory position, update item counts in stores and distribution centers, and improve network flow.

235. The statement referenced in ¶234 above that "we continue to work to refine operations and improve performance" was materially false and misleading when made, because Defendants failed to disclose the adverse fact that the systemic nature of these problems faced in Canada would require major, wholesale changes to fix, which was known to Defendants or recklessly disregarded by them. Target Canada was in need of significant process changes and Defendants were aware, but continued to fail to disclose this.

236. The market's reaction to the Company's 3Q13 results, updated guidance, and continued struggles in Canada was swift. On November 21, 2013, Piper Jaffray issued an analyst report stating, "***[g]iven no update to Canada guidance at the analyst day, we're surprised by the magnitude of the miss and guidance reduction***." The next day, Telsey Advisory Group wrote, "[w]hile the US business was essentially in line with expectations, ***Canada came in worse than anticipated***. ***Moreover, the outlook is even worse than most anticipated*** – mainly due to ongoing pressure in Canada – ***following the company's recent analyst meeting***." Additionally, J.P. Morgan said in a November 22, 2013 analyst report that "***[t]he miss may have confounded investors given the recent the [sic] 10/30 Analyst Day as many thought the 'all clear' was signaled***."

237. In response to these disappointing results, the price of Target common stock declined from $66.49 per share on November 20, 2013 to close at $64.19 per share on November 21, 2013 – a decline of approximately $2.30 per share, or approximately 3.5%. This decline in Target's common stock was caused in part from a materialization of the risk of the undisclosed systemic problems impacting Target Canada's supply chain IT systems. Notwithstanding these disclosures by the Company, Target's common stock remained artificially inflated as a result of false and misleading statements and material omissions made by Defendants during the Class Period.

238. On November 27, 2013, Target filed its quarterly report on Form 10-Q with the SEC for 3Q13 (the "3Q13 Form 10-Q"), which was signed by Defendant Mulligan. The 3Q13 Form 10-Q reiterated the Company's 3Q13 financial results reported in the 11/21/13 Press Release, as set forth in ¶¶228-29 above. The 3Q13 Form 10-Q was falsely certified by

Defendants Steinhafel and Mulligan, as noted in ¶¶176-77 above. It contained actionable omissions pursuant to Item 303 of Regulation S-K [17 C.F.R. §229.303], as alleged in ¶¶268-72, *infra*.

**First Quarter 2014 Statements**

239. On January 10, 2014, Target issued a Press Release (the "1/10/14 Press Release"), in which it provided early estimates for the Company's 4Q13 financial results. In the 1/10/14 Press Release, the Company stated, *inter alia*, that it expected approximately ($0.45) of dilution related to the Canadian Segment, compared with prior guidance, which it had only recently given in the 11/21/13 Press Release, of a range between ($0.22) to ($0.32). The Company stated that the revised dilution numbers were "driven by the gross margin impact of continued efforts to clear excess inventory."

240. Analysts were surprised to learn of this downward revision for the Canadian Segment. For example, a Piper Jaffray analyst report issued the same day noted that "the ***Canadian business continues to come in worse than anticipated***, which we view as another disappointment and are hopeful Target sets realistic expectations for this segment in 2014."

241. On this news, the price of Target common stock declined from $63.34 per share on January 9, 2014 to close at $62.62 per share on January 10, 2014 – a decline of approximately $0.72 per share, or approximately 1.14%. This decline in Target's common stock was caused in part from a materialization of the risk of the undisclosed systemic problems with Target Canada's supply chain IT systems. Target's common stock, however, remained artificially inflated as a result of false and misleading statements and material

omissions made by Defendants during the Class Period. Defendants had not revealed the significant systemic problems that plagued Target Canada.

242. On February 26, 2014, prior to the trading session, Target announced its financial and operational results for the three and twelve month period ended February 1, 2014 ("4Q13") in a press release (the "2/26/14 Press Release"), which it filed with the SEC on Form 8-K. In the 2/26/14 Press Release, Target reported 4Q13 net earnings of $520 million or EPS of $0.81 and full-year net earnings of $1.97 billion. Additionally, for the Canadian Segment, Target reported fourth quarter and full-year 2013 EBIT losses of $329 million and $941 million, respectively, as well as a fourth quarter gross margin rate of 4.4 percent, driven by efforts to "clear excess inventory."

243. That same day, Target hosted a conference call for analysts and investors (the "2/26/14 Conf Call"), to discuss these results. During the call, CFO Mulligan stated, in pertinent part, as follows:

> In the Canadian segment, sales came in just below expectations. Importantly as Gregg mentioned, we took advantage of holiday traffic to clear through a significant amount of excess inventory in the quarter, and while we expect some small lingering issues with long lean receipts this year, ***the Canadian segment ended 2013 in a much cleaner inventory position***, paving the way for smoother operations in 2014. In all, the segment drove $0.40 of EPS dilution in the fourth quarter, better than the expectations we provided in our January press release.

244. The statement referenced in ¶243 above that Target Canada had "a much cleaner inventory position" was materially false and misleading when made, because Defendants failed to disclose the severe systemic problems with Target Canada's supply chain IT systems that continued to cause significant inventory problems.

245. On March 14, 2014 Target filed its annual report on Form 10-K with the SEC for FY 2013 (the "2013 Form 10-K"), which was signed by Defendants Steinhafel and Mulligan. The 2013 Form 10-K reiterated the Company's FY 2013 financial results reported in the 2/26/14 Press Release, as set forth in ¶242. The 2013 Form 10-K was falsely certified by Defendants Steinhafel and Mulligan, as noted in ¶¶176-77.

246. The 2013 Form 10-K also included representations about Target's approach to inventory management, stating, in pertinent part, as follows:

> Our ability to deliver a preferred shopping experience to our guests is supported by ***our strong supply chain and technology infrastructure***, a devotion to innovation that is ingrained in our organization and culture, and our disciplined approach to managing our business and investing in future growth.
>
> * * *
>
> ***We achieve effective inventory management by being in-stock in core product offerings***, maintaining positive vendor relationships, and carefully planning inventory levels for seasonal and apparel items to minimize markdowns.
>
> * * *
>
> ***A substantial part of our business is dependent on our ability to*** make trend-right decisions and ***effectively manage our inventory*** in a broad range of merchandise categories, including apparel, home decor, seasonal offerings, food and other merchandise. ***Failure to accurately predict constantly changing consumer tastes, preferences, spending patterns and other lifestyle decisions , and personalize our offerings to our guests may result in lost sales, spoilage and increased inventory markdowns, which would lead to a deterioration in our results of operations by hurting our sales, gross margins and profitability***.
>
> * * *
>
> ***We rely extensively on our computer systems to manage inventory***, process guest transactions, manage guest data, communicate with our vendors and other third parties, service REDcard accounts and summarize and analyze

> results, and on continued and unimpeded access to the internet to use our computer systems. Our systems are subject to damage or interruption from power outages, telecommunications failures, computer viruses and malicious attacks, security breaches and catastrophic events. ***If our systems are damaged or fail to function properly, we may incur substantial repair or replacement costs, experience data loss and impediments to our ability to manage inventories or process guest transactions, and encounter lost guest confidence, which could adversely affect our results of operations***. The Data Breach we experienced negatively impacted our ability to timely handle customer inquiries, and we experienced weaker than expected U.S. Segment sales following the announcement of the Data Breach.

247. The statement referenced in ¶246 above that Target had a "strong supply chain and technology infrastructure" was materially false and misleading when made because it failed to disclose the adverse fact that its Canadian Segment had neither a "strong" supply chain nor "strong" technology infrastructure. Rather, Defendants knew or recklessly disregarded that systemic problems existed within Target Canada's supply chain IT systems. The statement referenced in ¶246 above that "we achieve effective inventory management" was materially false and misleading when made because Defendants failed to disclose that Target did not have effective inventory management with respect to its Canadian Segment. The statement referenced in ¶246 above that failure to "effectively manage our inventory . . . may result in lost sales, spoilage and increased inventory markdowns, which would lead to a deterioration in our results of operations" was materially false and misleading when made because Defendants failed to disclose that, at the time, Target was not effectively managing inventory due to systemic problems with its Canadian Segment's supply chain IT systems. Similarly, the statement referenced in ¶246 above that "[i]f our systems are damaged or fail to function properly," it "could adversely affect our results of operations" was materially false and misleading when made because Defendants failed to disclose that, at the time,

systemic problems with its Canadian Segment's supply chain IT systems did prevent them from functioning properly, and did adversely affect its results.

248. In addition, the 2013 Form 10-K included representations about Target's approach to capital investments in technology and new stores, stating, in pertinent part, as follows:

> ***If our capital investments in technology, new stores and remodeling existing stores do not achieve appropriate returns, our competitive position, financial condition and results of operations may be adversely affected***.
>
> Our business is becoming increasingly reliant on technology investments and the returns on these investments are less predictable than building new stores and remodeling existing stores. We are currently making, and will continue to make, significant technology investments to support our multichannel efforts, implement improvements to our guest facing technology and transform our information processes and computer systems to more efficiently run our business and remain competitive and relevant to our guests. ***These technology initiatives might not provide the anticipated benefits or may provide them on a delayed schedule or at a higher cost***. We must monitor and choose the right investments and implement them at the right pace. ***Targeting the wrong opportunities, failing to make the best investments, or making an investment commitment significantly above or below our needs could result in the loss of our competitive position and adversely impact our financial condition or results of operations***.
>
> * * *
>
> ***We continually make significant technology investments that will help maintain and update our existing computer systems***. Implementing significant system changes increases the risk of computer system disruption. ***Additionally, the potential problems and interruptions associated with implementing technology initiatives could disrupt or reduce our operational efficiency, and could impact the guest experience and guest confidence***.

249. The statement referenced in ¶248 above that Target's "financial condition and results of operations may be adversely affected" by its "capital investments in technology [and] new stores" was materially false and misleading when made because it failed to

disclose the adverse fact that its investments in technology and new stores in Canada were ***already*** adversely affecting the Company's financial condition and results. Rather, Defendants knew or recklessly disregarded that systemic problems existed within Target Canada's supply chain IT systems. Likewise, the statement referenced in ¶248 above that Target's "technology initiatives might not provide the anticipated benefits" was materially false and misleading when made because it failed to disclose that Target Canada's supply chain IT systems ***already*** did not provide the anticipated benefits due to these systemic problems. Further, the statements referenced in ¶248 above that "[t]argeting the wrong opportunities" or "failing to make the best investments . . . could result in the loss of our competitive position and adversely impact our financial condition or results of operations" were materially false and misleading when made because they failed to disclose that the Company ***already*** targeted the wrong opportunity in Canada and failed to make the best investments in its supply chain IT systems; rather, Defendants knew or recklessly disregarded systemic problems with Target Canada's supply chain IT systems that were ***already*** adversely impacting the Company. In addition, the statement referenced in ¶248 above that "problems and interruptions" from "implementing technology initiatives could disrupt or reduce our operational efficiency, and could impact the guest experience and guest confidence" was materially false and misleading when made because Defendants systemic problems with its Canadian Segment's supply chain IT systems already were disrupting the Company's operational efficiency and already were negatively impacting guest experience and confidence.

250. Further, the 2013 Form 10-K included representations about Target's expansion into Canada, stating, in pertinent part, as follows:

> In fiscal 2013 we opened 124 Target stores in Canada, which was our first retail store expansion outside of the United States. Our initial sales and operating results in Canada have not met our initial expectations. Improving our sales in Canada is contingent on our ability to deploy new marketing programs that positively differentiate us from other retailers in Canada, and achieve market acceptance by Canadian guests. In addition, our sales and operating results in Canada are dependent on our ability to manage our inventory to offer the expected assortment of merchandise to our Canadian guests while avoiding overstock situations, and general macroeconomic conditions in Canada. ***If we do not effectively execute our marketing program and manage our inventory in Canada, our financial results could be adversely affected***.

251. The statement referenced in ¶250 above that Target's "financial results could be adversely affected" if it does "not effectively . . . manage [its] inventory in Canada" was materially false and misleading when made because it failed to disclose that its failure to effectively manage inventory in Canada was ***already*** adversely affecting the Company's financial results. Rather, Defendants knew or recklessly disregarded that systemic problems existed within Target Canada's supply chain IT systems.

252. Additionally, the results of the Canadian Segment for FY 2013 were reported in the 2013 Form 10-K, in pertinent part, as follows:

**Canadian Segment**

| **Canadian Segment Results** | | | | Percent Change | |
|---|---|---|---|---|---|
| (dollars in millions) | **2013** | 2012 | 2011 | **2013/2012** | 2012/2011 |
| Sales | **$ 1,317** | $ — | $ — | **n/a** | n/a |
| Cost of sales | **1,121** | — | — | **n/a** | n/a |
| Gross margin | **196** | — | — | **n/a** | n/a |
| SG&A expenses | **910** | 272 | 74 | **234.9** | 268.7 |
| EBITDA | **(714)** | (272) | (74) | **162.6** | 268.7 |
| Depreciation and amortization | **227** | 97 | 48 | **133.6** | 103.2 |
| EBIT | **$ (941)** | $ (369) | $ (122) | **155.0%** | 203.5% |

| **Canadian Segment Rate Analysis** | **2013** |
|---|---|
| Gross margin rate | **14.9%** |
| SG&A expense rate | **69.1** |
| EBITDA margin rate | **(54.2)** |
| Depreciation and amortization expense rate | **17.3** |
| EBIT margin rate | **(71.5)** |

253. Even though the 2013 Form 10-K contained some financial disclosures regarding the performance of the Canadian Segment, it failed to contain a meaningful discussion of the performance of Target Canada. Pursuant to Item 7 of Form 10-K, Target's Class Period SEC filings were required to furnish the information required under Item 303 of Regulation S-K [17 C.F.R. §229.303], including any known trends, events or uncertainties that have caused or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results. The 2013 Form 10-K failed to disclose information required under Item 303(a)(3), including, *inter alia*, a discussion or quantification of both the extent to which the poor performance of the Canadian Segment was attributed to startup-costs and whether Defendants expected the Canadian Segment to continue to negatively impact the Company's operations. In addition, the 2013 Form 10-K omitted a meaningful

discussion of (a) the known, reasonable likelihood that systemic problems with the Canadian Segment's supply chain IT systems – which management created and tested so inadequately – would have a materially negative impact on the Company's performance, or (b) known trends regarding the systemic problems with the Canadian Segment's supply chain IT systems already negatively impacting the Company's performance.

254. Providing no reason why the Company suffered, *inter alia*, a massive $941 million EBIT loss, the 2013 Form 10-K merely noted that "due to the start-up nature of our Canadian Segment," certain of the financial information Defendants provided "may not be indicative of future results." Target also provided no explanatory information with respect to the considerable dilution to GAAP earnings per share that was credited to the Canadian Segment.

255. Target's failure to comply with Item 303 in connection with the Canadian Segment in the 2013 Form 10-K caught the attention of the SEC. On April 28, 2014, the SEC sent a letter to Defendant Mulligan regarding the 2013 Form 10-K (the "4/28/14 SEC Letter"), requesting that Target provide additional information on several items discussed therein. In particular, the SEC demanded that the Company explain why certain information relating to Canadian Segment was not disclosed in the 2013 Form 10-K. In the 4/28/14 SEC Letter, the SEC stated, in pertinent part, as follows:

> <u>Canadian Segment, page 23</u>
>
> We note the significant dilution to GAAP earnings per share attributed to the results of the Canadian Segment. ***Please tell us what consideration you gave to discussing and quantifying the extent to which the fiscal 2013 performance of the Canadian Segment is attributed, on the one hand, to start-up costs and challenges versus, on the other hand, lower than***

> ***anticipated sales and earnings of Canadian stores once opened. Additionally, please tell us what consideration you gave to disclosing the extent to which the performance of the Canadian Segment can reasonably be expected to continue to negatively impact your results of operations in future periods.*** Please refer to Item 303(a)(3) of Regulation S-K.

**Second Quarter 2014 Statements**

256. On May 21, 2014, prior to the opening of trading, Target announced its financial and operational results for the three month period ended May 3, 2014 ("1Q14") in a press release (the "5/21/14 Press Release"), which it filed with the SEC on Form 8-K. In the 5/21/14 Press Release, Target reported 1Q14 net earnings of $418 million, which amounted to a 16% drop in profit from the prior year and EPS of $0.66. For the Canadian Segment, Target reported first quarter 2014 EBIT losses of $211 million and a first quarter gross margin rate of 18.7 percent, reflecting the "continued impact of efforts to clear excess inventory, including long lead-time receipts." Target also reported that it expected Adjusted EPS of $0.85 to $1.00 in the second quarter of 2014.

257. That same day, Target hosted a conference call for analysts and investors (the "5/21/14 Conf Call"), to discuss these results. During the call, Defendant Mulligan was asked by an analyst about the performance of Target Canada stores based on the cycle in which they opened. Defendant Mulligan's exchange with the analyst set forth, in pertinent part, as follows:

> **Matthew R. Nemer – Wells Fargo – Analyst**:
>
> [C]an you talk to the early cycle stores versus the later cycle stores in Canada? Anything you can share on the difference between the financial metrics in the various cohorts. Thanks.

**John Mulligan - Target Corporation – Interim President & CEO, CFO**

> Yeah, we – as we said, we continue to see improvement across the business into April as the guests data improved, and our sales improved. And the early cycle stores continue to be the best. And it's – again almost in order down the sheet, like one cycle, two-cycle, three-cycle, four-cycle, five. ***So, the earliest stores, the longer they've been open, they performed the better, but the good thing is all cycles are on an upward path***.

258. The statements referenced in ¶257 above that "the earliest stores, the longer they've been open, they performed the better" and that "all cycles are on an upward path" were materially false and misleading when made because Defendants knew, or recklessly disregarded, that Target Canada stores continued to perform poorly, including those opened in early cycles, as would later be revealed to investors on August 20, 2014 (*infra* ¶264).

259. On May 29, 2014, Target filed its quarterly report on Form 10-Q with the SEC for 1Q14 (the "1Q14 Form 10-Q"), which was signed by Defendant Mulligan. The 1Q14 Form 10-Q reiterated the Company's 1Q14 financial results reported in the 5/21/14 Press Release, as set forth in ¶256 above. The 1Q14 Form 10-Q was falsely certified by Defendants Mulligan, as noted in ¶¶176-77 above. It contained actionable omissions pursuant to Item 303 of Regulation S-K [17 C.F.R. §229.303], as alleged in ¶¶268-72, *infra*.

260. On May 29, 2014, Defendant Mulligan sent a letter on behalf of Target in response to the 4/28/14 SEC letter. Target acknowledged that "***[d]uring the year, we experienced significant supply chain issues that contributed to inadequate in-stock levels and excess inventory in our distribution facilities***." The response letter went on to state that "[t]hese issues, combined with softer-than-expected sales, resulted in performance below our expectations. Because of the interrelated nature of these issues, we were unable to separately

identify and quantify the impacts from start-up issues versus lower-than-expected sales and earnings."

261. The statements referenced in ¶260 above were materially false and misleading when made because, even though Target acknowledged that the Company faced "significant" issues with its supply chain, it still failed to disclose that the systemic nature of these problems would require major, wholesale changes to fix, including a total reset.

262. On August 5, 2014, Target issued downward guidance for the second quarter of 2014 and reported that sales in the Canadian Segment continued to suffer from the "impact of continued investments to clear excess inventory." Part of the reason that Target reported this downward guidance was due to the fact that a reset of systems was needed in the Canadian Segment, which was disclosed later that month. On this news, the price of Target common stock declined from $60.70 per share on August 4, 2014 to close at $58.03 per share on August 5, 2014 – a decline of approximately $2.67 per share, or approximately 4.4%. Target Common stock continued to decline on August 6, 2014, from $58.03 per share on August 5, 2014 to close at $57.97 per share, as analysts commented on Target Canada's continued struggles.

263. Less than a week later, on August 12, 2014, Target admitted to the market, for the first time, that the problems with its supply chain IT systems were indeed systemic and, as a result, a full reset of its dreadful supply chain was necessary. The Company announced a "variety of initiatives to address in-stock issues" that Target had experienced in Canada since the beginning. In particular, the Company announced, that it would conduct, *inter alia*,

a "physical count of inventory at all stores, ***resulting in a reset of systems***, and more accurate ordering and shipping data."

264. On August 20, 2014, Target held a conference call with analysts and investors during which Target officials, including Defendant Mulligan, revealed part of the reason why Target had performed so poorly, as announced on August 5, 2014. Defendants expanded on the steps being taken to attempt to rectify Target Canada's supply chain problems that were first identified on August 12, 2014. Kathee Tesija, Target's Chief Merchandising and Supply Chain Officer, stated that "[t]o address in-stocks, the team is taking action on four dimensions: ***better reporting to identify in stock issues sooner; retraining our teams on best methods; developing new best methods tailored to Canadian segment systems; and reconfiguring systems*** to work more effectively over the long run." Defendants also announced that same-store sales decreased more than 11% in Canada over the prior year as a result of ongoing supply chain problems. Because the only stores that could be included in this metric were stores open for at least a year as of June 2013, this figure directly contrasted with Defendant Mulligan's statement on the 5/21/14 Conf Call that the early cycle Target Canada stores were performing well.

265. Despite the fact Defendants acknowledged what they had known was needed to address these problems, these efforts came too late. On January 15, 2015, less than two years after Target Canada opened its first store, Target issued a press release announcing it planned to discontinue all operations in Canada and that Target Canada had filed for insolvency protection under the laws of Canada.

**Summary of SEC Filings Signed by the Individual Defendants During the Class Period**

| Individual Defendant | SEC Filing Signed or Certified |
|---|---|
| Gregg W. Steinhafel | Signed 2012 Form 10-K<br>SOX Certification for the 2012 Form 10-K<br>SOX Certification for the 1Q13 Form 10-Q<br>SOX Certification for the 2Q13 Form 10-Q<br>SOX Certification for the 3Q13 Form 10-Q<br>Signed 2013 Form 10-K<br>SOX Certification for the 2013 Form 10-K |
| John J. Mulligan | Signed 2012 Form 10-K<br>SOX Certification for the 2012 Form 10-K<br>Signed 1Q13 Form 10-Q<br>SOX Certification for the 1Q13 Form 10-Q<br>Signed 2Q13 Form 10-Q<br>SOX Certification for the 2Q13 Form 10-Q<br>Signed 3Q13 Form 10-Q<br>SOX Certification for the 3Q13 Form 10-Q<br>Signed 2013 Form 10-K<br>SOX Certification for the 2013 Form 10-K<br>SOX Certification for the 1Q14 Form 10-Q |

266. As set forth above, the Individual Defendants signed the above-referenced annual and quarterly SEC filings made by Target during the Class Period, and are therefore deemed to have made the statements therein.

267. The statements made in each filing are deemed to be statements made by each Individual Defendant who signed that filing. The Individual Defendants are responsible and liable for all of the misstatements and omissions contained in each filing that they signed.

**Target's Class Period SEC Filings Omitted Known Trends, Events and Uncertainties that Were Impacting, and Would Impact, the Company's Financial Results**

268. Pursuant to Item 7 of Form 10-K and Item 2 of Form 10-Q, Target's Class Period SEC filings were required to furnish the information required under Item 303 of

Regulation S-K [17 C.F.R. §229.303], including any known trends, events or uncertainties that have caused or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results.

269. In 1989, the SEC issued an interpretive release on Item 303 and the disclosure required under the regulation. *See* Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), SEC Release No. 6835, 1989 WL 1092885, at *1 (May 18, 1989) (hereinafter referred to as "1989 Interpretive Release"). In the 1989 Interpretive Release, the SEC stated, in pertinent part, that:

> Required disclosure is based on currently known trends, events and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract. . . . A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

*Id*., at *4.

270. Furthermore, the 1989 Interpretive Release provided the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.

*Id.*, at *6.

271. The following were known trends, events, or uncertainties that Defendants knew were having, and were reasonably likely to have, an impact on the Company's continuing operations and, therefore, were required to be disclosed by Defendants pursuant to Item 303 in the 2012 Form 10-K, 1Q13 Form 10-Q, 2Q13 Form 10-Q, 3Q13 Form 10-Q, 2013 Form 10-K, and 1Q14 Form 10-Q, but were not:

(a) Target Canada suffered from severe and unresolved systemic problems with its supply chain IT systems which negatively impacted sales and profits;

(b) The longer Defendants waited to address these problems, the worse they were going to get; and

(c) Contrary to their representations about these issues, as these problems increased in scope due, in part, to a significant increase in the number of stores Target Canada operated, Defendants reasonably expected these issues to continue to negatively impact Target's results of operations over future periods.

272. As referenced by the SEC in the 4/28/14 Letter, Target did not disclose this information in the 2013 Form 10-K. As alleged in ¶253, *supra*, Target did not disclose these materially negative trends and uncertainties in its Canadian operations before the information began to come out the end of the Class Period.

**Target's Class Period SEC Filings Omitted to Include Significant Risk Factors Required to Be Disclosed Therein**

273. Pursuant to Item 1A of Form 10-K, Target's 2012 and 2013 Forms 10-K were required to furnish the information pursuant to Item 503 of Regulation S-K [17 C.F.R. §229.503], including, among other things, a "discussion of the most significant factors that make the [securities] speculative or risky." Pursuant to Item 1A of Form 10-Q, Target's Class Period Forms 10-Q were required to "[s]et forth any material changes from risk factors as previously disclosed" in Target's 2012 Form 10-K pursuant to Item 503 of Regulation S-K [17 C.F.R. §229.503]. Defendants failed to comply with Item 503 by failing to disclose risk factors or material changes in risk factors in these SEC filings.

274. Specifically, Defendants failed to disclose the following in Target's 2012 Form 10-K, 1Q13 Form 10-Q, 2Q13 Form 10-Q, 3Q13 Form 10-Q, 2013 Form 10-K, and 1Q14 Form 10-Q, as required under Item 503:

(a) Target Canada suffered from severe and unresolved systemic problems in its supply chain IT systems which created the risk that Target Canada would not be accretive;

(b) The pace with which Target Canada opened stores as quickly as it did created the risk that not all of these problems would be resolved; and

(c) As these problems increased in scope, they were reasonably expected to have an increased damaging effect on the Company's operations and financial performance.

## ADDITIONAL SCIENTER ALLEGATIONS

275. As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company (or in their own name) were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Target Canada, their control over, and/or receipt and/or modification of Target's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

276. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

277. Defendants possessed knowledge of facts or had access to information contradicting each of their public statements. Throughout the Class Period, Defendants were aware how systemically deficient Target Canada's supply chain IT systems were. As alleged above, during the Class Period, Defendants made specific statements about some of the problems that Target Canada was facing and indicated to investors that the Company

purportedly had a plan to address them. Defendants, however, were not in fact fixing these problems and failed to disclose numerous others.

278. As alleged above, Defendant Steinhafel was prepared to launch Target Canada regardless of the severe systemic problems with supply chain IT systems that materialized from the very beginning. In fact, only a few short weeks before the first Target Canada stores were scheduled to open, Defendant Steinhafel declared internally that Target would open its Canadian stores on time, even if Canadian Segment employees needed to do their work using "***paper and pencil***."

279. As alleged above, Defendant Fisher was in charge of the day-to-day operations of Target Canada, and, as a result possessed deep knowledge as to the problems Target Canada was facing. As detailed herein, Defendant Fisher held frequent status meetings at Target Canada's headquarters in Ontario with senior staff, during which these problems were discussed at length.

280. Additionally, as alleged above, Defendant Fisher regularly visited Target's headquarters in Minnesota to meet with, *inter alia*, Defendant Steinhafel and Target's Board of Directors, to report the severe systemic problems being experienced with Target Canada's supply chain IT systems. Moreover, Target commonly sent employees from headquarters in Minnesota to observe the problems in Canada. Statements about Target Canada during the Class Period, including statements about its supply chain IT systems, were based upon information provided by, or known by, the Individual Defendants.

281. As the problems mounted, Defendants continued to misrepresent to investors that Target Canada was going to be successful. Defendants were motivated to hide these problems to make it appear as if Target was on track to meet previously issued guidance.

282. Defendants failed to review or check information they had a duty to monitor or ignored obvious signs of fraud. Defendants turned a blind eye as Target continued to open wave after wave of stores in Canada, despite the fact that severe systemic problems with Target Canada's supply chain IT systems had already materialized and were getting worse. Defendants were aware, or recklessly disregarded, that in light of these problems, the Company should not have continued to open stores until they were resolved. Defendants were well aware that the problems would only increase in scope if Target Canada stuck to its store opening plan. As detailed herein, the CWs confirmed that Defendants' continued opening of stores did in fact worsen an already problematic situation. Given the nature and extent of the systemic problems that Target Canada faced, Defendants knew, or recklessly disregarded, the extent and scope of the problems during the Class Period. Furthermore, due to the systemic problems with its supply chain, Defendants knew that they lacked a reasonable basis to provide financial guidance.

283. Additionally, the fraud alleged herein relates to the core business of Target and its Canadian Segment so knowledge of the fraud may be imputed to Defendants. Given Defendants' knowledge of the truth concerning the severity of the systemic problems that permeated Target Canada's supply chain IT systems from the very beginning, the positive statements detailed above, made contemporaneously with that knowledge, were false and/or

misleading. Furthermore, these facts were known by Target employees in senior positions at Target and their knowledge can be imputed to Target itself.

284. Moreover, Defendants possessed substantial motives for misrepresenting Target Canada's problems throughout the Class Period.

285. Defendants Steinhafel, Mulligan, and Fisher, as well as other senior Company executives, in connection with the fraudulent scheme alleged herein, sold more than ***$63 million*** worth of Target common stock during the Class Period, or right before the Class Period when Defendants were in possession of negative material non-public information, at times and amounts that were unusual, as set forth below:

| **Name** | **Position** | **Date** | **No. of Shares Sold** | **Price** | **Proceeds** |
|---|---|---|---|---|---|
| Defendant Steinhafel | Chairman of the Board, President and Chief Executive Officer | 25-Mar-2013 | **301,638** | $68.39 | **$20,629,023** |
| Defendant Mulligan | Executive Vice President and Chief Financial Officer | 31-May-2013 | **17,093** | $69.91 | **$1,194,972** |
| Defendant Fisher | President, Target Canada | 06-Jun-2013<br>29-Nov-2013 | 709<br>4,415<br>**5,124** | $70.23<br>$63.93 | $49,793<br>$282,251<br>**$332,044** |
| Timothy R. Baer | Executive Vice President, General Counsel and Corporate Secretary | 27-Mar-2013<br>28-Mar-2013<br>28-May-2013 | 4,261<br>500<br>10,832<br>**15,593** | $69.65<br>$69.23<br>$70.51 | $296,779<br>$34,615<br>$763,764<br>**$1,095,158** |
| John D. Griffith | Executive Vice President, Property Development | 22-Apr-2013 | **109,468** | $69.00 | **$7,553,292** |
| Beth M. Jacob | Executive Vice President and Chief Information Officer | 20-Mar-2013<br>23-Apr-2013<br>30-May-2013 | 3,441<br>48,599<br>15,474<br>**67,514** | $68.61<br>$69.71<br>$70.32 | $236,087<br>$3,387,836<br>$1,088,132<br>**$4,712,055** |
| Jodee A. Kozlak | Executive Vice President, Human Resources | 05-Mar-2013<br>21-Mar-2013<br>04-Jun-2013 | 31,404<br>6,614<br>67,455<br>**105,473** | $66.59<br>$68.00<br>$72.00 | $2,091,192<br>$449,752<br>$4,856,760<br>**$7,397,704** |
| Tina M. Schiel | Executive Vice President, Stores | 06-Mar-2013<br>20-Mar-2013<br>22-Apr-2013 | 33,450<br>3,644<br>41,539<br>**78,633** | $66.24<br>$67.00<br>$68.80 | $2,215,728<br>$244,148<br>$2,857,883<br>**$5,317,759** |
| Kathee Tesija | Executive Vice President, Merchandising and Supply Chain | 13-Sep-2013 | **206,793** | $63.75 | **$13,183,054** |

| Name | Position | Date | No. of Shares Sold | Price | Proceeds |
|---|---|---|---|---|---|
| Laysha Ward | President, Community Relations and Target Foundation | 27-Mar-2013<br>05-Jun-2013 | 25,036<br>2,277 | $69.18<br>$70.34 | $1,731,990<br>$160,164 |
| | | | **27,313** | | **$1,892,155** |
| **TOTAL:** | | | **934,642** | | **$63,307,216** |

286. The timing of Target stock sales by the Individual Defendants was suspicious and unusual. During the Class Period, Defendants Steinhafel, Mulligan, and Fisher each exercised stock options that had fully vested more than four years earlier, but sold them only after the severe problems with Target Canada's launch began to materialize.

287. For example, on March 25, 2013, less than three weeks after the first Target Canada store opened, when Defendants were making positive statements about Target Canada, Defendant Steinhafel exercised stock options granted to him on January 12, 2005 and June 14, 2006 that fully vested on January 12, 2009 and June 14, 2010, respectively for proceeds of more than $20 million. Despite the fact that these options had vested years earlier, only once the first Target Canada Stores began to open and the systemic problems grew in scope did Defendant Steinhafel decide to cash in on them. These options were not even set to expire until January 12, 2015, at the earliest. Defendant Steinhafel earned a total net profit of $7,928,967 from the exercise of these two options, which together represented approximately ***19.89%*** of his total holdings.

288. Similarly, on May 31, 2013, just one day after telling analysts at the SCB Conference that, with respect to Target Canada, "a lot of the execution risk is behind us," Defendant Mulligan, well aware of Target Canada's growing execution risk, cashed in on options that had long since vested. On that date, Defendant Mulligan exercised options

granted as far back as January 12, 2005, most of which were fully vested and did not expire until January 12, 2015, at the earliest, for proceeds of more than $1 million. Mulligan earned a total net profit of $494,928, from the May 31, 2013 exercise of these options, which represented ***19.1%*** of his total holdings.

289. Likewise, on June 6, 2013, Defendant Fisher, exercised stock options that fully vested on January 12, 2009 and did not expire until January 12, 2015 for proceeds of nearly $50,000. Defendant Fisher, well aware of each of the problems plaguing Target Canada's operations and the fact they would only get worse as the Company continued its wave of store openings, sold shares for nearly $50,000 and earning a net profit of $14,747. Additionally, just eight days after Defendants raised the expected full-year EPS dilution attributed to the Canadian Segment but told investors that they were "preparing to enter 2014 with ***improved in-stocks and a much better inventory position***," Defendant Fisher sold 4,415 shares of Target Common stock for proceeds of $282,251. This represented approximately ***10.95%*** of his total holdings. Fisher knew that Target Canada's financial outlook and inventory position were only going to get worse as the many problems in the Canadian Segment increased in scope.

290. The size of the sales of Target stock by the Individual Defendants was also unusual, because, according to Forms 4 that were publicly filed with the SEC, each Individual Defendant made a sale during the Class Period in an amount that exceeded the amount of any prior sale of Target stock by such Defendant.

291. Taken collectively, Defendants Steinhafel's, Mulligan's, and Fisher's Class Period Target stock sales support an inference of scienter because they exercised options that

had long since fully vested and were not set to expire, the quantity they sold represented a significant percentage of their overall total holdings, and these sales were timed to capitalize on Target's inflated stock price before the systemic problems impacting the Canadian Segment were disclosed to investors.

## LOSS CAUSATION/ECONOMIC LOSS

292. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Target's common stock and operated as a fraud or deception on Class Period purchasers of Target's common stock.

293. As the risks concealed by Defendants' misrepresentations and material omissions materialized in a series of negative results for Target Canada's business, and facts concealed by Defendants' misrepresentations and omissions were revealed to the market by a series of partial disclosures, the price of Target's common stock fell removing the prior artificial inflation. As a result of purchasing Target's common stock during the Class Period and holding it until the inflation had been removed, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

294. Defendants' false and misleading statements and material omissions had the intended effect and actual result of causing Target's common stock to trade at artificially inflated levels throughout the Class Period.

295. By concealing from investors the adverse facts and risks detailed herein, Defendants presented a misleading picture of Target Canada's business and prospects. During the Class Period, as the true state of Target Canada was revealed to the market and

the concealed risks of investing in Target's common stock materialized, the price of Target's common stock suffered a dramatic, cumulative decline.

**August 21, 2013**
**Corrective Disclosure and/or**
**Materialization of Risk**

296. Before the opening of trading on August 21, 2013, Defendants announced disappointing financial results, including, among other things, sales numbers for Target Canada over the prior quarter, disclosed "clearance activity" regarding "excess inventory," and significantly increased guidance for FY 2013 dilution attributed to the Canadian Segment, from ($0.45) to ($0.82). That same day, on the 8/21/13 Conf Call, Defendants backed off previously issued projections that Target Canada would become accretive to earnings beginning in Q4 2013 and announced it was unlikely Target Canada would be profitable for FY 2014. In response to these disappointing results, the price of Target common stock declined from $67.95 per share on August 20, 2013 to close at $65.50 per share on August 21, 2013 – a decline of approximately $2.45 per share, or approximately 3.6%. By contrast, the S&P 500 index declined only 0.58% over the same period. The stock also experienced unusually heavy trading volume of over 15.2 million shares, compared to just 6.4 million shares traded the day before.

297. Target common stock, however, remained artificially inflated. During the 8/21/13 Conf Call Defendants explained the "inventory overhang" as if it were nothing more than a one-time event – the result, according to Steinhafel, of a sales "shortfall in some of the seasonal categories," when this was not true.

298. Additionally, even though Steinhafel confirmed that Target Canada's supply chain technology was "completely new," Defendants failed to disclose that this "integrated technology solution" had *not* been successfully integrated, that *not one* of the component software systems had, in its Target Canada version, been previously used by Target in the U.S., and that each of the Target Canada IT systems was experiencing systemic problems.

299. Contrary to the concealed truth about the systemic problems with Target Canada's supply chain, Steinhafel asserted the only thing needed in Canada was "the same kind of fine tuning that we go through every time we open a new store here in the United States," and that, except for the number of new stores being opened, "[w]hat we're seeing in Canada [is] . . . no different than what we've experienced [in the U.S.]."

**November 21, 2013**
**Corrective Disclosure and/or**
**Materialization of Risk**

300. On November 21, 2013, prior to the opening of trading, Target announced disappointing financial results, including, among other things, that its Canadian sales continued to struggle and once again raised its expected full-year EPS dilution attributable to the Canadian Segment. During the 11/21/13 Conf Call, Defendant Mulligan stated "clear[ing] excess inventory" continued to be a reason for "higher than expected dilution," and Steinhafel implicitly admitted that improved "inventory flow and allocation" was necessary to "moderate" the "sales shortfalls." Later that day, an analyst for Jeffries noted Target Canada's "projections are nowhere near the original targets." In response to these disappointing results, the price of Target common stock declined from $66.49 per share on November 20, 2013 to close at $64.19 per share on November 21, 2013 – a decline of

approximately $2.30 per share, or approximately 3.5%. The stock also experienced unusually heavy trading volume of over 16.3 million shares traded, compared to just 4.7 million shares traded the day before. By contrast, the S&P 500 index increased 0.81% over the same period.

301. Target common stock, however, remained artificially inflated. Defendants continued to conceal that Target Canada's poor financial results were caused by systemic problems in the supply chain IT systems not experienced by Target when opening stores in the U.S.

**January 10, 2014**
**Corrective Disclosure and/or**
**Materialization of Risk**

302. On January 10, 2014, Target preannounced 4Q13 results, stating, among other things, it expected ($0.45) of dilution related to the Canadian Segment, compared with prior guidance of between ($0.22) to ($0.32), recently provided on November 21, 2013. According to the Company, the revised dilution numbers were "driven by the gross margin impact of continued efforts to clear excess inventory." Cowen and Company described the preannounced quarterly dilution as "quite discouraging," and, on January 14, 2014, Belus Capital Advisors described the contrast between actual dilution for the full year 2013 with Target's dilution guidance provided at the start of 2013 as "jaw-dropping."

303. On news of the preannounced 4Q13 results, the price of Target common stock declined from $63.34 per share on January 9, 2014 to close at $62.62 per share on January 10, 2014 – a decline of approximately $0.72 per share, or approximately 1.14%. By contrast, the S&P 500 index increased 0.23% over the same period. The stock also experienced

unusually heavy trading volume of over 13 million shares traded, compared to just 7.2 million shares traded the day before.

304. Target common stock remained artificially inflated due to Defendants' fraudulent conduct as alleged herein. Among other things, Defendants failed to disclose the revised guidance was due to systemic problems with Target Canada's supply chain IT systems.

**May 5, 2014**
**Corrective Disclosure and/or**
**Materialization of Risk**

305. On May 5, 2014, Target's Board of Directors issued a statement that Defendant Steinhafel, the architect of the Company's Canadian expansion, had resigned from his roles as CEO, President, and Director, effective immediately. Steinhafel's departure revealed new information about the Company's problems in Canada, including that conditions were worse than represented. The Board's statement describes Target Canada as one of three "unprecedented challenges" Steinhafel had faced, and the only one of the three not described by the Board as having been handled "successfully," or at least "navigated" by Steinhafel. Steinhafel's resignation letter mentions the Canadian expansion in negative terms, referencing the Company's "slow start in Canada." Furthermore, negative news also was conveyed by the announcement's timing, coming only two weeks before Target's 1Q14 earnings announcement. This implied both that Steinhafel's departure could not wait, and that it foreshadowed disappointing financial results to come, caused in part by challenges plaguing Target Canada.

306. The market interpreted the May 5, 2014 announcement of Steinhafel's departure to convey negative information about Target Canada and analysts immediately recognized Steinhafel's dismissal as a disclosure that problems in Canada were worse than represented. In reports issued the same day, analysts commented as follows:

- Sterne Agee: "[G]iven the abruptness of the announcement with no permanent CEO in place . . . the move is clearly not a vote of confidence regarding: (1) near-term sales trends and (2) progress in Canada."
- BMO Capital Markets: "Mr. Steinhafel's departure comes on the heels of several challenges the company has recently faced, namely 1) stumbling out of the blocks in Canada . . . ."
- J.P. Morgan: "While the press may point to the highly publicized data breach, we believe the so far very disappointing launch in Canada is the bigger issue at hand."
- Wells Fargo: "Near term, this is pressuring TGT shares given the proximity of today's announcement to Target's Q1 earnings call on May 21. We suspect the credit card breach and underperformance in Canada (the two events that ultimately led to the Board's decision, in our view) are likely still weighing on Target's financial performance . . . ."
- Deutsche Bank: "[M]anagement seemed to be making the pitch to investors that they were moving in the right direction. The Board didn't seem to think so. . . ."

307. News outlets also treated Steinhafel's dismissal as indicating problems in Canada were unresolved and potentially more costly than previously represented. For instance, on May 6, 2014, the *Wall Street Journal* reported, "[m]any of Mr. Steinhafel's initiatives sputtered" and "[n]one suffered more than his $4.4 billion foray into Canada, which has been dogged by losses and cost overruns," and called it a "misstep[] . . . that verges on disaster." On May 7, 2014, the financial news platform, Trefis, stated "In Canada, the root of Target's problems is its underdeveloped supply chain system, which also reflects

the lack of investments. Since investment is a CEO decision, Gregg Steinhafel was in the firing line."

308. On the news regarding Steinhafel's resignation, the price of Target common stock declined from $62.01 per share on May 2, 2014, a Friday, to close at $59.87 per share on May 5, 2014 – a decline of approximately $2.14 per share, or approximately 3.5%. Target common stock remained artificially inflated due to Defendants' fraudulent conduct as alleged herein.

309. On the next day, May 6, 2014, the *Wall Street Journal* published two separate articles about the resignation, including one article on its first page, and Target common stock continued to decline, from $59.87 per share on May 5, 2014 to close at $57.64 per share on May 6, 2014 – a decline of approximately $2.23 per share, or approximately 3.7%. By contrast, the S&P 500 index increased 0.19% on May 5, 2014 and decreased only 0.90% on May 6, 2014. The stock also experienced unusually heavy trading volume of over 16.1 million shares traded, compared to just 3.4 million shares traded the day before. Target common stock remained artificially inflated due to Defendants' fraudulent conduct as alleged herein.

**May 20, 2014**
**Corrective Disclosure and/or**
**Materialization of risk**

310. On May 20, 2014, Target announced it was terminating Tony Fisher as President of Target Canada "[e]ffective immediately." Fisher's termination further clarified that Target Canada's operations were performing worse than previously reported, the supply chain problems were systemic, and any existing plan for fixing them was not satisfactory.

The announcement revealed the position being vacated by Fisher would be filled by Mark Schindele – until now, Senior VP of merchandising operations.

311. Additionally, according to the announcement, this position would be reorganized within the Target corporate structure such that Schindele would be reporting directly to Kathee Tesija, the Chief Merchandising and Supply Chain Officer. This reorganization placed an entire geographic entity (Target Canada) within one part of Target's functional hierarchy (Supply Chain), and singled out Target Canada from all of Target's other geographic entities for such positioning. Schindele's experience in operations, and Tesija's supervisory responsibility for supply chain, revealed the supply chain issues plaguing Target Canada were neither temporary nor resolved, but rather were deep and systemic. Additionally, the announcement's timing (one day before Target's 1Q14 earnings announcement) conveyed the urgency of the supply chain problems and additional undisclosed problems. This implied that Fisher's departure could not wait, and foreshadowed disappointing financial results to come, caused in part by the challenges plaguing Target Canada's supply chain.

312. The market interpreted the May 20, 2014 announcement of Fisher's departure to convey precisely this negative news. Analysts immediately recognized the connection between Fisher's dismissal and worse than represented problems in Canada, commenting as follows:

- Cowen & Company: "This morning TGT announced that, effective immediately, Mark Schindele, current SVP, merchandising operations, 'will assume the role of president, Target Canada,' replacing Tony Fisher who is departing the company. We view this move as further confirmation that Target Canada has not progressed as the company planned."

- Janney Capital Markets: "The company is facing several challenges in Canada, although it appears to be taking actions including senior management changes to turnaround the business. Our model is under review."

- Wells Fargo: "TGT also lowered 2014 Canada sales guidance sales to be about $2B vs. previous guidance for $2.6B. Recent management changes acknowledge the problems run deep and the fixes likely take time."

313. News outlets similarly reported Fisher's firing as indicating further problems for Target in Canada, including its supply chain. For example, the *New York Times* described the event as Target "try[ing] to right itself by firing the president of its struggling Canadian division," calling its expansion into Canada "bungled" and reporting that it "has also probably caused the retailer – and its high-ranking executives – extensive damage." Similarly, the financial news platform Trefis reported that "[j]ust a day before its earnings release, Target severed its Canadian operations president, Tony Fisher, in the wake of its disastrous performance" where "the main problem" was "low customer satisfaction that resulted from poor inventory management."

314. Most tellingly, on May 21, 2014, *Reuters* published a report (*see* ¶¶136-37, *supra*) explicitly connecting Fisher's firing with systemic supply chain problems uncovered by its reporters:

> ***Target***, which is due to report its quarterly financial results on Wednesday, ***has said little about what went wrong with its Canadian supply chain. But on Tuesday it fired Tony Fisher***, the president of its operation there, ***and replaced him with Mark Schindele, a veteran U.S. executive with deep experience in managing supply chains*** . . . . As goods arrived at the warehouses, workers found errors . . . . It is not clear whether these errors were caused by Target's buyers entering bad data, vendors making mistakes, some glitch in Eleven Points' warehouse computer system or all three . . . ***The inconsistencies between goods and computer records caused a chain reaction of delays***. Problem ***shipments*** needed to be unpacked and cataloged, a time-consuming process. They ***piled up instead of going out to stores***,

> taking over large parts of the massive warehouses, ***on a scale the sources said they had never seen at previous jobs***.

315. In short, even though still not certain of the extent of, or reasons for, Target Canada's supply chain problems, the market understood Fisher's departure as news that those problems were extensive and not being solved.

316. On this news regarding Fisher's firing and replacement, the price of Target common stock declined from $58.29 per share on May 19, 2014 to close at $56.61 per share on May 20, 2014 – a decline of approximately $1.68 per share, or approximately 2.88%. By contrast, the S&P 500 index decreased only 0.65% over the same period. The stock also experienced unusually heavy trading volume of almost 9.4 million shares traded, compared to just 3.6 million shares traded the day before. Target common stock remained artificially inflated due to Defendants' fraudulent conduct as alleged herein.

**May 22, 2014**
**Corrective Disclosure and/or**
**Materialization of Risk**

317. On May 21, 2014, Target announced disappointing first quarter financial results. Among other things, Canadian sales were worse than previously expected and Target reduced guidance for full year Canadian revenue. On the 5/21/14 Conf Call, Mulligan, acting as interim CEO, stated the Canadian segment was making "efforts to eliminate excess inventory," and that "[r]ecent management changes, including yesterday's announcements, demonstrate that we believe meaningful change is needed to put us on a different long-run trajectory." Target common stock had already declined substantially in response to the announcements of Steinhafel's and Fisher's departures, which reflected

problems with Target Canada's supply chain. Defendants still concealed the fundamental inadequacy of Target Canada's supply chain IT systems, as well as the lack of progress toward fixing that inadequacy.

318. In press interviews held the same day as the earnings call, but not widely published until the next day, May 22, 2014, in the *Minneapolis Tribune*, and in a *Financial Post* article widely reprinted by Canadian newspapers, Mulligan stated he had seen photos of empty shelves in the Target Canada stores "for far too long," and that "it's unacceptable for us to look like that." Also on May 22, the *New York Times* and *Wall Street Journal* publicized Target's first quarter losses attributable to Target Canada and described Target's expansion into Canada as "bungled" and "botched." As a result of these disclosures, on May 22, 2014, the price of Target common stock declined from $57.20 per share on May 21, 2014 to close at $55.99 per share on May 22, 2014 – a decline of approximately $1.21 per share, or approximately 2.1%. By contrast, the S&P 500 index increased 0.24% over the same period. The stock also experienced unusually heavy trading volume of over 12.4 million shares traded, compared to just 3.6 million shares traded before this string of revelations on May 19, 2014. Target common stock remained artificially inflated as a result of Defendants' fraud as alleged herein.

**June 2, 2014 Analyst Reports**

319. A week later, on May 30, 2014, Target held a "sell side analyst meeting." Unlike with earnings calls and the occasional company presentation hosted by financial industry firms, no transcript from this meeting was made public. Some analysts, however,

reported on Target's disclosures during the meeting. For example, a June 2, 2014 Jefferies report stated:

> Major system issues have resulted in high out of stocks and poor forecasting. . . . Target did not extend its US systems to Canada, but used a new one that it claims has the capabilities of a BMW, but are configured like a VW. ***The goal is to get them to a performance level on par with the US, but it is unclear how long this will take***.

A June 2, 2014 UBS analyst report stated:

> Management openly discussed the flaws from the beginning. ***The choice was made to avoid dead rent costs by rapidly opening stores instead of just a few. This required a rapid build out of IT to support the stores, leaving out the full complexity needed to forecast the business, assort the stores and manage labor***. Using the US system was deemed to be too expensive vs. building new. ***Currently, consultants have been brought in to figure out how to reboot their IT systems. The answer seems to be a month away***.

320. The Company, however, had still not publicly revealed the above facts and maintained its guidance provided on May 21, 2014 for the second quarter of 2014.

**August 5, 2014**
**Corrective Disclosure and/or**
**Materialization of Risk**

321. On August 5, 2014, Target surprised the market by publishing "preliminary" second quarter results, stating, among other things, that adjusted EPS was within a range of $0.78 per share, rather than the prior guidance given on May 21, 2014 of $0.85 to $1, partly due to "softer than expected" sales in the Canadian Segment, and "continued investments to clear excess inventory."

322. Based on this preliminary second quarter report, Target Canada's supply system could be fixed only by a complete "reboot," and any such reboot sufficient to supply the fix was outside of the range of any previous guidance. On August 5, 2014, Belus Capital

Advisors reported "the mention by Target of softer than expected Canadian results, in light of management's incrementally positive tone on the first quarter earnings call regarding the segment's turnaround, is frankly disturbing. . . . Target Canada's new leader . . . may have a hard time convincing incoming CEO Brian Cornell to stay the course." On the same day, Morningstar Equity Research published a report stating "we think the new [Target] CEO will need to take a hard look at the merit to operating in [Canada]"; and Cowen and Company reported the statement about Target Canada in the "preliminary" quarterly results "is likely to further the 'will TGT exit Canada?' debate." On this news, the price of Target common stock declined from $60.70 per share on August 4, 2014 to close at $58.03 per share on August 5, 2014 – a decline of approximately $2.67 per share, or approximately 4.4 %. By contrast, the S&P 500 index decreased only 0.96% over the same period. The stock also experienced unusually heavy trading volume of almost 14.9 million shares traded, compared to just 4.2 million shares traded the day before.

323. On the next day, August 6, 2014, Goldman Sachs cut Target from "Buy" to "Neutral." As analysts reacted to Target Canada's continued struggles, the price of Target Common stock declined from $58.03 per share on August 5, 2014 to close at $57.97 per share on August 6, 2014. Collectively, on August 5 and 6, 2014, the shares of Target common stock declined $2.73 or 4.5% on unusually heavy trading volume.

**Post Class Period Events**

324. As of the close of the market on August 6, 2014, the inflation caused by Defendants misstatements and material omissions regarding Target Canada's supply chain IT systems had been removed from the price of Target's shares as a result of the disclosures

about the systemic supply chain IT problems and/or the materializations of the risks that had been concealed.

325. Subsequently, on August 12, 2014, Target issued a press release outlining "key initiatives" regarding Target Canada, which included a "reset" of supply chain "systems." Later the same day, a *Globe and Mail* article reported that, according to Target Canada's new President, Mark Schindele, Target Canada was switching to the vendor identification system it employed in the U.S. Also that day, Schindele was quoted in a *Reuters* article, stating "[w]e're now unwinding some of the decisions we made that were based on speed." The need for this reset was a contributing factor of the Company's reduced guidance as announced on August 5, 2014.

326. On an August 20, 2014 earnings call, Defendants expanded on the steps being taken to attempt to remedy Target Canada's supply chain IT problems. Kathee Tesija stated that "[t]o address in-stocks, the team is taking action on four dimensions: better reporting to identify in-stock issues sooner; retraining our teams on best methods; developing new best methods tailored to Canadian segment systems; and reconfiguring systems to work more effectively over the long run." Defendants also announced that same-store sales decreased more than 11% in Canada over the prior year as a result of ongoing supply chain problems.

327. Finally, on January 15, 2015, Target announced that its Canadian Segment was filing for bankruptcy protection. During the conference call following that announcement CEO Brian Cornell stated, "we are unable to map out a scenario which would allow Target to generate positive profits or cash flow until at least 2021." He further stated, "if we [were] going to continue operating in Canada we would need to invest additional capital in our

supply chain and technology to make further operational improvements and enable Target to sell online in Canada." On the same day, a Piper Jaffray analyst stated, "[w]e believe investors were already valuing TGT shares based solely on U.S. operations."

**Cumulative Effect of the Partial Disclosures and Materializations of Risk**

328. The declines in the price of Target common stock after the partial disclosures and materializations of risk on August 21, 2013, November 21, 2013, January 10, 2014, May 5 and 6, 2014, May 20, 2014, May 22, 2014, and August 5 and 6, 2014, were a direct result of Defendants' fraud increasingly being revealed to the market. Taken together, the combined effect of these events was to disclose the true financial condition of Target Canada, which was materially worse than previously disclosed by Target.

329. The timing and magnitude of the price declines in Target's common stock negates any inference that the losses suffered by Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

330. As a result of these revelations and materializations of undisclosed risk, and the corresponding drops in the price of Target's common stock, Plaintiff and the Class suffered real economic loss.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

331. At all relevant times, the market for Target common stock was an efficient market for the following reasons, among others:

(a) Target's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) as a regulated issuer, Target filed periodic public reports with the SEC and the NYSE;

(c) Target regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Target was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

332. As a result of the foregoing, the market for Target common stock promptly digested current information regarding Target from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of Target's common stock during the Class Period suffered similar injury through their purchase(s) of Target common stock at artificially inflated prices and a presumption of reliance applies.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: *AFFILIATED UTE* DOCTRINE

333. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972),

because Defendants' material omissions during the Class Period caused harm to Plaintiff and the Class. Because the Complaint alleges Defendants' failure to disclose material adverse information regarding Target's business and operations in Canada – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

334. Given the importance of the Class Period material omissions set forth above, that requirement is satisfied here, and, therefore, *Affiliated Ute* provides a separate, distinct basis for finding the applicability of a presumption of reliance.

## NO SAFE HARBOR

335. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Target who knew that those statements were false when made.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

336. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

337. This Count is asserted against Target and the Individual Defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

338. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

339. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of the Company as specified herein.

340. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Target common stock during the Class Period in an effort to maintain artificially high market prices for Target's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants are sued either

as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

341. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as senior executives of the Company were privy to and participated in the creation, development and reporting of the Company's financial results and guidance; (iii) each of the Individual Defendants was advised of and had access to other members of the Company's management team, internal reports and other data and information at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

342. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing from the investing public the significant problems with Target Canada's operations and supporting the artificially inflated price of Target common stock. As demonstrated by Defendants' misstatements of the Company's business and operations in Canada during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were

reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

343. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Target's common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of Target's common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Target common stock during the Class Period at artificially high prices and were damaged as a result of the securities law violations alleged herein.

344. At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class, and the marketplace, known the truth regarding the significant problems alleged herein, which were not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their Target common stock, or, if they had purchased such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

345. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

346. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Target common stock during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

347. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

348. This Count is asserted against the Individual Defendants for violations of Section 20(a) of the Exchange Act.

349. The Individual Defendants acted as controlling persons of Target within the meaning of Section 20(a) of the Exchange Act.

350. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements

were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

351. As set forth above, the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Target common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, pray for relief and judgment, as follows:

A. Determining that this action is a proper class action, certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding Plaintiff and other members of the Class such other and further relief as may be just and proper under the circumstances.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED: November 14, 2016

**ROBBINS GELLER RUDMAN & DOWD LLP**

*/s/ Evan J. Kaufman*

Samuel H. Rudman (*admitted pro hac vice*)
Evan J. Kaufman (*admitted pro hac vice*)
Robert D. Gerson (*admitted pro hac vice*)
Andrew L. Schwartz (*admitted pro hac vice*)
58 South Service Road, Suite 200
Melville, New York 11747
Tel: (631) 367-7100
Fax: (631) 367-1173
srudman@rgrdlaw.com
ekaufman@rgrdlaw.com
rgerson@rgrdlaw.com
aschwartz@rgrdlaw.com

**LABATON SUCHAROW LLP**
Thomas A. Dubbs (*admitted pro hac vice*)
Thomas G. Hoffman, Jr. (*admitted pro hac vice*)
140 Broadway
New York, New York 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
tdubbs@labaton.com
thoffman@labaton.com

*Lead Counsel for Plaintiff*

**ZIMMERMAN REED, LLP**
Carolyn G. Anderson (MN No. 275712)
June P. Hoidal (MN No. 033330X)
1100 IDS Center
80 South 8th Street
Minneapolis Minnesota 55402
Tel: (612) 341-0400
Fax: (612) 341-0844
Carolyn.Anderson@zimmreed.com
June.Hoidal@zimmreed.com

*Liaison Counsel for Plaintiff*

# CERTIFICATION OF NAMED PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

CARPENTERS PENSION FUND OF ILLINOIS ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6. The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages)

directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of November, 2016.

CARPENTERS PENSION FUND OF ILLINOIS

By: Angelica B. Ambrose
Angelica B. Ambrose, Administrator

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 05/29/2013 | 2,583 | $69.60 |
| 06/17/2013 | 2,060 | $69.76 |
| 06/25/2013 | 8,405 | $69.14 |
| 06/28/2013 | 6,814 | $68.86 |
| 08/07/2013 | 574 | $71.64 |
| 08/30/2013 | 1,357 | $63.26 |
| 09/27/2013 | 585 | $64.02 |
| 10/28/2013 | 643 | $64.50 |
| 12/18/2013 | 1,238 | $63.17 |
| 04/08/2014 | 8,452 | $61.34 |
| 04/15/2014 | 6,625 | $59.38 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 07/09/2013 | 190 | $71.69 |
| 09/03/2013 | 2,600 | $63.59 |
| 09/05/2013 | 2,294 | $63.48 |
| 10/02/2013 | 77 | $63.23 |
| 11/05/2013 | 261 | $64.75 |
| 11/13/2013 | 153 | $66.58 |
| 11/21/2013 | 148 | $64.08 |
| 02/05/2014 | 3,675 | $55.02 |
| 03/05/2014 | 5,010 | $60.63 |
| 03/12/2014 | 5,091 | $60.93 |
| 05/05/2014 | 44 | $60.21 |
| 05/07/2014 | 789 | $58.07 |
| 05/13/2014 | 41 | $59.35 |
| 06/05/2014 | 21,563 | $57.54 |

*Opening position of 16,700 shares.

CERTIFICATE OF SERVICE

I, Evan J. Kaufman, hereby certify that on November 14, 2016, I authorized a true and correct copy of the attached:

Consolidated Amended Complaint for Violations of the Federal Securities Laws

to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ Evan J. Kaufman*
EVAN J. KAUFMAN