| | |
|---|---|
| *In re: Target Corporation Securities Litigation* | Master File No. 16-CV-1315 (JNE/BRT) |
| *In re: Target Corporation ERISA Litigation* | Master File No. 16-CV-2400 (JNE/BRT) |
| THIS ORDER RELATES TO: All Actions | **ORDER** |

Shareholders of Target Corporation stock brought suit against the company and its current and former agents under the Securities Exchange Act of 1934 (the "Exchange Act"), codified at 15 U.S.C. § 78a *et seq.*, and the Employee Retirement Income Security Act of 1974 ("ERISA"), codified in relevant part at 29 U.S.C. ch. 18, for conduct related to Target's expansion into Canada during the years 2013 and 2014. The Court consolidated the shareholder suits into the two above-referenced actions, and Target filed motions to dismiss in each action. For the following reasons, the Court grants Target's motions to dismiss.

## II. BACKGROUND

Target is a large retailer in the United States with over 1,800 store locations. (Securities Amended Complaint ("SAC") ¶ 43, S. Dkt. No. 57.)[1] By as late as 2010, Target evaluated opportunities for opening stores in international markets, such as Canada. (*See id.* ¶ 46.) An opportunity to expand into Canada presented itself, and in January 2011, Target announced that it would open stores in the country starting in 2013. (*Id.* ¶ 49.)

---

[1] For the purposes of providing background, the Court cites to the Amended Complaint in the securities action. The securities and ERISA actions share similar background facts. Citations in this Order containing the designation "S." or "E." correspond to sources in the securities action or the ERISA action, respectively.

The expansion into Canada became a "key component" of Target's "growth story" and efforts to compete with other retailing rivals, such as Wal-Mart. (*Id.* ¶ 53; *see id.* ¶¶ 43, 45, 48.) In pursuit of these ends, Target embarked on an ambitious plan to open over 100 stores in Canada in two years. (*See id.* ¶ 49.) Accomplishing this tall order required "Target Canada" to rapidly develop stores, distribution centers, vendor relationships, and supply chain information technology systems. (*See id.* ¶¶ 47, 49.)

Large-scale retailers like Target rely heavily on supply chain systems to keep track of inventory, shipments, costs, product information, replenishment, sales, and more. (*See id.* ¶ 61.) In order to operate effectively, systems performing supply chain functions must be integrated and have the ability to share crucial business data. (*See id.*) Accordingly, part of Target's success in the US is due to its "well-developed supply chain and IT infrastructure . . . . customized and adjusted over the years to meet [Target's] specific needs." (*Id.* ¶ 62.) Although Target already had a refined US supply chain infrastructure in place when it announced expansion into Canada, the company chose to use a different, new set of supply chain systems for the expansion because extending its existing US systems "would have been too complex and taken too much time." (*Id.* ¶ 71.) Thus, Target purchased a new, central "Enterprise Resource Planning" ("ERP") system and other new systems for its Canadian supply chain infrastructure. (*Id.* ¶ 64.)

From the beginning, the central ERP system contained data integrity issues, which caused problems in other systems. (*See id.* ¶¶ 64-65, 78-80.) The new warehouse management system had troubles communicating with the central system. (*See id.* ¶¶ 65, 85.) The inventory replenishment system was "dysfunctional" and required "manual overrides." (*Id.* ¶ 66; *see id.* ¶ 94.) The long-term inventory demand software "did not provide accurate sales forecasts, and Target employees did not know how to use it." (*Id.* ¶ 67; *see id.* ¶ 95.) And the point-of-sale

systems "often malfunctioned." (*Id.* ¶ 68; *see id.* ¶ 97.) Prior to opening any Canadian stores, the supply chain systems suffered from "systemic problems" related to "most" of the above-mentioned issues. (*Id.* ¶¶ 60, 69, 100.) When Target Canada finally opened its first stores in March 2013, customers were "confronted with empty store shelves," but, at the same time, Target Canada's "three massive distribution centers were overwhelmed with excess products." (*Id.* ¶¶ 82-83.) Other "various problems persisted through 2015." (*Id.* ¶ 92; *see id.* ¶ 102.) As more stores opened, the problems "magnified" and became "more disruptive and difficult to correct." (*Id.* ¶ 114.)

Target Canada incurred significant net operating losses throughout 2013 and 2014. (*See id.* ¶¶ 126, 157.) On May 5, 2014, Target's Board of Directors issued a statement announcing that Target's CEO, Gregg Steinhafel, resigned from his roles at the company. (*Id.* ¶ 127.) The resignation was due in part to Target Canada's underperformance, as well as Target's "massive credit card data breach." (*Id.* ¶ 128.) On May 20, 2014, Target announced that Target Canada's President, Tony Fisher, had been terminated. (*Id.* ¶ 132.) Then, on August 12, 2014, Target announced a variety of initiatives to address inventory issues, including a "physical count of inventory at all stores, resulting in a reset of systems, and more accurate ordering and shipping data." (*Id.* ¶ 146 (emphasis omitted).)

Finally, on January 15, 2015, Target announced that it would discontinue operating its Canadian stores and that Target Canada would file for insolvency protection. (*Id.* ¶ 158.) Target's new CEO, Brian Cornell, noted that continued operations in Canada would require additional investments in the supply chain "to make further operational improvements and enable Target to sell online in Canada." (*Id.* ¶ 159.) He further explained that the company was "unable to map out a scenario which would allow Target Canada to generate profits or cash flow until at

least 2021." (*Id.* (emphasis omitted).) In the insolvency filings, Target Canada's general counsel stated that the venture did not succeed due to issues in four principal categories, one of which was the supply chain. (*See id.* ¶ 161.)

### III. THE SECURITIES ACTION

Plaintiffs[2] allege that between March 20, 2013 and August 4, 2014 (the "Securities Class Period"), certain Defendants made a series of false and/or misleading statements regarding Target Canada's performance and supply chain.[3] (*See id.* ¶¶ 1, 170-261.) Generally speaking, Plaintiffs allege that these Defendants represented that Target Canada was progressing well and facing minor or common problems, when in reality the supply chain issues were much larger and success was much less certain or impossible. (*See id.* ¶¶ 3, 8-9.) Plaintiffs assert causes of action under (1) § 10(b) of the Exchange Act and Securities and Exchange Commission ("SEC") Rule 10b-5 and (2) § 20(a) of the Exchange Act. (*See id.* ¶¶ 336-51.) Defendants move to dismiss both counts. (*See* S. Dkt. No. 69.)

### A. Exchange Act § 10(b) and Rule 10b-5 Claims

Section 10(b) of the Exchange Act, codified at 15 U.S.C. § 78j(b), makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as

---

[2]  For the purposes of this Part, references to "Plaintiffs," "Defendants," and other similar placeholder terms correspond to the securities action only. Similarly, terms in Part VI correspond to the ERISA action only, unless otherwise noted.

[3]  Plaintiffs include pre-Securities Class Period statements in the SAC, but they do not explicitly allege that those statements were false or misleading. The Court does not interpret Plaintiffs to be alleging that those statements were false and misleading and thus only treats the statements as "shed[ding] light on whether class period statements were false or materially misleading." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001); *see Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 989 (8th Cir. 2012) (citing *In re Scholastic*, 252 F.3d at 72); *see also In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) ("A defendant . . . is liable only for those statements made during the class period.").

the [SEC] may prescribe." SEC Rule 10b-5 makes it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). Together, § 10(b) and Rule 10b-5 create a private cause of action for fraud. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014) (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730 (1975)). Claims brought pursuant to these provisions have six elements:

(1) a material misrepresentation or omission;

(2) scienter;

(3) a connection with the purchase or sale of a security;

(4) reliance;

(5) economic loss; and

(6) loss causation.

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011); *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005).

To survive a motion to dismiss, plaintiffs must plausibly plead a claim to relief under § 10(b) and Rule 10b-5 when accepting all of the alleged facts as true. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). In addition, plaintiffs must plead facts as to elements (1) and (2) with the level of particularity required by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), codified in relevant part at 15 U.S.C. § 78u-4.

The PSLRA's pleading standards are "more rigorous than those under Rule 9(b) of the Federal Rules of Civil Procedure." *Lustgraaf v. Behrens*, 619 F.3d 867, 874 n.2 (8th Cir. 2010). They "are unique to securities and were adopted in an attempt to curb abuses of securities fraud litigation." *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 741 (8th Cir. 2002). One of those

abuses is "the practice of pleading 'fraud by hindsight.'" *Id.* at 742 (citing *In re Vantive Corp.*

*Sec. Litig.*, 283 F.3d 1079, 1084-85 (9th Cir. 2002)).

Defendants primarily argue that Plaintiffs failed to plead enough facts as to elements (1)

and (2) to meet the PSLRA's requirements. (*See* Securities Defendants' Memorandum in

Support of Their Motion to Dismiss ("S. Def. Br.") 2, S. Dkt. No. 71.) Their overarching theory

as to why this is the case is that Plaintiffs' claims are really just "impermissible fraud-by-

hindsight claim[s]." (*Id.*) They argue, for example, that the SAC "[f]ails to identify particular

facts or sources showing that any of Defendants' public statements were materially false or

misleading in context and when made." (*Id.* (emphasis omitted).) Plaintiffs counter that the SAC

contains sufficient facts and that their reliance on confidential witnesses and well-sourced news

articles as a basis for their allegations helps Plaintiffs clear the PSLRA's pleading hurdle and is

not an attempt to plead fraud by hindsight. (*See* Securities Plaintiffs' Response Memorandum in

Opposition to the Motion to Dismiss ("S. Pl. Br.") 3, 14-16, 25-27, S. Dkt. No. 87.)

Focusing solely on element (1), a material misrepresentation or omission, the PSLRA

requires plaintiffs to "specify each statement alleged to have been misleading, the reason or

reasons why the statement is misleading, and, if an allegation regarding the statement or

omission is made on information and belief, the complaint shall state with particularity all facts

on which that belief is formed." § 78u-4(b)(1). This standard requires plaintiffs to plead the who,

what, when, where, why, and how with regard to the challenged statements such that the alleged

facts "necessarily show that the defendants' statements were misleading." *In re 2007 Novastar*

*Fin. Inc., Sec. Litig.*, 579 F.3d 878, 882 (8th Cir. 2009) (quoting *In re Cerner Corp. Sec. Litig.*,

425 F.3d 1079, 1083 (8th Cir. 2005)). Plaintiffs must plead a "link between an alleged

misleading statement and specific factual allegations demonstrating the reasons why the

statement was false or misleading." *Id.* at 883. If a complaint fails to comply with the PSLRA's requirements, the Court must dismiss the complaint. § 78u-4(b)(3)(A).

In general, pleading fraud by hindsight is characterized by failure to meet the PSLRA's requirement to specify facts explaining "why" a challenged statement was false or misleading when it was made. *See In re Navarre*, 299 F.3d at 743. For example, a business states mid-year that sales are on track to meet expected year-end projections, but later reports lower year-end sales. If a plaintiff brings a securities fraud action based only on these facts and alleges that the mid-year prediction must have been false when made, then the plaintiff is pleading fraud by hindsight. *See Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 551 (8th Cir. 1997) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)); *In re Patterson Cos., Inc. Sec., Derivative & ERISA Litig.*, 479 F. Supp. 2d 1014, 1030 (D. Minn. 2007); *see also Elam v. Neidorff*, 544 F.3d 921, 927 (8th Cir. 2008). In such a case, the plaintiff is merely pleading that the prediction must have been false mid-year because it conflicts with year-end facts—an unsatisfactory explanation for "why" the mid-year statement was false when made.

Undoubtedly, Plaintiffs have met the PSLRA's requirement to "specify each statement alleged to be misleading" because they quote numerous statements throughout the SAC. § 78u-4(b)(1). However, Plaintiffs fail to "specify . . . the reason or reasons why [each] statement is misleading." *Id.* For almost every challenged statement, Plaintiffs provide only the expansive, undefined explanation that the supply chain suffered from "systemic problems" and that the existence of such problems rendered the statement false or misleading. (*E.g.*, SAC ¶ 170.) Even accepting that supply chain system problems existed throughout the Securities Class Period, Plaintiffs do not connect any specific problems to any specific statements. Rather, Plaintiffs primarily allege only that there were persistent, overarching systemic problems. For many

statements, their explanation as to "why" shows pleading fraud by hindsight. Without more

detailed allegations, Plaintiffs fail to necessarily show that Defendants' statements were false or

misleading when made, as required by the PSLRA.[4] *See In re 2007 Novastar*, 579 F.3d at 882. A

review of representative challenged statements in the SAC reveals the inadequacies:

*1. March 20, 2013 Statements*

The earliest challenged statement is from March 20, 2013, shortly after Target Canada

opened its first pilot stores. (*See* SAC ¶ 171.) On that date, Target filed its annual Form 10-K for

the fiscal year ending February 2, 2013. (*See id.*) The Form 10-K stated, in part:

> Our ability to deliver a shopping experience that is preferred by our customers,
> referred to as "guests," *is supported by our strong supply chain and technology
> infrastructure*, a devotion to innovation that is ingrained in our organization and
> culture, and our disciplined approach to managing our current business and
> investing in future growth.
>
> . . .
>
> *Effective inventory management is key to our ongoing success.* We utilize various
> techniques including demand forecasting and planning and various forms of
> replenishment management. *We achieve effective inventory management by being
> in-stock in core product offerings, maintaining positive vendor relationships, and
> carefully planning inventory levels* for seasonal and apparel items to minimize
> markdowns.

(*Id.* ¶ 172 (some emphasis omitted).)

Plaintiffs allege that the statement about a "strong supply chain and technology

infrastructure" was "false and misleading when made because it failed to disclose the adverse

facts that [Target Canada] had neither a 'strong' supply chain nor 'strong' technology

infrastructure." (*Id.* ¶ 173.) Similarly, the averments about "effective inventory management"

were "false and misleading when made because Defendants failed to disclose that Target did not

---

[4]   To the extent that Plaintiffs do not allege or argue why certain statements were false or
      misleading, the Court finds that Plaintiffs do not meet the PSLRA's standards with respect to
      those statements or waive the argument that the statements are actionable.

have effective inventory management with respect to [Target Canada's] supply chain IT systems." (*Id.*)

The SAC does not connect the Form 10-K statements to "any specific fact that would render the . . . statements false [or misleading]" when made. *Elam*, 554 F.3d at 927. In an entirely different section, the SAC provides some background information about what issues existed around the time Target filed the Form 10-K. For example, plaintiffs allege that the inventory replenishment system "was so dysfunctional that it was turned off *immediately after the first stores had opened*, and could not be operated without constant manual overrides." (SAC ¶ 66 (emphasis added); *see id.* ¶¶ 94, 112.) They allege that in Fall 2012, Target Canada participated in a "data week" to verify product data points, but that *when the first stores opened*, there were unresolved data issues and excess inventory in warehouses. (*Id.* ¶¶ 80-83, 118.) "[I]n *the weeks leading up to the first store openings* . . . there was a widely held fear among employees that the stores would not be ready to open . . . ." (*Id.* ¶ 101 (emphasis added).) But outside these examples, Plaintiffs only paint with a broad brush by alleging that *before Target opened any Canadian stores*, the systems suffered from "most" of the problems summarized above, there were systemic problems, and the systems "did not function properly" throughout the Securities Class Period. (*Id.* ¶ 69.) Such sweeping allegations disconnected from particular facts are insufficient to comply with the PSLRA's mandate that plaintiffs specify why statements were false or misleading at the time the statements were made. *See In re 2007 Novastar*, 579 F.3d at 882, 883 & n.4 (finding insufficient broad allegations of, for example, undisclosed "systematic deviations"); *In re Cerner*, 425 F.3d at 1084 (finding that the plaintiffs did not adequately allege why the statement that demand was "strong" was false or misleading when made); *In re Navarre*,

299 F.3d at 743 ("The amended complaint fails to indicate why these statements would have been false or misleading at the several points in time in which it is alleged they were made.").

Without additional factual allegations, the Court is left with numerous questions as to why and how the Form 10-K statements were false or misleading. Why was it false or misleading to characterize Target's supply chain as a whole—or Target Canada's separate supply chain—as strong or effective? What, specifically, were the supply chain problems at this exact moment in time, and what about these problems were systemic? To what extent did any then-existing problems weaken the supply chain or render it ineffective? Because the SAC fails to allege particular facts that would answer these and other questions and "merely contains '[a] litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false,'" the SAC fails to meet the PSLRA's pleading standards. *In re 2007 Novastar*, 579 F.3d at 883 (quoting *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008)); *see In re Navarre*, 299 F.3d at 743 (asking similar questions).

The SAC also contains allegations that, when taken as true, undermine Plaintiffs' general theory that statements were *materially* false or misleading due to the existence of systemic problems.[5] For example, on March 4, 2013—before the Securities Class Period began and just weeks before Target filed the Form 10-K—Fisher disclosed that Target Canada had "built [its] technology infrastructure from the ground up over the last two years." (SAC ¶ 168.) And his comments also drew attention to out-of-stock merchandise, indicating that the supply chain was

---

[5]   A misrepresentation or omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx*, 563 U.S. at 38 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)). Such information is that which "would have assumed actual significance in the deliberations of the reasonable shareholder." *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 897 (8th Cir. 2002) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

imperfect. (*See id.*; *see also id.* ¶ 119.) Public statements like these undercut general allegations

that the challenged statements omitted nonpublic details—unidentified in the SAC—about

allegedly overarching problems. *See Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund*

*v. Diodes, Inc.*, 810 F.3d 951, 958 (5th Cir. 2016) ("Most reasonable investors would rather

receive an accurate 'bottom line' assessment of a disclosed company problem than all of its

assumptions and nuances."). What additional information should Target have disclosed? Why

would further disclosure have significantly altered the total mix of information available to

investors at the time? Plaintiffs do not allege answers to these questions.

In summary, Plaintiffs fail to explain, with the level of detail required by the PSLRA,

why the Form 10-K statements were false or misleading when made, and what little detail they

do allege contradicts their sweeping, nonspecific explanations.

2. *March 28, 2013 Statements*

On March 28, 2013, Defendant John Mulligan, then-CFO, attended an annual retail

conference in Canada and gave a presentation in which he stated, for example:

> How about Canada? Going into the year last year, we talked about four key items
> we needed to achieve. We needed to build out of the supply chain; build the
> technology; build the team; and then begin to remodel stores, primarily the ones
> that we're opening right now. *We achieved all four of those objectives, and did so*
> *with a great deal of financial discipline. And the team did a fantastic job. We're*
> *right where we want to be right now*, and did so with $0.48 of dilution versus our
> goal of $0.50.

(SAC ¶ 179 (some emphasis omitted).) In response to a question recognizing that Target Canada

had taken "a few shots to the chin" due to "out-of-stocks," he also stated:

> We needed to get the first three stores open. You can do all the testing you want
> of systems and supply chain in the labs. Ultimately, you need to get the real world
> working. And so getting those three stores opening; let our teams, which is 99%
> Canadian team members who haven't worked in Target stores, letting them get
> used to things. *And that's gone really well. We're very pleased. I think that*
> *supply-chain efforts, we work through I think—if we had had a normal amount of*
> *opening, we would have worked through those very rapidly. But combined with*

*the overwhelming response, it's taken us a bit longer than we might like. But we feel very good about where we're at.*

(*Id.* ¶ 181 (some emphasis omitted).) Plaintiffs allege that Mulligan's statements that Target Canada had "achieved" the objectives of building a supply chain and was "right where [it] wanted to be" were "materially false and misleading when made, because [the statements] failed to disclose the systemic problems experienced in Target Canada's supply chain IT systems." (*Id.* ¶ 180.) Similarly, the statements that testing and training were going well and that Target Canada felt "very good" about where it was were false and misleading due to "systemic problems," "inadequately trained employees," and atypical supply chain issues. (*Id.* ¶¶ 182-83.) Furthermore, "these supply chain problems were both severe and systemic such that a full system reset was necessary." (*Id.* ¶ 182.) The statement about customers' "overwhelming response" was also misleading for analogous reasons. (*See id.* ¶ 183.)

Here, too, the SAC does not adequately allege the who, what, when, where, and how to specifically explain why any of the challenged statements were false or misleading when made. At this time, Target Canada *had* built a supply chain and a technology infrastructure. In what way had they failed to build it at this moment in time? To what extent were employees untrained or the supply chain issues atypical? What made the supply chain problems severe? The SAC does not provide "the barest clue," and, as discussed earlier, the SAC contains too few specifics as to the alleged systemic problems. *Parnes*, 122 F.3d at 550.

Plaintiffs also do not explain what a "complete reset" would entail, let alone why it was needed less than one month after Target Canada opened its first stores. That more than fifteen months later new leadership determined that a "reset" of systems was the best course of action going forward does not sufficiently explain why a reset was needed prior to that point. (*See* SAC ¶¶ 146, 263.) Rather, the reference to a complete reset indicates that Plaintiffs are pleading fraud

by hindsight. *See DiLeo*, 901 F.2d at 627 ("You cannot tell from reading [the complaint] why the [plaintiffs] believe that the problems were so apparent that reserves should have been jacked up before the end of 1983—why failure to increase the reserves amounted to 'fraud.'").

The March 28, 2013 challenged statements further exhibit Plaintiffs' failure to specify, with particularity, why the challenged statements were false or misleading when made.

### 3. May 22, 2013 Statements

On May 22, 2013, Target announced its financial results for Q1 2013 and posted a loss for Target Canada. (*See* SAC ¶¶ 184-85.) During a conference call with investors and analysts related to these results, Steinhafel stated:

> After two years of preparation, in March we opened our first 24 Canadian stores in the greater Toronto area and we're very pleased with the reception we received from our new Canadian guests. . . . Two weeks ago we opened our second wave of 24 Canadian stores in British Columbia, Alberta and Manitoba and *we're very pleased with* the initial guest response in these markets and *the ability of our teams and systems to accommodate the increasing volume of traffic and sales.*

(*Id.* ¶ 187 (some emphasis omitted).) Plaintiffs allege that the statements referring to the ability to accommodate traffic and sales were false and misleading because "neither [Target Canada's] teams nor its supply chain IT systems were in fact equipped to handle the volume of traffic and sales, which created systemic problems that increased as a result of Target continuing with its ill-advised, rampant store opening pace in Canada." (*Id.* ¶ 188.)

Plaintiffs allege no facts to explain why or how, at this point in time, the supply chain systems were not equipped to handle traffic and sales. And there are no additional facts regarding systemic problems outside those already discussed. Plaintiffs' allegation as to "why," then, is essentially a conclusory allegation that the statements were false, without any supporting details. Such an allegation does not meet Rule 8(a)(2)'s plausibility requirement, let alone the PSLRA's

heightened standards. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (holding that "naked assertion[s]" are insufficient (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007))).

In addition, the reference to Target's "ill-advised" store opening pace signals pleading fraud by hindsight. There are no specific allegations demonstrating that company leadership knew that the rapid expansion strategy would fail. And it is facially implausible that leadership willfully or knowingly engaged in an ill-advised strategy. *See Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 627 (4th Cir. 2008). In these circumstances, the basis for the assertion of imprudence can only reasonably be attributed to leadership's later supply chain-related regrets and the withdrawal from Canada. (*See* SAC ¶¶ 149, 151-52.)[6] The "ill-advised" assertion also reveals an attempt to make out a securities fraud claim using allegations that sound in breaches of fiduciary duty. But "plaintiff[s] may not 'bootstrap' a claim for internal corporate mismanagement or breach of fiduciary duty by alleging that the corporation or its directors failed to disclose that mismanagement or breach." *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 682 (D. Colo. 2007) (citing *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 473 (1977) ("The language of § 10(b) gives no indication that Congress meant to prohibit any conduct not involving manipulation or deception.")); *see also St. Louis Union Tr. Co. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 562 F.2d 1040, 1048 (8th Cir. 1977) ("Section 10(b) and Rule 10b-5 were not intended to bring within their ambit simple corporate mismanagement or every imaginable breach of fiduciary duty in connection with a securities transaction."). This implicit bootstrapping further illustrates pleading fraud by hindsight because it attempts to turn the pursuit of a strategy—later shown to be imprudent—into fraud.

---

[6] These accounts refer to "hindsight," using a "time machine," and "do[ing] it all over again."

Plaintiffs also allege that, in response to a question about productivity at the early

Canadian stores and expectations in relation to consumables, Steinhafel said, in part:

> Over time our consumables share will grow . . . . We didn't want to come out of the blocks by hitting those categories too hard because we wanted to make sure that we led with our strength. *And we wanted to make sure that all the supply chains and the operational disciplines were in place. We feel very confident now that they are. We're ready to start making those kinds of adjustments in merchandising and supply chain and in store operations to start refining the model.*

(SAC ¶ 189 (some emphasis omitted).) Plaintiffs allege that Steinhafel's confidence in the

"supply chain and the operational disciplines" was materially false and misleading because the

statement failed to disclose the systemic supply chain problems. (*See id.* ¶ 190.) The statements

that Target Canada could make "adjustments" and "start refining" were false and misleading

because the systemic nature of the supply chain problems "require[d] major, wholesale changes

to fix." (*Id.*)

Plaintiffs again fail to allege any specific facts demonstrating that at this point in time the

supply chain and operational disciplines were not in place or that Steinhafel was not actually

confident in his assessment. There are also no facts showing that improving whatever

deficiencies existed was impossible, rendering such a contention implausible. The assertion that

major, wholesale changes—which are undescribed—were required further indicates that

Plaintiffs' case is built on hindsight and informed by later determinations that supply chain issues

would require additional investments and contributed to Target's withdrawal from Canada. (*See*

SAC ¶¶ 159, 161.) In short, Plaintiffs again fail to give "particulars" as to why these statements

were false or misleading when made and therefore fail to meet the PSLRA's pleading standards.

*In re Navarre*, 299 F.3d at 743.

### 4. May 30, 2013 Statements

Eight days later, on May 30, 2013, Mulligan attended a conference in New York City.

(*See* SAC ¶ 194.) In response to a question about Target Canada's execution risk, he said:

> *A lot of the execution risk is behind us.* We need the initial execution risk. *We're still refining. Things like replenishment systems, they take a while to tune, and so we're tuning*, and each one of the stores will be different. So we're working through that. But there is a wave of system enhancements that need to come and operational enhancements that need to come, and *that's just us honing the business that needed to happen naturally through time just as we've done in the US over 50 years*, but part of us improving and getting to that profitability we need in Canada, we don't have everything we need on day one. There's follow-on investment that we need to do. So that needs to continue to happen. *But as far as what we planned for the start-up, we feel really good about where we are today.*

(*Id.* ¶ 196 (some emphasis omitted).) While at the conference, he also said:

> And, finally, Canada -- when you invest billions of dollars and record losses in your P&L, you obviously generate a very large negative ROIC. *We expect that to turn in the fourth quarter of this year as we turn to accretion and then that will grow. So the ROIC will naturally improve in Canada.*

(*Id.* ¶ 198 (some emphasis omitted).) Plaintiffs allege that Mulligan's statement as to "execution risk" was false and misleading because "the execution risk was only intensifying as [Target Canada] continued to open stores regardless of the fact that [Target Canada] was plagued by severe systemic issues with its supply chain IT systems." (*Id.* ¶ 197.) The "refining" and "tuning" statements were false and misleading because they failed to disclose that the systemic problems would require major, wholesale changes to fix. (*Id.*) The ROIC statement also failed to disclose the systemic problems and those problems' negative operational impact. (*Id.* ¶ 199.) Until the problems were corrected, Mulligan "lacked a reasonable basis in providing this guidance." (*Id.*)

Just as the SAC fails to include details about the systemic problems at earlier junctures in time, so too does it fail to include any details about Target Canada's execution risk at the time Mulligan spoke. In addition, Plaintiffs again fail to allege specific details showing that on or around May 30, 2013, refining and tuning were not viable options for fixing whatever supply

chain problems were manifest. And Plaintiffs plead no specific facts showing that the ROIC

guidance was false or misleading when issued for similar reasons. Plaintiffs do not plead facts

that connect any particular supply chain issues to Target Canada's negative financial results and

only generally allege such a cause-and-effect relationship. Without specific details as to how and

to what extent particular supply chain issues directly affected financial results, Plaintiffs fail to

meet the PSLRA's standards for explaining why Mulligan lacked a reasonable basis in providing

guidance on ROIC improvement in Canada. *See In re 2007 Novastar*, 579 F.3d at 883.

### 5. *August 21, 2013 Statements*

On August 21, 2013, Target announced its financial results for Q2 2013 and reported a

loss for Target Canada. (*See* SAC ¶¶ 200-01.) During a conference call, Steinhafel provided an

update on Target Canada and stated, in part:

> *Our expectations are informed by* our experience in launching the PFresh remodel
> program and City Target format, *as well as our historical experience entering
> new markets in the US.* In many of these markets *we saw [a] similar pattern* in
> which sales momentum was slower than expected at the launch, but grew rapidly
> in the first several years after opening, resulting in achievement of our fifth year
> sales goals. For the stores we've opened, the team in Canada is working to adjust
> inventory and store staffing to match the pace of sales in each individual location.
> And for the segment in total, we have updated the expected timing of earnings
> accretion. *Having said that, we remain highly confident in our strategy.*

(*Id.* ¶ 204 (some emphasis omitted).) In response to a question about inventory, he also said:

> *The inventory overhang is a function of the shortfall primarily in some of the
> seasonal categories. . . . But it's the same kind of fine tuning that we go through
> every time we open a new store here in the United States, and they have
> experienced for years and years.* There is always a tremendous amount of fine
> tuning and getting the right match of sales volatility, variability, assortment, and
> aligning that with inventory. What we're seeing in Canada is there's such a big
> critical mass that it stands out, and it's far more obvious. *But it's no different than
> what we've experienced [in the U.S.]*

(*Id.* ¶ 208 (some emphasis omitted).) Plaintiffs allege that the comparisons to US operations were false and misleading because "Target had never before encountered such systemic problems to the extent . . . [it was] dealing with [problems] in Canada." (*Id.* ¶ 205; *see id.* ¶ 209.)

Despite their assertions to the contrary, Plaintiffs do not allege any particular facts distinguishing specific problems Target Canada faced from those faced by Target in the US. What particular differences existed, and how drastic a disparity in experience did the differences create? How did those differences relate to inventory and sales? It is obvious that Target Canada would experience different supply chain issues because it used entirely different supply chain systems. But how, why, and to what extent were the issues Target Canada experienced not "similar" or not the "same?" The Court does not know because the SAC does not say. Plaintiffs' general allegations of systemic problems and the threadbare conclusion that Target did not suffer systemic problems in the US are not enough to meet the PSLRA's pleading standards. *See In re 2007 Novastar*, 579 F.3d at 883-84; *In re Cerner*, 425 F.3d at 1084.

*6. October 30, 2013 Statements*

At a meeting with the financial community in Canada on October 30, 2013, Fisher commented on Target Canada's supply chain and stated, in part:

> We are simplifying processes and improving replenishment practices at our stores, things we take for granted after 50 years in the US, to help us operate more efficiently and strengthen our presentation. For instance, in July we rolled out an important receiving process improvement which cut the amount of time it takes to check in a trailer at a store from about 25 minutes to less than two minutes. And it is more accurate. And systematic replenishment in store, which we are now unveiling nationwide, has shown promising results in pilot stores, getting merchandise out of the back room quickly and on to the sales floor. Our stores, merchandising team, vendors, and sourcing offices are working together to improve our ordering practices. *And we are doing whatever it takes to clear excess merchandise out of our supply chain so we can more efficiently and effectively and correctly flow product from our distribution centers to our stores.*
>
> . . .

> *Now our team is getting better every day at interacting with this new technology and we are quickly executing hundreds of fixes to make this suite of systems even easier for our team members to use.*

(SAC ¶ 222 (some emphasis omitted).) In response to a question about "operational initiatives to . . . get Canada back on track," Fisher further stated:

> So we had plans, and we started these back in 2012, as far as we were going to start lean, start with a very narrow scope. The fact that we went out of the box with these technology solutions allowed us to react and enhance those very, very quickly after opening. So given our performance and the fact that we are sort of our initial sales goal, *we are staying with all the initial plans because they are the right ones.*

(*Id.* ¶ 224 (some emphasis omitted).) Plaintiffs allege that Fisher's statement that Target Canada was "doing whatever it takes to clear excess merchandise" was false and misleading because "a complete reset of the supply chain IT systems was what was actually required to solve its systemic problems," but Target Canada was not implementing a reset. (*Id.* ¶ 223.) The statement that Target Canada's original plans were the "right ones" was false and misleading in light of the systemic problems. (*See id.* ¶ 225.)

As with Plaintiffs' previous allegations regarding "why" statements were false and misleading, the Court cannot find any details in the SAC that would sufficiently substantiate Plaintiffs' theories. The only additional context provided by the SAC is that by Fall 2013, distribution centers were bursting with goods. (*See id.* ¶¶ 88, 106.) But Plaintiffs do not tie any such allegations to the explanation that a reset was needed. Plaintiffs also do not allege whether, as Fisher stated, Target Canada was actually implementing improvements to its supply chain systems and whether those improvements were effective. And Plaintiffs' explanation as to the "right ones" statement is essentially a conclusory allegation that Target Canada's plans were the "wrong ones." Therefore, Plaintiffs fail to meet the PSLRA's requirement to allege particular details as to why Fisher's October 30, 2013 statements were false or misleading when made. *See In re Navarre*, 299 F.3d at 743.

*7. November 21, 2013 and February 26, 2014 Statements*

On November 21, 2013, Target announced its financial results for Q3 2013 and posted a loss for Target Canada. (*See* SAC ¶¶ 229-30.) As part of prepared remarks made during a conference call, Steinhafel stated, in part:

> The Target Canada team is energized and prepared for the holiday season, and preparing to enter 2014 with *improved in-stocks and a much better inventory position.*

(*Id.* ¶ 232 (some emphasis omitted).)

One quarter later, on February 26, 2014, Target announced its financial results for Q4 2013 and again posted a loss for Target Canada. (*See id.* ¶¶ 242-43.) During a conference call, Mulligan stated, in part:

> In the Canadian segment, sales came in just below expectations. Importantly as [Steinhafel] mentioned, we took advantage of holiday traffic to clear through a significant amount of excess inventory in the quarter, and while we expect some small lingering issues with long lean receipts this year, *the Canadian segment ended 2013 in a much cleaner inventory position*, paving the way for smoother operations in 2014.

(*Id.* ¶ 243 (some emphasis omitted).) Plaintiffs allege that both statements regarding inventory position were false and misleading because of the existence of systemic supply chain problems. (*See id.* ¶¶ 233, 244.)

The only additional context as to the state of Target Canada at the time Steinhafel and Mulligan spoke is that Target Canada was operating 124 stores. (*See id.* ¶ 122.) But this additional context adds little to Plaintiffs' "systemic problems" theory. Plaintiffs allege that as more stores opened, the problems magnified, but they do not explain why such magnification made the challenged statements false or misleading when made. (*See, e.g.*, *id.* ¶¶ 114, 170.) Even as to Steinhafel and Mulligan's above statements, Plaintiffs fail to allege details to show why the statements were false or misleading when made. Why was it the case that Steinhafel could not

reasonably expect such improvements? Or that improvements were impossible? Or that Mulligan's statement recapping 2013 was false or misleading? The SAC is silent and therefore fails to meet the PSLRA's pleading standards. *See In re Navarre*, 299 F.3d at 743.

    8.  *May 21, 2014 Statements*

Shortly after Steinhafel's resignation and Fisher's termination, Target announced its financial results for Q1 2014 on May 21, 2014 and posted a loss for Target Canada. (*See* SAC ¶ 256.) In response to a question during a conference call, Mulligan stated:

> [W]e continue to see improvement across the business into April as the guests data improved, and our sales improved. And the early cycle stores continue to be the best. And it's – again almost in order down the sheet, like one cycle, two-cycle, three-cycle, four-cycle, five. *So, the earliest stores, the longer they've been open, they performed the better, but the good thing is all cycles are on an upward path.*

(*Id.* ¶ 257 (some emphasis omitted).) Plaintiffs allege that this statement was false and misleading because "Target Canada stores continued to perform poorly, including those opened in early cycles, as would later be revealed to investors on August 20, 2014." (*Id.* ¶ 258.) About three months later, on August 20, Target officials announced that "same-store sales decreased more than 11% in Canada over the prior year as a result of ongoing supply chain problems. Because the only stores that could be included in this metric were stores open for at least a year as of June 2013, this figure directly contrasted with" Mulligan's May 21 statement. (*Id.* ¶ 264.)

This is Plaintiffs' most specific explanation as to falsity and/or materiality, but it is still insufficient. Notably, the explanation says nothing about "systemic problems." But similar to the systemic problems theory, the explanation is based on hindsight. Indeed, the explanation is the archetype of pleading fraud by hindsight. *See In re Patterson*, 479 F. Supp. 2d at 1030; *see also Parnes*, 122 F.3d at 551 ("The story in this complaint is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy.

The plaintiff contends that the difference must be attributable to fraud." (quoting *DiLeo*, 901 F.2d at 627)). Plaintiffs merely compare an earlier statement about sales to a later, inconsistent statement and point to the inconsistency as proof that the statement must have been false when made. "'Must be [false]' is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition." *Parnes*, 122 F.3d at 551 (quoting *DiLeo*, 901 F.2d at 627).

"Plaintiffs may not proffer the different financial statements and rest. [They] must point to some facts suggesting that the difference is attributable to fraud." *Id.* Plaintiffs must allege specific facts that show the statement was false or misleading *when it was made*, not merely proven to be false or misleading in hindsight. *In re Navarre*, 299 F.3d at 743; *see also Parnes*, 122 F.3d at 547 ("Predictions on future growth . . . will almost always prove to be wrong in hindsight." (quoting *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993))). Because Plaintiffs do not allege any such additional facts, they fail to meet the PSLRA's requirements.

### 9. *Item 303 Non-disclosures*

Plaintiffs allege that when Target filed its Form 10-Qs and 10-Ks throughout the Securities Class Period, the Forms contained actionable omissions pursuant to Item 303 of Regulation S-K.[7] (*See* SAC ¶¶ 193, 220, 238, 253, 259.) Plaintiffs complain that the filings failed to include a discussion of "the extent to which the poor performance of [Target Canada] was attributed to startup-costs and whether Defendants expected [Target Canada] to continue to negatively impact the Company's operations" as a result of the systemic supply chain problems.

---

[7] Item 303 requires management to describe, among other things, "significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations" and "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(i)-(ii).

(*Id.* ¶ 253; *see id.* ¶ 271.) For example, the Form 10-K for year 2013 reported a $941 million

EBIT loss for Target Canada, but provided little to no explanation for the loss. (*See id.* ¶ 254.) In

response to Target's Form 10-K filed March 14, 2014, the SEC requested the following:

> Please tell us what consideration you gave to discussing and quantifying the extent to which the fiscal 2013 performance of the Canadian Segment is attributed, on the one hand, to start-up costs and challenges versus, on the other hand, lower than anticipated sales and earnings of Canadian stores once opened. Additionally, please tell us what consideration you gave to disclosing the extent to which the performance of the Canadian Segment can reasonably be expected to continue to negatively impact your results of operations in future periods.

(*Id.* ¶ 255 (emphasis omitted).) In a response letter, Mulligan wrote:

> During the year, we experienced significant supply chain issues that contributed to inadequate in-stock levels and excess inventory in our distribution facilities. . . . These issues, combined with softer-than-expected sales, resulted in performance below our expectations. Because of the interrelated nature of these issues, we were unable to separately identify and quantify the impacts from start-up issues versus lower-than-expected sales and earnings.

(*Id.* ¶ 260. (emphasis omitted).)

Even assuming, without deciding, that breach of Item 303's disclosure duty may form the

basis of a § 10(b) and Rule 10b-5 claim,[8] Plaintiffs must still meet the PSLRA's requirement to

allege with particularity a breach of that disclosure duty. *See* § 78u-4(b)(1). But because

Plaintiffs couch their Item 303 theory of liability in their general "systemic problems"

explanation, (*see* SAC ¶¶ 271-74), their Item 303 theory fares no better than their other

explanations as to why statements were misleading and fails to meet the PSLRA's pleading

standards, *see In re 2007 Novastar*, 579 F.3d at 883-84.

---

[8]  *Compare In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1055-56 (9th Cir. 2014), *and Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000), *with Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101-02 (2d Cir. 2015), *and Beaver Cty. Employees' Ret. Fund v. Tile Shop Holdings, Inc.*, 94 F. Supp. 3d 1035, 1047-48 (D. Minn. 2015).

*10. Other Statements and Summary*

Plaintiffs quote several other challenged statements throughout the SAC's 129 pages and 351 paragraphs.[9] Those challenged statements, like the ones analyzed above, fail to meet the PSLRA's pleading standard for analogous reasons, primarily because Plaintiffs' explanation as to why the challenged statements were false or misleading when made is tied to general, nonspecific allegations that systemic supply chain problems persisted throughout the Securities Class Period, that the problems contradicted the challenged statements or were not disclosed to the public, and that therefore Defendants' statements were materially false and misleading. But as discussed at length above, the SAC does not "specify the reasons why each statement was false or misleading." *In re 2007 Novastar*, 579 F.3d at 883. "The [SAC] does not provide any link between an alleged misleading statement and specific factual allegations demonstrating the reasons why the statement was false or misleading . . . ." *Id.* And the SAC does not "necessarily show that the defendants' statements were [false or] misleading." *Id.* at 884. Therefore, the SAC does not "provide the level of particularity required by the PSLRA." *Id.*

The primary reason for Plaintiffs' pleading inadequacies is that Plaintiffs are pleading fraud by hindsight. Plaintiffs disclaim such a practice, pointing to their reliance on credible news sources and confidential witnesses for their allegations. (*See* S. Pl. Br. 14-28.) Such sources may be used to support allegations showing that statements were false or misleading if the basis for

---

[9]    The Court notes that "a heightened pleading standard need not translate to a lengthy complaint." *In re Leapfrog Enters., Inc. Sec. Litig.*, No. 03-CV-5421 (RMW), 2006 WL 2192116, at *3 (N.D. Cal. Aug. 1, 2006); *see OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 491-92 (3d Cir. 2016); *In re Merrill Lynch & Co., Inc. Res. Reports Sec. Litig.*, 272 F. Supp. 2d 243, 268 (S.D.N.Y. 2003) ("Plaintiff's . . . amended complaint is 112 pages long, contains 424 paragraphs, and is in clear violation of Federal Rule of Civil Procedure 8(a), which mandates that pleadings shall consist of a 'short and plain statement of the claim showing that the pleader is entitled to relief.' An unquestionably simple complaint uttered in so many pages borders very substantially on what Congress intended to eliminate under the [PSLRA's] heading of 'abusive litigation.'").

the sources' knowledge is described with particularity. *See* § 78u-4(b)(1); *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004). But even if sources are sufficiently described, the allegations supported by those sources must still adequately explain why challenged statements were false or misleading when made. *See In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 959-60 (8th Cir. 2008); *see also New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 51 (1st Cir. 2008) ("[W]e look at all of the facts alleged to see if they provide an adequate basis for believing that the defendants' statements were false. This involves an evaluation, inter alia, of the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." (internal quotation marks and citations omitted)).

Setting aside whether the basis for the confidential witnesses and news articles' knowledge is sufficiently described, (*see* SAC ¶¶ 32-42), the SAC only attributes general information about Target Canada's supply chain problems to these sources, (*see id.* ¶¶ 82-115). Plaintiffs extrapolate their overarching systemic problems explanation from this general information, as well as later company decisions involving a "reset" of systems and a withdrawal from Canada due in part to supply chain issues. They then explain that the challenged statements must have been false and misleading during the entire Securities Class Period because the supply chain contained systemic, supposedly unfixable, general problems. This is pleading fraud by hindsight, supplemented only by relevant, but vague, background information about supply chain problems that existed during the Securities Class Period. The PSLRA prohibits reliance on such threadbare and hindsight-inspired allegations. *See* § 78u-4(b)(1); *In re Navarre*, 299 F.3d at 743.

With the benefit of hindsight, it is possible—and perhaps even likely—that Target would have plotted a less rapid expansion into Canada or employed different supply chain systems. (*See* SAC ¶¶ 149, 151-52.) Regardless, the securities laws "do not provide investors with a recourse against unsuccessful management strategies," *Parnes*, 122 F.3d at 551 (quoting *Searls v. Glasser*, 64 F.3d 1061, 1069 (7th Cir. 1995)), or business reverses, *DiLeo*, 901 F.2d at 627 ("Awards on account of business failure, even the expenses of litigation on the subject, would discourage firms from taking risk in the first place. This would make investors as a whole worse off." (internal citation omitted)). For all the foregoing reasons, Plaintiffs fail to distinguish their case from one founded on hindsight. They fail to allege sufficient particular facts explaining why any of the challenged statements were materially false or misleading when made. *See In re 2007 Novastar*, 579 F.3d at 883; *In re Cerner*, 425 F.3d at 1084; *In re Navarre*, 299 F.3d at 742-43. Therefore, the Court must dismiss the SAC.[10] *See* § 78u-4(b)(3)(A).

## B. Exchange Act § 20(a) Claims

Section 20(a) of the Exchange Act provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . .

15 U.S.C. § 78t(a). "Controlling person" claims brought under § 20(a) are, by definition, then, derivative of a controlled person's violation of the Exchange Act. *In re Hutchinson Tech., Inc.*

---

[10] Because the Court dismisses the SAC for failure to plead a material misrepresentation or omission with the level of particularity required by the PSLRA, the Court does not address whether Plaintiffs plead a strong inference of scienter. The Court has doubts, however, as to whether Plaintiffs meet the PSLRA's standards with regard to that element due to Plaintiffs' pleading fraud by hindsight. *See In re Stratasys Ltd. S'holder Sec. Litig.*, --- F.3d ---, No. 16-3264, 2017 WL 3139438, at *3 (8th Cir. July 25, 2017); *In re Ariad Pharm., Inc. Sec. Litig.*, 842 F.3d 744, 751, 753-54 (1st Cir. 2016); *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1251 (10th Cir. 2016), *as amended* (July 6, 2016); *Podraza v. Whiting*, 790 F.3d 828, 841 (8th Cir. 2015); *Elam v. Neidorff*, 544 F.3d 921, 930 (8th Cir. 2008).

*Sec. Litig.*, 536 F.3d 952, 961 (8th Cir. 2008). Because the Court finds that Plaintiffs fail to allege such a violation with the level of particularity required by the PSLRA, their § 20(a) claims likewise fail. *See id.*

## IV. THE ERISA ACTION

The ERISA action contains allegations similar to those in the securities action, but related to the Target Corporation 401(k) Plan (and absorbed Target Corporation Ventures 401(k) Plan) (the "Plan"). (*See* ERISA Amended Complaint ("EAC") ¶ 1, E. Dkt. No. 22.) Plaintiffs were Plan participants between February 27, 2013 and May 19, 2014, inclusive (the "ERISA Class Period"). (*See id.* ¶¶ 19-22, 51.) During that period, Plan participants invested in the Plan's Company Stock Fund (the "Fund"), which invested in Target common stock as part of Target's Employee Stock Ownership Plan ("ESOP"). (*See id.* ¶¶ 3, 60, 68.)

In general, Plaintiffs allege that Defendants Plan Investment Committee ("PIC") and its members, Target, and company executives who appointed individuals to the PIC all breached their duties of prudence and loyalty when they failed to take steps to protect Plan participants from drops in Target stock price that resulted from Target Canada's failure. (*See id.* ¶ 5.) Plaintiffs allege that Defendants had inside, nonpublic information about Target Canada's systemic supply chain problems indicating that failure was inevitable, that this information was not fully public and led to artificially-inflated stock prices, and that Defendants were thus duty-bound to take actions to protect Plan participants from future price drops. (*See id.* ¶¶ 7, 86-167.)

Plaintiffs assert three causes of action: (1) breach of the duty of prudence in violation of ERISA §§ 404(a)(1)(B) and 405, (2) breach of the duty of loyalty in violation of ERISA §§ 404(a)(1)(A) and 405, and (3) failure to adequately monitor other fiduciaries and provide

them with accurate information in violation of ERISA § 404. (EAC ¶¶ 177-221.) Defendants move to dismiss all three counts for failure to state a claim. (*See* E. Dkt. No. 28.)

## A.  Count I for Breach of the Duty of Prudence

ERISA § 404(a)(1)(B), codified at 29 U.S.C. § 1104(a)(1)(B), requires Plan fiduciaries to discharge their duties solely in the interests of participants and beneficiaries "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." This standard is objective; it focuses on the fiduciaries' conduct preceding a challenged decision, rather than the results of that decision. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009). To prove a breach of this duty of prudence—which has been described as one of "the highest known to the law"—plaintiffs must make a prima facie showing that defendants (1) acted as fiduciaries, (2) breached their fiduciary duties, and (3) caused a loss to the Plan. *Id.* at 594, 598 (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). When evaluating whether this showing has been met, courts should engage in a "holistic evaluation" of the factual allegations. *Id.* at 598.

Defendants challenge element (2), that they breached any fiduciary duties. (*See* ERISA Defendants' Memorandum in Support of Their Motion to Dismiss ("E. Def. Br.") 8-9, E. Dkt. No. 30.) They argue that Plaintiffs' claims fail under the pleading standards articulated by the Supreme Court in *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014) and reaffirmed in *Amgen, Inc. v. Harris*, 136 S. Ct. 758 (2016). (*See* E. Def. Br. 9-11.)

1. *Dudenhoeffer* and *Amgen*

In *Dudenhoeffer*,[11] ESOP plan participants alleged that the fiduciary defendants knew or should have known that a company's stock was overvalued and excessively risky based on, among other things, nonpublic information known to the fiduciaries in their positions as insiders. 134 S. Ct. at 2464. The participants asserted that instead of continuing to hold and buy company stock, the defendants should have sold stock before the value declined, refrained from purchasing more stock, cancelled the ESOP option, and disclosed the inside information. *Id.*

The Supreme Court remarked that, "[o]n the one hand, ERISA itself subjects pension plan fiduciaries to a duty of prudence," but that "[o]n the other hand, Congress recognizes that ESOPs are 'designed to invest primarily in' the stock of the participants' employer." *Id.* at 2465. As such,

> in many cases an ESOP fiduciary who fears that continuing to invest in company stock may be imprudent finds himself between a rock and a hard place: If he keeps investing and the stock goes down he may be sued for acting imprudently . . . but if he stops investing and the stock goes up he may be sued for disobeying the plan documents.

*Id.* at 2470.

To weed out meritless claims and address the ESOP fiduciary dilemma, the Supreme Court held that in order for plaintiffs to state a claim "for breach of the duty of prudence on the basis of inside information," they must plausibly allege an alternative action that the defendant fiduciaries could have taken that (1) would have been consistent with the securities laws, and (2) "a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it." *Id.* at 2472. The Court noted one example of an action that would be inconsistent with securities laws: "divesting the fund's holdings of the employer's stock on the basis of inside information." *Id.* at 2472. As to the second element, the Supreme Court advised:

---

[11] The case is also commonly referred to as *Fifth Third*.

[L]ower courts . . . should also consider whether the complaint has plausibly alleged that a prudent fiduciary in the defendant's position could not have concluded that stopping purchases—which the market might take as a sign that insider fiduciaries viewed the employer's stock as a bad investment—or publicly disclosing negative information would do more harm than good to the fund by causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund.

*Id.* at 2473.

The Supreme Court revisited *Dudenhoeffer* in *Amgen* just two years later. Reversing the Ninth Circuit Court of Appeals's decision that a complaint satisfied *Dudenhoeffer*'s standards, the Court stated:

The Ninth Circuit's proposition that removing the Amgen Common Stock Fund from the list of investment options was an alternative action that could plausibly have satisfied [*Dudenhoeffer*'s] standards may be true. If so, the facts and allegations supporting that proposition should appear in the stockholders' complaint. Having examined the complaint, the Court has not found sufficient facts and allegations to state a claim for breach of the duty of prudence.

136 S. Ct. at 760. The Supreme Court then remanded the case for the sole issue of whether the plaintiffs should be granted leave to amend their complaint to add details to meet *Dudenhoeffer*'s standards. *See id.*

2. *Plaintiffs' Alleged Alternative Actions*

Plaintiffs allege that Defendants should have taken the following alternative actions to protect Plan participants from artificially-inflated Target stock prices: (1) refrained from purchasing Target stock by "freezing" purchases and/or sales of Target stock in the Fund, (EAC ¶ 152); (2) held Plan contributions in cash or some other short-term investment rather than making future purchases of Target stock, (*id.* ¶¶ 142, 162); (3) disclosed the nonpublic, material information to the public, (*see id.* ¶¶ 152, 163); (4) sent targeted letters to Plan participants encouraging them to diversify holdings, (*id.* ¶ 164); (5) sought guidance from the Department of Labor ("DOL") or SEC or outside experts, (*id.* ¶ 166); or (6) resigned as fiduciaries, (*id.*).

a. Refrained from Purchasing Stock by Freezing Purchases and/or Sales

Defendants argue, among other things, that refraining from purchasing the stock by freezing purchases or sales could lower the stock price by sending a negative signal about the company, so a prudent fiduciary could conclude that a freeze would cause more harm than good. (E. Def. Br. 17-19.) Plaintiffs respond that no prudent fiduciary could conclude that a freeze would do more harm than good in the context of Target Canada's critical supply chain problems and argue that *Dudenhoeffer* does not foreclose the possibility that a freeze may constituting a prudent alternative action. (ERISA Plaintiffs' Response Memorandum in Opposition to the Motion to Dismiss ("E. Pl. Br.") 23-28, E. Dkt. No. 45.)

Although Plaintiffs in the ERISA action are not required to plead their claims with particularity, they must "plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it." *Dudenhoeffer*, 134 S. Ct. at 2472. As *Amgen* instructs, facts supporting such a proposition "should appear in the stockholders' complaint." 136 S. Ct. at 759-60.

The EAC does not include sufficient allegations supporting the general proposition that a prudent fiduciary could not have concluded that refraining from purchasing stock by freezing stock purchases or freezing stock sales would do more harm than good. (*See, e.g.*, EAC ¶¶ 147-67.) Plaintiffs primarily allege in a conclusory way that these alternative actions would have saved Plan participants from future losses. (*See id.* ¶¶ 151-52.) Such naked assertions are analogous to those the Supreme Court found insufficient in *Amgen*. *See* 136 S. Ct. at 759-60 (ruling on First Amended Class Action Consolidated Complaint, *Amgen, Inc. v. Harris*, No. 2:07-CV-5442 (PSG/PLA), at ¶¶ 290, 344 (C.D. Cal. Mar. 23, 2010), Dkt. No. 168 at 80, 93).

Outside of the conclusory allegations, Plaintiffs allege that because the Fund's purchases during the first half of 2014 represented "one quarter of one percent" of market trading volume, it was "extremely unlikely" that a freeze implemented by the Fund would have had a negative, appreciable effect on share price. (EAC ¶ 156.) But this allegation is non-responsive to *Dudenhoeffer*'s concern that ceasing purchases could send mixed signals, causing a drop in stock price. *See Saumer v. Cliffs Nat. Res. Inc.*, 853 F.3d 855, 865 (6th Cir. 2017). Although *Dudenhoeffer* does not foreclose the possibility that a freeze might constitute a viable alternative in some circumstances, Plaintiffs' failure to plausibly plead the viability of a freeze in the circumstances of this case is fatal to Plaintiffs' claim.[12] *See id.*; *Whitley v. BP, P.L.C.*, 838 F.3d 523, 529 (5th Cir. 2016); *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 68 (2d Cir. 2016), *cert. denied,* 137 S. Ct. 1067 (2017).

### b. Held Contributions in Cash or Other Short-Term Investments

Defendants argue that holding Fund contributions in cash or other investment options would require disclosure to the market, risking a drop to Target stock price no different than that risked by a freeze. (*See* E. Def. Br. 19-20.) Defendants also argue that Plaintiffs' failure to address this alternative action in Plaintiffs' response memorandum results in waiver. (*See* ERISA Defendants' Reply Memorandum ("E. Def. Reply Br.") 12, E. Dkt. No. 46.) Plaintiffs do not specifically discuss the cash option, except in their discussion of why freezing the Fund was a viable alternative action. (*See* E. Pl. Br. 23-24.) At oral argument, Plaintiffs explained that

---

[12] Plaintiffs also allege that the Fund was a net purchaser of Target stock for part of the ERISA Class Period. (*See* EAC ¶¶ 148, 152, 156.) However, Plaintiffs only argue this explanation with respect to disclosure of material, nonpublic information. (*See* E. Pl. Br. 22-23.) Therefore, the Court considers this argument in connection with disclosure.

holding contributions in cash or other short-term investments would not risk harm to Plan participants because the Fund is unitized.[13] (*See* E. Dkt. No. 56 at 23-26.

For the reasons that Plaintiffs do not plausibly plead the alternative of freezing the Fund, they also fail to adequately allege this alternative action. *See Saumer*, 853 F.3d at 863, 865 (finding that plaintiffs failed to meet *Dudenhoeffer*'s standards with regards to the alternative action of holding contributions in cash); *Lynn v. Peabody Energy Corp.*, No. 4:15-CV-916 (AGF), 2017 WL 1196473, at *2, 7 (E.D. Mo. Mar. 30, 2017) (similar); *In re BP P.L.C. Sec. Litig.*, No. 4:10-CV-4214 (KPE), 2017 WL 914995, at *6 (S.D. Tex. Mar. 8, 2017) (similar); *In re Idearc ERISA Litig.*, No. 3:09-CV-2354 (N), 2016 WL 7189980, at *5 (N.D. Tex. Feb. 26, 2016) (similar). Moreover, choosing to hold investments in cash, rather than to invest in stock, on the basis of nonpublic information, presents the very same between-a-rock-and-a-hard-place scenario discussed in *Dudenhoeffer*. *See* 134 S. Ct. 2470. To wit, plan participants have sued fiduciaries for holding too large a class buffer, thereby creating "investment drag." *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 793-94 (7th Cir. 2011). Thus, here too, Plaintiffs fail to plead sufficient facts to meet *Dudenhoeffer*'s pleading standard.

### c. Disclosed the Material, Nonpublic Information

Defendants argue that the disclosure alternative is not adequately pled because Plaintiffs did not allege what alternative information should have been provided, and prudent fiduciaries could have concluded that a corrective disclosure would cause the Plan more harm than good.

---

[13] A unitized fund is one in which "participants own units of the fund rather than shares of the relevant company stock." *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 792 (7th Cir. 2011). Unitized funds contain both common stock of the relevant company and a cash or short-term investment buffer, which enables administrators to make immediate distributions of funds or to immediately transfer investments to other plan funds. *See id.* at 793. The unitized nature of the fund also enables the pooling of stock purchases and sales, reducing stock purchase transaction costs. *See id.*

(*See* E. Def. Br. 11-13.) They also argue that because the Fund sold more shares than it purchased throughout the entire ERISA Class Period, this fact suggests that reasonable fiduciaries would not consider disclosure a better option because in such circumstances, the proceeds from the higher-priced sales would be greater than the outflows used to buy stock at inflated prices. (*See id.* at 15-16; E. Def. Reply Br. 6-7.) Plaintiffs respond that no reasonable fiduciary could have concluded that disclosing the truth would do more harm than good given Target Canada's expansion timeline and extreme IT systems problems (which made future losses foreseeable) and the fact that the Fund was a net purchaser during part of the ERISA Class Period. (*See* E. Pl. Br. 18-23.) Defendants contend that Plaintiffs' arguments are based on hindsight and therefore insufficient. (*See* E. Def. Br. 15-16; E. Def. Reply Br. 4-5.)

Even assuming, without deciding, that Plaintiffs plausibly allege that Target's stock was artificially inflated, and that Defendants knew that was the case, such allegations are insufficient, standing alone, to meet *Dudenhoeffer*'s requirements, *see* 134 S. Ct. at 2473 (requiring plaintiffs to plead facts to plausibly allege prudent alternative actions in the circumstances); *see also Amgen*, 136 S. Ct. at 760 (same); *Saumer*, 853 F.3d at 864-65 (same); *Whitley*, 838 F.3d at 529 (same); *Rinehart*, 817 F.3d at 68 (same). Plaintiffs may not simply allege that because a stock price drop was inevitable, *ipso facto* almost any legal alternative action aimed at softening losses to participants would do more good than harm. *See In re JPMorgan Chase & Co. ERISA Litig.*, No. 12-CV-4027 (GBD), 2016 WL 110521, at *4 (S.D.N.Y. Jan. 8, 2016) ("[Plaintiffs] assert . . . that the 'fact' that 'disclosing a fraud *always* causes a company's stock price to drop' does not 'justif[y] perpetuating a fraud' because 'the longer a fraud goes on, the more painful the correction w[ill] be.' These assertions are not particular to the facts of this case and could be made by plaintiffs in any case asserting a breach of ERISA's duty of prudence. They amount to

no more than factors Defendants might have considered when deciding whether to make public disclosures. But *Dudenhoeffer* sets a higher pleading standard."), *aff'd sub nom. Loeza v. John Does 1-10*, 659 F. App'x 44 (2d Cir. 2016).

Moreover, Plaintiffs' theory as to why Defendants should have disclosed nonpublic information about the supply chain problems—because Target Canada was "doomed" to failure—rests on hindsight. (EAC ¶¶ 90.) But compliance with ERISA's duty of prudence is not evaluated from the "vantage point of hindsight." *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 918 (8th Cir. 1994) (quoting *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984)); *see Rinehart*, 817 F.3d at 63-63 ("ERISA's 'fiduciary duty of care . . . requires prudence, not prescience.'" (quoting *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013)). ERISA instructs courts to review fiduciary actions "under the circumstances then prevailing." 29 U.S.C. § 1104(a)(1)(B). Thus, the prudence of a fiduciary's action depends on the information available to the fiduciary at the time of the decision, and assertions of imprudence devoid of contextual support are insufficient to state a claim under ERISA. *See Pension Ben. Guar.*, 712 F.3d at 716 ("[A]n allegation that an investment's price dropped, even precipitously, does not alone suffice to state a claim under ERISA."); *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 425 (4th Cir. 2007) ("[T]he [plaintiffs] cannot succeed in this lawsuit simply by demonstrating that [the company] offered the Company Fund during a time of grave uncertainty . . . ."). Because Plaintiffs' theory as to the prudence of disclosure rests on hindsight, it is insufficient to state a breach of the duty of prudence claim under ERISA, let alone meet *Dudenhoeffer*'s standards.

Turning to the purchases and sales volume during the ERISA Class Period, Plaintiffs allege that during 2013, the Fund purchased approximately 6,000,000 shares and sold 7,400,000

shares, making it a net seller for the year. (*See* EAC ¶ 61.) However, from January 1, 2014 to April 30, 2014 (near the end of the ERISA Class Period), the Fund purchased approximately 1,260,940 shares and sold only 63,205 shares, making it a net purchaser for that period. (*See id.* ¶ 141.) Combining these figures, the Fund was a net seller overall, suggesting that prudent fiduciaries would have disfavored disclosure during the ERISA Class Period. *See In re BP*, 2017 WL 914995, at *5.

Even if the ERISA Class Period is separated to consider the January 1, 2014 to April 30, 2014 time period in isolation, the EAC does not contain facts showing that a reasonable fiduciary could not have concluded that disclosure during that period would do more harm than good. First, reliance on the single fact that the Fund turned out to be a net purchaser for four months of the ERISA Class Period to show fiduciary imprudence and the viability of an alternative action constitutes pleading imprudence by hindsight, which is insufficient. *See Roth*, 16 F.3d at 918; *Rinehart*, 817 F.3d at 63-64. Second, there is little indication that Defendants knew or should have predicted that the Fund would be a net purchaser in the first four months of 2014 or that purchases would outnumber sales by approximately twenty to one; the EAC only alleges that Defendants were informed about net inflows for Q1 2014 in June 2014, after the ERISA Class Period ended. (*See* EAC ¶ 82.) Otherwise, the EAC only alleges that for the entire prior year, the Fund was a net seller. (*See id.* ¶ 61.) Third, as *Dudenhoeffer* contemplates, disclosure may cause "a drop in the stock price and a concomitant drop in the value of the stock *already held by the fund*." 134 S. Ct. at 2473 (emphasis added); *see also Saumer*, 853 F.3d at 864 (considering whether disclosure would have hurt participants "already invested in the ESOP"). Disclosure could also "spook" the market. *See In re BP*, 2017 WL 914995, at *5. The Court will not supplement Plaintiffs' failure to plead facts addressing these and other concerns by speculating

36

that a prudent fiduciary could not have concluded that disclosure would do more harm than good during the ERISA Class Period. *See Amgen*, 136 S. Ct. at 759-60; *In re Idearc*, 2016 WL 7189980, at \*5.

In summary, Plaintiffs do not plausibly allege that a prudent fiduciary could not have concluded that disclosure would do more harm than good in the circumstances. Outside of the allegations discussed above, Plaintiffs only conclusorily allege that this is the case, (*see* EAC ¶ 150-51), or allege that had disclosure occurred, the Plan participants would have likely avoided losses as great as those later sustained, (*see id.* ¶ 152, 158-59). Accordingly, Plaintiffs fail to meet *Dudenhoeffer*'s pleading standards with respect to the disclosure alternative.

> ### d.  Sent Targeted Letters to Plan Participants, Sought Guidance from the DOL, SEC, or Other Experts, or Resigned as Fiduciaries

Defendants argue that there is no reason to think that sending targeted letters to Plan participants, seeking guidance from regulators or experts, or resigning as fiduciaries would have led Defendants to make different decisions and that these alternative actions could have implicated disclosure concerns. (*See* E. Def. Br. 20-22.) Because Plaintiffs do not address these alternatives in their response memorandum, Defendants argue that Plaintiffs waive any arguments for the viability of these alternative actions. (*See* E. Def. Reply Br. 12.)

For the same reasons that Plaintiffs fail to plead the other alternative actions, they also fail to adequately allege these alternative actions. Sending targeted letters recommending diversified holdings would likely add nothing to the information already provided to Plan participants and could pose the same disclosure problems identified above. (*See* E. Def. Br. 22.) Seeking the DOL and SEC's guidance is really no different from disclosure because doing so would still require public disclosure. *See In re BP*, 2017 WL 914995, at \*6. It is also unclear how outside experts would have affected Defendants' decision-making. *See In re Idearc*, 2016 WL

7189980, at *6 ("The Court does not see how the advice of a third party would have changed the Defendants' options."). And resigning would only shift responsibility to other fiduciaries. *See In re Idearc*, 2016 WL 7189980, at *6. Without allegations explaining how any of these alternatives would have been prudent in the circumstances or led to different decisions, Plaintiffs fail to meet *Dudenhoeffer*'s pleading standard.

   e. Engaging in a Reasoned Prudence Analysis

   Plaintiffs allege, but do not argue, that Defendants violated ERISA by failing to engage in a "reasoned decision-making process" regarding the continued prudence of investing in Target stock. (EAC ¶¶ 6, 181, 187.) Defendants term this allegation a "procedural prudence" alternative action and argue it should be disregarded because Plaintiffs do not allege how engaging in a more-thorough review of the Fund's performance would have led Defendants to make different decisions. (*See* E. Def. Br. 23 n.9.)

   The EAC does not contain any facts showing that a more thorough review process would have led prudent fiduciaries to make different decisions about investing in Target stock. Furthermore, Plaintiffs' overarching duty of prudence theory is not that PIC members were uninformed about Target stock's detailed performance history, but instead that they failed to act prudently because they *were informed* about material, nonpublic information concerning the *company*. Thus, the rest of the EAC contradicts the assertion that Defendants are at fault for the complained-of losses due to a deficient review process.

## B. Count II for Breach of the Duty of Loyalty

   ERISA § 404(a)(1)(A), codified at 29 U.S.C. § 1104(a)(1)(A), provides that fiduciaries must discharge their duties in the sole interest of participants and beneficiaries, for the exclusive purpose of providing them benefits. Like the duty of prudence, this standard is objective; it

focuses on the fiduciaries' conduct preceding a challenged decision, rather than the results of that decision. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009). And like breaches of the duty of prudence, breaches of the duty of loyalty require proving: (1) that the defendants acted as fiduciaries, (2) they breached their fiduciary duties, and (3) the breach caused a loss to the plan. *Id.* at 594.

Plaintiffs allege that all Defendants breached their duty of loyalty by not avoiding conflicts of interest and by placing their own and/or Target's interests above the interests of Plan participants. (*See* EAC ¶¶ 194, 200.) Defendants committed these breaches when they failed to engage independent fiduciaries, (*id.* ¶ 194), made direct or indirect communications with Plan participants omitting or misrepresenting information regarding or materially related to investments in Target stock, (*id.* ¶¶ 195, 208), and knowingly participated in each other's' failure to protect the Plan from such breaches, (*id.* ¶ 199).

### 1. Failure to Engage Independent Fiduciaries and Omission of Material, Nonpublic Information

Defendants argue that Plaintiffs' breach of the duty of loyalty theories based on failure to engage independent fiduciaries and failure to disclose material, nonpublic information about the state of Target Canada's supply chain are really just breach of the duty of prudence claims in disguise. (*See* E. Def. Br. 25-26; E. Def. Reply Br. 13-14.)

Plaintiffs' own argument to the contrary implicitly admits such a similarity. For example, Plaintiffs argue that "if a fiduciary *decides between the available courses of action* based on the interests of himself or his employer, the fiduciary has breached the duty of loyalty." (E. Pl. Br. 34 (emphasis added).) Plaintiffs further state, "no *prudent* fiduciary could, exercising his or her duty of loyalty, have made the same decisions as Defendants." (*Id.* (emphasis added) (quoting EAC ¶ 15).) The EAC also betrays Plaintiffs' arguments that the breach of the duty of loyalty

claims are separate by alleging that such claims concern "breaches . . . for continuing to allow the investment of the Plan's assets in Target Stock throughout the [ERISA] Class Period despite the fact that they knew or should have known that such investment was *imprudent*." (EAC ¶ 190 (emphasis added).) It also alleges that Defendants were "hopelessly conflicted *and making imprudent decisions*." (*Id.* ¶ 12 (emphasis added).)

Plaintiffs' breach of the duty of loyalty claims based on the theories that Defendants should have engaged independent fiduciaries or disclosed material, nonpublic information are derivative of Plaintiffs' breach of the duty of prudence claims. *See Brown v. Medtronic, Inc.*, 628 F.3d 451, 461 (8th Cir. 2010) (holding that duty of loyalty claims and monitoring claims could be dismissed because they were derivative of insufficiently pled breach of the duty of prudence claims); *see also In re Citigroup ERISA Litig.*, 662 F.3d 128, 134 (2d Cir. 2011) (similar) *abrogated on other grounds by Dudenhoeffer*, 134 S. Ct. 2459; *Wright v. Medtronic, Inc.*, No. 09-CV-443 (PJS/AJB), 2011 WL 31501, at *8 (D. Minn. Jan. 5, 2011) (similar). Because the Court determines that Plaintiffs do not adequately allege breaches of the duty of prudence under *Dudenhoeffer*, the Court finds that Plaintiffs' derivative breach of the duty of loyalty claims also fail. Allowing a claim that would be foreclosed by *Dudenhoeffer*, based on failure to take an alternative action, to proceed when pled as a breach of the duty of loyalty would exacerbate the rock-and-hard-place dilemma discussed in that case. *See* 134 S. Ct. 2470.

Even if Plaintiffs' claims are not derivative, the EAC does not state a plausible breach of the duty of loyalty. For example, the EAC fails to plausibly allege that Defendants were so conflicted that the duty of loyalty required them to engage independent fiduciaries. Far from presenting a case of inherent conflict, Plaintiffs conclusorily allege that certain Defendants "plac[ed] their own and/or [Target's] interests above the interests of the participants," and were

motivated to "entrench management and provide other benefits to [Target]," (EAC ¶¶ 167, 194.)
But Defendants' mere positions and financial interests in Target cannot alone support a claim
based on conflicts of interest. *See In re Citigroup*, 662 F.3d at 145-46 ("Under plaintiffs'
reasoning, almost no corporate manager could ever serve as a fiduciary of his company's Plan.
There simply is no evidence that Congress intended such a severe interpretation of the duty of
loyalty."); *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 756 F. Supp. 2d 330, 355
(S.D.N.Y. 2010) ("[T]he purported conflict would exist for all corporate insiders, who are
charged with managing the affairs of the corporation; it would deprive the plans of services of
the most knowledgeable individuals."); *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 479
(S.D.N.Y. 2005).

In addition, ERISA does not "impose a wide-ranging duty of disclosure on corporate
insiders who serve as ERISA fiduciaries. *Wright*, 2011 WL 31501, at *7. "[I]mposing such a
duty 'would either render much of securities law a dead letter, or (more likely) dissuade
employers from offering company stock to employees in the first place, in direct contravention
of Congress's objectives when it passed ERISA.'" *Id.* (quoting *Gearren v. McGraw–Hill Cos.*,
690 F. Supp. 2d 254, 273 (S.D.N.Y. 2010)). ERISA is properly read only to require disclosure of
"plan- and benefit-specific information that is of interest to plan participants,"[14] whereas the

---

[14] Omissions relating to nonpublic information about "bad business decision[s]" are "not
comparable" to the kinds of omissions that are actionable under ERISA. *Howell v. Motorola,
Inc.*, 633 F.3d 552, 572 (7th Cir. 2011); *see also Kalda v. Sioux Valley Physician Partners,
Inc.*, 481 F.3d 639, 644 (8th Cir. 2007) ("[A] fiduciary . . . cannot remain silent if it knows or
should know that the beneficiary is laboring under a material misunderstanding of *plan
benefits*." (emphasis added)). Where the Eighth Circuit Court of Appeals has addressed
disclosure of nonpublic information, it has done so in relation to plan information, not general
company information. *See, e.g.*, *Braden*, 588 F.3d at 598-600 (failure to disclose that
investment fund options in a plan charged higher fees than comparable funds and shared
revenue with the trustee); *Shea v. Esensten*, 107 F.3d 625, 628-29 (8th Cir. 1997) (failure to

securities laws "define when general financial and corporate information must be provided to the investing public." *Id.* Therefore, "employee-investors who believe that material information has been unlawfully withheld must, like every other member of the investing public, seek redress under the securities laws." *Id.*; *see Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1285-86 (11th Cir. 2012) ("We will not create a rule that converts fiduciaries into investment advisors."); *In re Citigroup*, 662 F.3d at 143 ("We decline to . . . create a duty to provide participants with nonpublic information pertaining to specific investment options."); *Edgar v. Avaya, Inc.*, 503 F.3d 340, 350 (3d Cir. 2007) *abrogated on other grounds by Dudenhoeffer*, 134 S. Ct. 2459; *In re Lehman Bros. Sec. & ERISA Litig.*, 113 F. Supp. 3d 745, 767-68 (S.D.N.Y. 2015), *aff'd sub nom. Rinehart*, 817 F.3d 56, *cert. denied,* 137 S. Ct. 1067 (2017).

### 2. Direct or Indirect Misleading Communications with Participants

Plaintiffs contend that Defendants made direct and indirect communications with Plan participants that were inaccurate and breached the duty of loyalty.[15] (*See* E. Pl. Br. 34-35.) They allege that "[t]hese communications included, but were not limited to, conference calls with analysts, SEC filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions)." (EAC ¶ 195.) They conclusorily allege that Defendants "acted as fiduciaries to the extent of this communication activity." (*Id.*)

The duty of loyalty "requires fiduciaries to 'deal fairly and honestly with all plan members.'" *Braden*, 588 F.3d at 598 (quoting *Shea v. Esensten,* 107 F.3d 625, 628 (8th Cir.

---

disclose referral agreements underlying an ERISA health benefits plan where such arrangements were material to a patient's ability to trust doctors' recommendations).

[15] Plaintiffs' breach of the duty of loyalty theory based on direct or indirect communications may also be derivative of the breach of the duty of prudence claims—the similarity being that Plaintiffs are really just complaining that Defendants should have made different statements than they did. However, the Court assumes, without deciding, that this claim is distinct.

1997), *cert. denied,* 522 U.S. 914 (1997)). Thus, it is a breach of the duty of loyalty to affirmatively mislead participants or beneficiaries. *Id.*

First, Plaintiffs do not plead one single misleading or inaccurate statement made by Defendants who are only PIC members or Plan administrators. Nor do Plaintiffs identify any instance in which those Defendants communicated any challenged statements to Plan participants. With respect to the other Defendants (Target, Steinhafel, and Mulligan), Plaintiffs do not allege—other than conclusorily—that such Defendants acted in a fiduciary capacity (the first element of a breach of the duty of loyalty claim) when making any challenged statements.

ERISA requires that "the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions." *Pegram v. Herdrich*, 530 U.S. 211, 225 (2000). A fiduciary acts in a fiduciary capacity when he/she/it acts "in relation to a plan" and performs a "fiduciary function." *Id.* at 226; *see also* 29 U.S.C. § 1002(21)(A). Assuming, without deciding, that public statements made in the normal course of business may constitute actionable, "indirect" communications, the EAC otherwise contains no instances in which Target, Steinhafel, or Mullian directly communicated any of the challenged statements to Plan participants. And as to the indirect communications, there are no non-conclusory allegations showing that Defendants' challenged statements were made in relation to Plan administration or any fiduciary function. Thus, Plaintiffs fail to plausibly allege a breach of the duty of loyalty based on directly or indirectly communicating misleading statements to Plan participants. *See Gearren v. The McGraw-Hill Cos.*, 660 F.3d 605, 610-11 (2d Cir. 2011); *In re Citigroup*, 662 F.3d at 143.[16]

---

[16] Plaintiffs cite *Morrison v. MoneyGram Int'l, Inc.*, 607 F. Supp. 2d 1033, 1054-55 (D. Minn. 2009) in support of their communications claim. (*See* E. Pl. Br. 34.) However, in that case, the plaintiffs alleged that the defendant incorporated SEC filings into the plan summary

*3. Co-fiduciary Liability*

A "claim of co-fiduciary liability . . . must co-exist with *some* breach by a fiduciary of their duties under ERISA." *Krueger v. Ameriprise Fin., Inc.*, No. 11-CV-2781 (SRN/JSM), 2012 WL 5873825, at *19 (D. Minn. Nov. 20, 2012) (quoting *Crocker v. KV Pharm. Co.*, 782 F. Supp. 2d 760, 788 (E.D. Mo. 2010)). Because the foregoing shows that Plaintiffs fail to plausibly plead that such a breach took place, this theory of liability also fails.

## C. Count III for Breach of the Duty to Monitor

Plaintiffs allege that Defendants Target, Steinhafel, and Mulligan breached their duty to monitor PIC appointees, ensure that appointees knew the full extent of Target's situation, and remove appointees whose performance was inadequate. (*See* EAC ¶ 217.) They also allege that these Defendants are liable for each other's breaches of the duty to monitor. (*See id.* ¶ 219.) Defendants argue that this claim should be dismissed because it is derivative of the fiduciary duty claims, which are inadequately pled. (*See* E. Def. Br. 27.) Plaintiffs respond that the claims *are derivative* of the other claims, but that the claims are still independently maintainable. (*See* E. Pl. Br. 37-28.)

Under ERISA, appointing fiduciaries "cannot escape liability by passing the buck to another person and then turning a blind eye." *Howell v. Motorola, Inc.*, 633 F.3d 552, 573 (7th Cir. 2011). As such, appointing fiduciaries must review the performance of trustees and other fiduciaries "in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards." *Id.* (quoting 29 C.F.R. § 2509.75-8 at FR-17). However, "Plaintiffs cannot maintain a claim for breach of the duty to

---

description and plan prospectuses and, acting as plan fiduciary, distributed such documents to participants. *See id.* By comparison, Plaintiffs do not make such allegations and identify no single instance in which Defendants, when acting in their fiduciary capacities, relayed any challenged statements directly to Plan participants.

monitor . . . absent an underlying breach of the duties imposed under ERISA." *Rinehart*, 817

F.3d at 68 (citation omitted); *see Brown*, 628 F.3d at 461; *see also Whitley*, 838 F.3d at 525

(addressing claims for breaches of the duty to monitor and the duty of prudence).

Because Plaintiffs fail to plausibly plead that Defendants breached any fiduciary duties,

the breach of the duty to monitor claims also fail. In addition, even if such claims were

independently actionable, "ERISA does not impose a duty on appointing fiduciaries to keep their

appointees apprised of nonpublic information." *Rinehart*, 817 F.3d at 68 (quoting *In re Lehman*

*Bros.*, 113 F. Supp. 3d at 765).

## V. LEAVE TO AMEND

Plaintiffs in both the securities and ERISA actions request leave to amend if the Court

decides to dismiss all or any part of their claims. (*See* S. Pl. Br. 66 n.41; E. Pl. Br. 38.)

Defendants argue that such requests should be denied because Plaintiffs have not moved for

leave to amend or offered any proposed amendments. (*See* Securities Defendants' Reply

Memorandum ("S. Def. Reply Br.") 22-23, S. Dkt. No. 89; E. Def. Reply Br. 16.)

The Court has discretion to deny informal requests for leave to amend unaccompanied by

proposed amendments. *See Glickert v. Loop Trolley Transp. Dev. Dist.*, 792 F.3d 876, 880 (8th

Cir. 2015); *In re 2007 Novastar Fin. Inc., Sec. Litig.*, 579 F.3d 878, 884-885 (8th Cir. 2009);

*Jacobs Trading, LLC v. Ningbo Hicon Int'l Indus. Co., Ltd.*, 872 F.Supp.2d 838, 850 (D. Minn.

2012). The Court denies Plaintiffs' requests.

## VI. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT

IS ORDERED THAT:

1. Defendants' Joint Motion to Dismiss in the securities action [Dkt. No. 69 in Master File No. 16-CV-1315 (JNE/BRT)] is GRANTED.

2. Defendants' Motion to Dismiss in the ERISA action [Dkt. No. 28 in Master File No. 16-CV-2400 (JNE/BRT)] is GRANTED.

3. The Securities Amended Complaint [Dkt. No. 57 in Master File No. 16-CV-1315 (JNE/BRT)] is DISMISSED WITHOUT PREJUDICE.

4. The ERISA Amended Complaint [Dkt. No. 22 in Master File No. 16-CV-2400 (JNE/BRT)] is DISMISSED WITHOUT PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: July 31, 2017.

s/Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge